FILED

2024 Sep-20  PM 03:24
U.S. DISTRICT COURT
N.D. OF ALABAMA

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## EASTERN DIVISION

| | |
|---|---|
| **JOHN RUSSELL CALHOUN,** ] | |
| ] | |
| **Petitioner,** ] | |
| ] | |
| **v.** ] | **Case No.: 1:18-cv-0874-ACA** |
| ] | |
| **TERRY RAYBON, Warden of** ] | |
| **Holman Correctional Facility,** ] | |
| ] | |
| **Respondent.** ] | |

## MEMORANDUM OPINION AND ORDER

John Russell Calhoun, an Alabama prisoner sentenced to death on four capital murder charges, petitions for a writ of habeas corpus under 28 U.S.C. § 2254, asserting challenges to both his convictions and his sentences. (Docs. 1, 1-1). The court **WILL DENY** Mr. Calhoun's petition **IN PART** and will set an evidentiary hearing on the claim that he is ineligible for execution under *Atkins v. Virginia*, 536 U.S. 304 (2002).

## I.      BACKGROUND

"In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct." 28 U.S.C. § 2254(e)(1). The court therefore draws its description of the facts from the state courts' findings, supplemented when necessary by the trial transcripts.

1.    The Crime

In May 1998, Loretta Phillips and her daughter were out placing signs advertising a yard sale that Mrs. Phillips and her husband, Tracy Phillips, were having at their house. (Doc. 18-2 at 49). Mr. Calhoun approached Mrs. Phillips to inquire about a television being sold at the yard sale. (*Id.* at 49–50). Because he said he would not be able to attend the yard sale, Mrs. Phillips brought him back to the house, where Mr. Calhoun introduced himself as "Joe Green" and talked briefly with Mr. Phillips before leaving. (*Id.* at 50; doc. 18-6 at 133).

Later that evening, the Phillipses's neighbor called to tell Mrs. Phillips that a man was looking in the windows of the house. (Doc. 18-2 at 50); *Calhoun v. State*, 932 So. 2d 923, 934 (Ala. Crim. App. 2005) ("*Calhoun I*"). Mrs. Phillips told her husband, who went outside to investigate. (Doc. 18-2 at 50). The man then entered the house wearing a stocking mask and gloves and pointing a gun at Mr. Phillips. (*Id.*; doc. 18-6 at 140–41). Despite the mask, Mrs. Phillips recognized Mr. Calhoun from earlier in the day. (Doc. 18-2 at 50). She ran upstairs to lock herself, her eleven-year-old daughter, and her daughter's friend inside a room. (*Id.*). After she had ushered the children out to a balcony (doc. 18-6 at 142), Mr. Phillips told her to open the door because Mr. Calhoun had a gun to Mr. Phillips's head. (Doc. 18-2 at 51). She unlocked the door and let the men inside. (*Id*).

2

Inside the room, Mr. Phillips pleaded for Mr. Calhoun to take anything he wanted and go, but Mr. Calhoun asked for Mrs. Phillips to undress. (*Id.*). After she did so, Mr. Calhoun told her to get onto the bed and spread her legs. *Calhoun I*, 932 So. 2d at 934. When she obeyed, Mr. Calhoun forced Mr. Phillips to place his face "against [her] private area" before shooting him in the back of the head, killing him immediately. (Doc. 18-2 at 51). The Phillipses's daughter began screaming, crying, and offering for him to take her "dollies," and Mr. Calhoun "threatened to kill them all." (*Id.*). Mr. Calhoun put the two girls in another bedroom and took Mrs. Phillips downstairs, where, holding her at gunpoint, he attempted to rape her, performed oral sex on her, forced her to perform oral sex on him, and finally succeeded in raping her. (*Id.* at 51–52).

During the rape, Mrs. Phillips struggled with Mr. Calhoun for the gun, during which time each of them bit the other. (Doc. 18-2 at 52; doc. 18-6 at 152). Mr. Calhoun tried to shoot her, but the gun "only clicked." (Doc. 18-2 at 52). When Mrs. Phillips attempted to reach a telephone, Mr. Calhoun beat her with the gun then used the gun to penetrate her vagina and anus. (*Id.*). Afterward, he raped her again with his penis. (*Id.*).

Mr. Calhoun then told Mrs. Phillips to go upstairs and get Mr. Phillips's wallet. (Doc. 18-2 at 52). She refused but offered him jewelry stored in the downstairs

bathroom. (*Id.* at 52–53). He let her keep her "anniversary ring" and threw "some of the jewelry down" (doc. 18-6 at 158), but took "the remaining jewelry items" (doc. 18-2 at 53). Mr. Calhoun initially told Mrs. Phillips he was going to take her with him but let her go when they neared the door to the house, telling her to run. (*Id.*). She ran upstairs and called the police. (*Id.*).

The police had already received one emergency call about a suspicious car and person near the Phillipses's house (doc. 18-2 at 50), so when Mrs. Phillips called, they were already in the neighborhood (*id.* at 53). Mrs. Phillips was taken to a hospital, where she spent over a week in the intensive care unit. (*Id.* at 53).

Meanwhile, Mr. Calhoun had left in his car. (*Id.*). Police spotted and pursued the car, but Mr. Calhoun escaped. (*Id.* at 53–54). A sheriff found Mr. Calhoun's car in some bushes near where his mother lived. *Calhoun I*, 932 So. 2d at 935. During a search the following day, a police officer spotted Mr. Calhoun, but he eluded them. *Id.* Police eventually found Mr. Calhoun hiding under a bed in a nearby residence. *Id.* Mr. Calhoun was thirty years old at the time. (Doc. 18-11 at 160).

    2.    Trial Proceedings

A grand jury issued four indictments charging Mr. Calhoun with capital murder: murder during a first degree robbery, murder during a first degree burglary, murder during a first degree sodomy, and murder during a first degree rape. (Doc.

18-1 at 15–16, 184–85; doc. 18-2 at 86–87, 197–98); *see* Ala. Code § 13A-5-40(a)(2)–(4) (1998). The state trial court consolidated the indictments before trial. (Doc. 18-6 at 44).

Many witnesses testified during the guilt phase of the trial, including Mrs. Phillips, her children, several of their neighbors who witnessed parts of the events, two of Mr. Calhoun's friends with whom he had spent time earlier in the day, Mr. Calhoun's mother Patricia Garrett, police officers who responded to the 911 calls and pursued Mr. Calhoun after the attack, medical professionals who treated and conducted a rape examination of Mrs. Phillip, and forensic experts. (*See generally* doc. 18-6 at 96–203; docs. 18-7 through 18-9; doc. 18-10 at 3–149). Among the forensic witnesses was Angelo Della Manna, who testified that the blood found on Mr. Calhoun's "discarded clothes was consistent with" Mrs. Phillips's blood and partial DNA results from semen collected from Mrs. Phillips "was consistent with Calhoun's DNA," but definitely excluded Mr. Phillips. *Calhoun I*, 932 So. 2d at 934; (doc. 18-9 at 75, 172, 174, 179–80, 198). A dental expert testified that comparing the bite on Mrs. Phillips to Mr. Calhoun's teeth showed an "extremely high degree of match" and comparing the bite on Mr. Calhoun to Mrs. Phillips's teeth showed "a high level of consistency, [but] probably not as high as the other bite." (Doc. 18-9 at 106); *Calhoun I*, 932 So. 2d at 934. The jury found Mr. Calhoun guilty of all four

counts of capital murder. (Doc. 18-11 at 84–85; *see also* doc. 18-1 at 141; doc. 18-2 at 44, 158; doc. 18-3 at 63).

At the sentencing phase of the trial, the State presented evidence that Mr. Calhoun had two previous convictions for attempted first degree rape and a conviction for first degree sexual abuse. (Doc. 18-11 at 103, 107). The defense called two witnesses to present mitigating evidence: Ms. Garrett (Mr. Calhoun's mother), and psychologist Dr. Alvin Shealy.[1] (Doc. 18-11 at 109, 115–116).

Ms. Garrett described her own level of education as "I really—I did not—third grade. I could not learn so I dropped out of school." (*Id.* at 114). Mr. Calhoun had dropped out of school in or after sixth grade and received no further schooling. (*Id.* at 111, 114). Mr. Calhoun's father had never been involved in his life and his stepfather had been in and out of jail during Mr. Calhoun's childhood. (*Id.* at 110–111). Mr. Calhoun had been married and had a child, though he and his wife had divorced. (Doc. 18-11 at 111–12). Despite the divorce, he maintained a good relationship with his son. (*Id.* at 112–13). Ms. Garrett testified that Mr. Calhoun had been a good son, a good father, and a churchgoer, and she "want[ed] him to live." (*Id.* at 112–13).

---

[1] The spelling of Dr. Shealy's name varies throughout the record. The court uses the spelling from Dr. Shealy's curriculum vitae. (Doc. 18-1 at 63).

The court will describe Dr. Shealy's testimony in more detail later, but in summary, he testified that Mr. Calhoun's self-reported intoxication during the offense, plus something approaching an impulse control disorder and "what appears to be a compulsive sexual disorder . . . could lead to impairment of his ability to conform his conduct to the requirements of law." (*Id.* at 133).

The jury recommended in a ten to two vote that Mr. Calhoun receive the death penalty. *Calhoun I*, 932 So. 2d at 935; (doc. 18-11 at 175). The parties did not present any additional evidence at the judicial hearing that followed (doc. 18-11 at 178), and the trial court sentenced Mr. Calhoun to death. (Doc. 18-11 at 182). In a series of separate orders, the state trial court made findings of fact about the guilt and penalty phases of the trial. (Doc. 18-2 at 49–50). The court found that the State had proved four aggravating circumstances: Mr. Calhoun had previous convictions for felonies involving the use or threat of violence to the person and Mr. Calhoun committed the murder during a robbery, a burglary, and a rape. (*Id.* at 55, 57–58). The court acknowledged that, through Dr. Shealy and Ms. Garrett, Mr. Calhoun had offered evidence of statutory and non-statutory mitigating circumstances, but it found no mitigating circumstances existed. (*See id.* at 55, 59–60). The court found that "the conduct of the defendant constituted a brutal, aggravated, merciless and intentional killing of a man." (*Id.* at 55–56). In one of the orders, the court stated: "[T]he

7

defendant is a black male and the victim, Tracy Phillips, was a white male," then described the racial composition of the jury. (Doc. 18-2 at 56).

### 3.   Direct Appeal

On direct appeal, Mr. Calhoun challenged various aspects of his trial and sentencing. *See generally Calhoun I*, 932 So. 2d at 935–79. While his appeal was pending, the United States Supreme Court issued *Atkins v. Virginia*, 536 U.S. 304 (2002), so the Alabama Court of Criminal Appeals ordered supplemental briefing on the applicability of that decision. (*See* doc. 18-17 at 98). This court will address the details of his arguments where relevant in the discussion section of this opinion. In 2005, the Alabama Court of Criminal Appeals affirmed the convictions and sentences, *id.* at 979, and the Alabama Supreme Court denied certiorari, *id.* at 932. In 2006, the United States Supreme Court denied certiorari. *Calhoun v. Alabama*, 548 U.S. 926 (2006)

### 4.   Postconviction Proceedings

Mr. Calhoun petitioned the Circuit Court of Talladega County for postconviction relief under Alabama Rule of Criminal Procedure 32. (Doc. 18-23 at 133–199). In 2015, the state habeas trial court summarily denied Mr. Calhoun's petition in a reasoned opinion. (Doc. 18-26 at 79–154). In 2016, the Alabama Court of Criminal Appeals affirmed in a reasoned opinion. *Calhoun v. Alabama*, 261 So.

3d 457 (Ala. Crim. App. 2016) ("*Calhoun II*"). In 2017, the Alabama Supreme Court denied certiorari without an opinion. (Doc. 18-33 at 203).

Mr. Calhoun then filed his § 2254 petition, asserting multiple claims, some of which have multiple subclaims. (*See* doc. 1 at 2–4). In the interest of clarity, the court will give each claim and subclaim its own number as follows:

(1)   Under *Atkins*, Mr. Calhoun cannot be executed because he is intellectually disabled ("Claim One");

(2)   Appellate counsel was ineffective for failing to adequately present the *Atkins* claim during Mr. Calhoun's direct appeal ("Claim Two");

(3)   Trial counsel were ineffective during the penalty phase of the trial for failing to investigate and present mitigating evidence ("Claim Three");

(4)   Trial counsel were ineffective during the guilt phase of the trial in several ways:

> a.   by waiving a challenge under *Batson v. Kentucky*, 476 U.S. 79 (1986), and failing to challenge the denial of the Sixth Amendment's fair cross section requirement ("Claim Four");

> b.   by failing to challenge the use of Mr. Calhoun's mother as a "court witness" ("Claim Five");

> c.   by failing to object to an improper jury instruction about the capital murder instruction ("Claim Six")

> d.   by failing to request an instruction on the lesser included offense of felony murder ("Claim Seven");

> e.   by failing to object to victim impact testimony or request a limiting instruction ("Claim Eight");

      f.  by failing to object to improper bad act evidence or request a limiting instruction ("Claim Nine");

      g.  by failing to object to prosecutorial misconduct ("Claim Ten");

      h.  by failing "to object to and effectively challenge prejudicial evidence" ("Claim Eleven");

      i.  by failing "to explain why Mr. Calhoun was not guilty of capital murder" ("Claim Twelve");

(5)    The State denied Mr. Calhoun a fair trial by engaging in prosecutorial misconduct ("Claim Thirteen");

(6)    The state trial court violated the Eighth Amendment by failing to properly consider the mitigating evidence ("Claim Fourteen");

(7)    The state trial court violated the Eighth Amendment by improperly considering the races of Mr. Calhoun and the victim ("Claim Fifteen");

(8)    The State violated *Batson* ("Claim Sixteen");

(9)    The state trial court erroneously denied Mr. Calhoun's motion to strike a juror for cause ("Claim Seventeen");

(10)   The state trial court failed to examine the jury selection process to determine whether the jury pool represented a fair cross section of the community ("Claim Eighteen");

(11)   Under *Ring v. Arizona*, 536 U.S. 584 (2002), Mr. Calhoun's sentence is unconstitutional ("Claim Nineteen"); and

(12)   The cumulative effect of these errors denied Mr. Calhoun due process ("Claim Twenty").

(Doc. 1 at 2–4, 36–78; doc. 1-1 at 1–75).

10

## II.   DISCUSSION

The State challenges each of Mr. Calhoun's claims, some of them on the merits and some of them as procedurally defaulted. (Doc. 21). The court will address the claims in numeric order, except that where an ineffective-assistance claim is based on a substantive constitutional claim, the court will discuss both the substantive claim and the ineffective-assistance claim together.

Because Mr. Calhoun filed his § 2254 petition after April 24, 1996, the Anti-Terrorism and Effective Death Penalty Act of 1996 ("AEDPA") governs this action. *Guzman v. Sec'y, Fla. Dep't of Corr.*, 663 F.3d 1336, 1345 (11th Cir. 2011). Under AEDPA, where a state court has adjudicated a habeas claim on the merits, a federal court may not grant relief except in highly limited circumstances. *See* 28 U.S.C. § 2254(d).

First, the court may grant habeas relief if the state court's decision (1) "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). "Clearly established federal law" means "the holdings, as opposed to the dicta, of [the United States Supreme] Court's decisions as of the time of the relevant state-court decision." *Williams v. Taylor*, 529 U.S. 362, 412 (2000). "Contrary to" federal law means the state court reached "a conclusion opposite to

11

that reached by [the Supreme] Court on a question of law or . . . the state court decide[d] a case differently than [the] Court . . . on a set of materially indistinguishable facts." *Id.* at 412–13. "Unreasonable application of" federal law means the state court correctly identified "the governing legal principle from [the Supreme] Court's decisions but unreasonably applie[d] that principle to the facts of the prisoner's case." *Id.* at 413. Section 2254(d)(1) sets "a highly deferential standard that is intentionally difficult to meet." *Meders v. Warden, Ga. Diagnostic Prison*, 911 F.3d 1335, 1348 (11th Cir. 2019). A petitioner cannot satisfy the standard merely by showing that the state court reached the wrong result; he must establish that the state court's ruling "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Virginia v. LeBlanc*, 582 U.S. 91, 94 (2017).

Alternatively, a federal court may grant habeas relief if the state court's decision "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2). The petitioner cannot satisfy § 2254(d)(2) by persuading the federal court that the state court's factual finding was wrong. *See Wood v. Allen*, 558 U.S. 290, 301 (2010) ("[A] state-court factual determination is not unreasonable merely because the federal habeas court would have reached a different conclusion in the first

instance."). Instead, the petitioner must establish that the evidence is "too powerful to conclude anything but the petitioner's factual claim" or that "the state court's finding was clearly erroneous." *Landers v. Warden, Att'y Gen. of Ala.*, 776 F.3d 1288, 1294 (11th Cir. 2015) (alteration and quotation marks omitted).

Moreover, § 2254 requires the court to presume the correctness of any factual findings by the state court, with the petitioner bearing the burden of rebutting that presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1). But even a successful showing under § 2254(e)(1) does not "necessarily mean the state court's decision was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding," as required for relief under § 2254(d)(2). *Pye v. Warden, Ga. Diagnostic Prison*, 50 F.4th 1025, 1035 (11th Cir. 2022) (en banc) (quotation marks omitted). A state court's erroneous factual findings can still result in a reasonable decision "so long as the decision, taken as a whole, doesn't constitute an unreasonable determination of the facts and isn't based on any such determination." *Id.* (quotation marks omitted).

Ultimately, if "fairminded jurists could disagree on the correctness of the state court's decision," the state court's decision is not unreasonable. *Harrington v. Richter*, 562 U.S. 86, 101 (2011) (quotation marks omitted). But relief is not automatic even if the petitioner can show that the decision was unreasonable. Instead,

if a petitioner establishes that a state court's decision is not entitled to deference under § 2254(d), the court reviews the claim *de novo*. *Madison v. Comm'r, Ala. Dep't of Corr.*, 761 F.3d 1240, 1243–44 (11th Cir. 2014).

    1.  <u>Claim One</u>

Mr. Calhoun contends that, under the Supreme Court's decision in *Atkins*, he is ineligible for execution because he is intellectually disabled, and the Alabama Court of Criminal Appeals' rejection of this claim without an evidentiary hearing was unreasonable. (Doc. 1 at 37–52). The State responds that the Court of Criminal Appeals reasonably rejected this claim based on the evidence before it. (Doc. 21 at 32–47).

During Mr. Calhoun's direct appeal, the United States Supreme Court issued *Atkins*, holding that executing "mentally retarded"—now called intellectually disabled—offenders violates the Eighth Amendment to the Constitution. 536 U.S. at 311, 321. The Court left "to the States the task of developing appropriate ways to enforce the constitutional restriction upon their execution of sentences." *Id.* at 317 (quotation marks and alterations omitted). Shortly after the United States Supreme Court issued *Atkins*, the Alabama Supreme Court issued *Ex parte Perkins*, 851 So. 2d 453, 456 (Ala. 2002), holding that the "broadest definition" of intellectual disability requires: (1) "significantly subaverage intellectual functioning (an IQ of 70 or

14

below")"; (2) "significant or substantial deficits in adaptive behavior"; and (3) manifestation of "these problems" before the defendant turned eighteen.[2]

Because Mr. Calhoun's presentence report indicated that he had a low intelligence quotient ("IQ"), the Alabama Court of Criminal Appeals ordered the parties to brief the applicability of *Atkins* to his case. *Calhoun I*, 932 So. 2d at 977–78. Mr. Calhoun argued that the trial record established his intellectual disability because two experts found his IQ to be below seventy and Mr. Calhoun showed deficits in his adaptive behavior that manifested before the age of eighteen based on his inability to complete high school, lack of vocational training, functional illiteracy, lack of independent living, and severe substance abuse problem. (Doc. 18-17 at 98, 104–10). Alternatively, Mr. Calhoun requested remand for "further factual development" in the trial court. (*Id.* at 111–13).

Because this court's evaluation of the Alabama Court of Criminal Appeals' decision is limited to the evidence before that court, the court describes that evidence

---

[2] After the Alabama Court of Civil Appeals decided Mr. Calhoun's direct appeal, the United States Supreme Court held that state courts cannot impose a rule that any IQ above seventy automatically forecloses a finding of intellectual disability. *Hall v. Florida*, 572 U.S. 701, 704 (2014). The *Hall* opinion is not relevant to the court's discussion of whether the state court's rejection of Mr. Calhoun's claim was a reasonable application of *Atkins* because the Supreme Court had not yet announced that legal principle at the time of the state court decision. *See* 28 U.S.C. § 2254(d)(1); *Lockyer v. Andrade*, 538 U.S. 63, 71–72 (2003); *see also Kilgore v. Sec'y, Fla. Dep't of Corr.*, 805 F.3d 1301, 1314 (11th Cir. 2015) (holding that *Hall* is not retroactively applicable).

in detail here. *See Cullen v. Pinholster*, 563 U.S. 170, 181 (2011) ("[R]eview under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits."). It consisted of a report from Dr. Kathy Ronan regarding Mr. Calhoun's competency and mental state, trial testimony from Dr. Shealy, the presentence report, and Ms. Garrett's testimony.

Dr. Ronan, a Ph.D. and a certified forensic examiner at Taylor Hardin Secure Medical Facility, evaluated Mr. Calhoun's "competency to stand trial and mental state at the time of the offense" at the order of the state trial court. (Doc. 18-1 at 74, 81). Dr. Ronan provided the trial court with a written report based on information acquired from defense counsel and the prosecutor, current psychological and intellectual testing, and an interview. (*Id.* at 75). Mr. Calhoun provided his own background information, as Dr. Ronan did not have contact information for Mr. Calhoun's family members. (*Id.*).

Dr. Ronan noted that "[c]ognitively, there were some areas of below normal functioning, although no severe deficits were observed." (*Id.* at 78). She had a doctoral graduate student administer the Wechsler Adult Intelligence Scale-Revised, and the student reported that Mr. Calhoun "did not appear to put forth his best effort but that he was cooperative, attentive, and appropriate during the testing." (Doc. 18-1 at 78). He scored a verbal IQ of 67, prorated performance IQ of 68, and prorated

full scale IQ of 66, "all of which fall within the upper part of the Mild Range of Retardation." (*Id.*). But Dr. Ronan concluded that "his inter-and intra- test patterns, as well as his questionable motivation and general presentation, suggest that although he may have intellectual deficits, he likely functions higher than this, probably in the Borderline range." (*Id.*). Nothing in the record identifies the IQ scores associated with the "borderline range."

Dr. Ronan also performed a test for Mr. Calhoun's current psychiatric and personality functioning by reading the items to him because of his history of special education. (*Id.* at 78). Dr. Ronan noted that he was capable of comprehending the questions but that he "substantially exaggerated psychiatric difficulties as well, way beyond what those who actually experience such difficulties report." (Doc. 18-1 at 78–79). According to her report, the validity indicators indicated an invalid profile. (*Id.* at 79).

Dr. Ronan's written report states that Mr. Calhoun told her he "went into special education in the sixth grade" but continued school until ninth grade, when he was sent to the Childersburg Children's Developmental Center for drawing a picture of his penis. (*Id.* at 76). He did not return to school after this. (*Id.*). He began drinking at age seventeen and using cocaine at age eighteen. (Doc. 18-1 at 76). He married when he was nineteen or twenty, but divorced three years later when he went to jail.

17

(*Id.* at 76). At some point he began using marijuana as well. (*Id.*). He attempted suicide when he was about twenty-six years old. (*Id.*).

In addition to Mr. Calhoun's own statements, Dr. Ronan determined based on information from the Calhoun County District Attorney's Office that the conduct underlying two attempted rape convictions occurred when Mr. Calhoun was twenty-two or twenty-three years old, the conduct underlying a sexual abuse conviction occurred when he was twenty-eight years old, and a female employee alleged that when he was twenty-eight he exposed himself and masturbated while talking to her at work. (Doc. 18-1 at 76–77).

During Dr. Ronan's examination of Mr. Calhoun, he "grabbed his penis with one of his hands outside of his clothing, after maneuvering his body to a point where the officers could not see him," and continued to squeeze himself for "several moments" until she told him to stop. (*Id.* at 77). He obeyed "and seemed embarrassed, but made no comments about the behavior nor did he repeat the behavior." (*Id.*). Dr. Ronan observed that the incident was significant; in her experience of nearly 700 evaluations, she had never seen an individual touch themselves in such a manner. (*Id.*). Her diagnostic impression of his history of "repeated sexually inappropriate behaviors including forced sexual contact" probably "[came] closest to fitting Impulse-Control Disorder, Not Otherwise Specified." (Doc. 18-1 at 77). In

18

Dr. Ronan's opinion, Mr. Calhoun did not suffer from a major debilitating psychiatric disordered but he did have a "Personality Disorder, Not Otherwise Specified with a mixture of antisocial and narcissistic features," cocaine and alcohol dependence, and marijuana abuse. (*Id.* at 79).

Defense counsel called Alvin Shealy to testify in mitigation at sentencing. Dr. Shealy is a forensic psychologist who defense counsel requested to evaluate Mr. Calhoun's competency to stand trial and "assess whether . . . there were any mitigating factors that might be relevant [to] sentencing." (Doc. 18-11 at 121). As a general matter, Dr. Shealy evaluates patients for this purpose by interviewing the patient, performing a mental status examination and psychological testing, and reviewing other psychological evaluations performed "and any other information" provided to him. (*Id*. at 122). In this case, Dr. Shealy interviewed Mr. Calhoun to determine his understanding of the charges against him and the criminal justice process. (*Id*.). Dr. Shealy also reviewed Dr. Ronan's report and performed an IQ test, the Bender-Gestalt test [sic], and some projected personality tests. Dr. Shealy attempted to administer the "MMPI[,] which is sort of a standard part of the psychological test family," but Mr. Calhoun "was not able to read well enough to understand the items on [it]" (*Id*. at 122–24).

Dr. Shealy testified that both he and Dr. Ronan concluded that Mr. Calhoun was competent to stand trial and that there was no justification for an insanity defense. (Doc. 18-11 at 124). Regarding Mr. Calhoun's intellectual functioning, Dr. Shealy reported only Mr. Calhoun's score on the verbal section of the IQ test. (*Id.*). Mr. Calhoun scored a 58 on that section, which falls in the classification of mild intellectual disability. (*Id.*). Dr. Shealy concluded that Mr. Calhoun was brighter than the score suggested. (*Id.*). Dr. Shealy did not address the administration or the results of any other tests he performed. (*Id.* at 121–37). Finally, Dr. Shealy noted Dr. Ronan's diagnoses of Mr. Calhoun with an impulse control disorder and a personality disorder and explained that either or both of those could lead to impairment of his ability to conform his conduct to the requirements of law. (Doc. 18-11 at 125).

The record also included the presentence report prepared by a probation and parole officer who interviewed Mr. Calhoun. (Doc. 18-1 at 160–76). Mr. Calhoun told the officer that he "was dismissed from [Talladega County Training School] for disciplinary reasons" during ninth grade. (*Id.* at 172). He was sixteen years old at the time. (*Id.*). According to the officer, "[i]t appears his overall school adjustment was unsatisfactory." (*Id.*). Mr. Calhoun stated that he could not read well or do mathematics and the officer noted his impression that Mr. Calhoun was "functionally

20

illiterate." (Doc. 18-1 at 172). Mr. Calhoun denied receiving vocational training or attending trade school but acknowledged having "on-the-job" instruction as a concrete finisher. (*Id.* at 172). He also reported working as an hourly concrete finisher at for at least five years and working for another employer before that. (*Id.*).

The last of the relevant evidence is Ms. Garrett's testimony. She testified that Mr. Calhoun had dropped out of school in or after sixth grade and had no further schooling. (Doc. 18-11 at 111, 114). Likewise, Ms. Garrett herself had dropped out of school after third grade because she "could not learn." (*Id.* at 114). Ms. Garrett testified that Mr. Calhoun had lived with Ms. Garrett "pretty much all his life," that Mr. Calhoun attended church, was a good father to his son, and that she wanted him to live. (*Id.* at 112–13).

The Court of Criminal Appeals summarily rejected Mr. Calhoun's *Atkins* claim. *Calhoun I*, 932 So. 2d at 977–78. The Court noted that Dr. Ronan and Dr. Shealy both performed IQ testing and found scores below seventy, but both also opined that Mr. Calhoun was malingering. *Id.* at 978. The Court found persuasive that Mr. Calhoun had been married, had a son with whom he had maintained a relationship, and had held jobs "his entire adult life," including "working as a concrete finisher and making a wage of $17 per hour" when he committed the murder. *Id.* Because the Alabama Supreme Court's denial of certiorari does not explain its

21

rationale, the court must "look through" to the Alabama Court of Criminal Appeals' opinion and presume that the Alabama Supreme Court adopted the same reasoning. *See Wilson v. Sellers*, 138 S. Ct. 1188, 1192 (2018).

Mr. Calhoun contends that the Court of Criminal Appeals' adjudication of his claim was based on an unreasonable application of clearly established federal law, under § 2254(d)(1), and an unreasonable determination of the facts, under § 2254(d)(2). (Doc. 1 at 45–52). The court concludes that the decision was not based on an unreasonable application of clearly established federal law but it was based on an unreasonable determination of the facts.

### a. Section 2254(d)(1)

Section 2254(d)(1) bars habeas relief unless the adjudication "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." Mr. Calhoun contends that the Alabama Court of Criminal Appeals' decision satisfies this requirement because under *Atkins*, *Bobby v. Bies*, 556 U.S. 825 (2009), *Brumfield v. Cain*, 576 U.S. 205 (2015), and *Moore v. Texas*, 581 U.S. 1 (2017), the state court improperly focused on Mr. Calhoun's adaptive strengths instead of his adaptive deficits and improperly decided on the claim based on evidence presented for mitigation purposes. (Doc. 1 at 45–47). In his reply brief, however, he disclaims any

22

reliance on post-*Atkins* decisions with respect to the reasonableness of the Alabama Court of Criminal Appeals' decision. (Doc. 27 at 31).

The court accepts this disclaimer because "clearly established Federal law" as used in § 2254(d)(1) means "the governing legal principle or principles set forth by the Supreme Court at the time the state court renders its decision." *Lockyer v. Andrade*, 538 U.S. 63, 71–72 (2003). The only exception is later-issued opinions that set out new "substantive" rules, such as rules that "place particular conduct or persons covered by [a] statute beyond the State's power to punish." *Schriro v. Summerlin*, 542 U.S. 348, 351–352 (2004) ("New *substantive* rules generally apply retroactively."); *see also Edwards v. Vannoy*, 141 S. Ct. 1547, 1560 (2021) (recognizing that another exception used to exist, but that it is "moribund. It must be regarded as retaining no vitality") (quotation marks omitted).

The Alabama Court of Criminal Appeals issued its decision, and the Alabama Supreme Court denied certiorari, in 2005. *Calhoun I*, 932 So. 2d at 923 (issued in 2005). But the United States Supreme Court did not issue *Bobby*, *Brumfield*, and *Moore* until years later. *See Moore*, 581 U.S. at 1 (2017); *Brumfield*, 576 U.S. at 205 (2015); *Bobby*, 556 U.S. at 825 (2009). Mr. Calhoun's disclaimer means he has advanced no argument that those decisions created new substantive rules that the court should apply in assessing the reasonableness of the Alabama Court of Criminal

23

Appeals' 2005 decision. The only United States Supreme Court decision in place at the time the Alabama Supreme Court decided Mr. Calhoun's *Atkins* claim was *Atkins*. And Mr. Calhoun's only *Atkins*-specific argument is that "state courts must not rely solely on evidence presented during trial in determining whether a defendant is intellectually disabled." (Doc. 27 at 29; *see also* doc. 1 at 47).

*Atkins* made no such holding. It held only that execution of intellectually disabled defendants is an excessive punishment and is therefore unconstitutional. *Atkins*, 536 U.S. at 321. *Atkins* "did not provide definitive procedural or substantive guides for determining when a person who claims [intellectual disability] will be so impaired as to fall within *Atkins*' compass." *Bobby*, 556 U.S. at 831 (quotation marks and alteration omitted). The Alabama Court of Criminal Appeals' decision was not contrary to or an unreasonable application of *Atkins*. *See* 28 U.S.C. § 2254(d)(1).

### b. *Section 2254(d)(2)*

Mr. Calhoun also contends that the decision "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding," 28 U.S.C. § 2254(d)(2), because that evidence does not refute Mr. Calhoun's claim that he was intellectually disabled (doc. 1 at 49–52; doc. 27 at 18–28). This court is limited to the "evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2). But even with that limitation, under the United

States Supreme Court's decision in *Brumfield v. Cain*, 576 U.S. 305 (2015) and the Eleventh Circuit's decision in *Burgess v. Comm'r, Ala. Dep't of Corr.*, 723 F.3d 1308 (11th Cir. 2013), the court must find that the Alabama Court of Criminal Appeals based its decision on an unreasonable determination of the facts.

To reiterate, in Alabama, a petitioner is considered intellectually disabled if he "(1) has a significantly subaverage intellectual functioning, i.e., an IQ of 70 or less; (2) has significant or substantial deficits in adaptive behavior; and (3) . . . these deficits manifested themselves in the developmental period, i.e., before the age of 18." *Calhoun I*, 932 So. 2d at 978. The court will address each prong separately.

### i.  Significantly subaverage intellectual functioning

Dr. Shealy's testimony and Dr. Ronan's written report are the only evidence of Mr. Calhoun's intellectual functioning—*i.e.*, his IQ—presented before Mr. Calhoun's direct appeal. The only objective evidence Dr. Shealy provided about Mr. Calhoun's IQ was his testimony that Mr. Calhoun scored a 58 on the verbal component of the Wechsler Adult Intelligence Scale. (Doc. 18-11 at 122–23). It is unclear if Dr. Shealy administered the whole test. According to Dr. Shealy, a score of 58 "falls in the classification of mild [intellectual disability]." (*Id.* at 123).

With respect to subjective evidence, Dr. Shealy testified that he was unable to administer a test (the MMPI) because Mr. Calhoun "was not able to read well enough

to understand the items on that." (*Id.* at 123). He explained that psychologists assume they are not being told the truth and suspect malingering. (*Id.* at 136). He believed Mr. Calhoun "really was more intelligent than he tried to lead [Dr. Shealy] to believe," and that because of what Dr. Shealy characterized as malingering, he "concluded that [Mr. Calhoun] actually was brighter than that and that he wasn't [intellectually disabled]." (*Id.* at 123). Dr. Shealy did not testify about any testing done to confirm whether Mr. Calhoun was malingering or the extent of any malingering on his scores. (*See id.* at 121–37).

Dr. Ronan's written report states that she had a doctoral graduate student administer the Wechsler Adult Intelligence Scale-Revised,[3] on which Mr. Calhoun scored a verbal IQ of 67, a prorated performance IQ of 68, and a prorated full scale IQ of 66, "all of which fall within the upper part of the Mild Range of [Intellectual Disability]." (Doc. 18-1 at 78). She also stated that "[c]ognitively, there were some areas of below normal functioning, although no severe deficits were observed." (*Id.*).

---

[3] The Wechsler Adult Intelligence Scale has evolved over time. The original "Wechsler Adult Intelligence Scale" was published in 1955, revised in 1981 with publication of the "Wechsler Adult Intelligence Scale–Revised," and revised again in 1997 with publication of the "Wechsler Adult Intelligence Scale–Third Edition." *Thomas v. Allen*, 614 F. Supp. 2d 1257, 1265 (N.D. Ala. 2009). Dr. Ronan examined Mr. Calhoun in 1998 and used the Revised version of the test. (Doc. 18-1 at 78). Dr. Shealy, who examined Mr. Calhoun in 2000 (doc. 18-11 at 121), testified that he administered the "[Wechsler] Adult Intelligence Scale" (*id.* at 122). It is not clear whether he meant that he administered the original test (which was used from 1955 to 1981) or one of the later versions. Nothing in the record explains how scoring or results differ across the different versions of the test.

She concluded that Mr. Calhoun's "inter- and intra-test patterns, as well as his questionable motivation and general presentation, suggest that although he may have intellectual deficits, he likely functions higher than this, probably in the Borderline range." (*Id.*).

With that backdrop of evidence, the court will examine the similarities to the decisions in *Brumfield* and *Burgess*. In *Brumfield*, as in this case, the petitioner was sentenced before issuance of *Atkins* and made a post-*Atkins* request for "an opportunity to prove he was intellectually disabled." 576 U.S. at 307. Like Alabama law, Louisiana law required that the petitioner establish his "subaverage intelligence, as measured by objective standardized IQ tests." *Id.* at 308; *accord Perkins*, 851 So. 2d at 456 (holding that under Alabama law, a finding of intellectual disability requires, in part, "significantly subaverage intellectual functioning (an IQ of 70 or below)").

The evidence presented at Mr. Brumfield's sentencing included testimony from a psychologist that he had an IQ of 75 and a report (but no testimony) from another expert that his IQ was "a little bit higher" than that. 576 U.S. at 309–10. In state habeas proceedings, Mr. Brumfield requested an evidentiary hearing on his *Atkins* claim but the state habeas courts summarily rejected the claim, *id.* at 310, explaining, with respect to intellectual functioning, that his "IQ score was

inconsistent with a diagnosis of intellectual disability," *id.* at 313. The United States Supreme Court held that this finding was unreasonable. *Id.* at 314–16. The Court explained that the IQ test result of 75 "was squarely in the range of potential intellectual disability," *id.* at 315, and there was not any "evidence of any higher IQ test score that could render the state court's determination reasonable," *id.* at 316. The testimony from one expert that another expert had "rated his intelligence just a little higher" could not support a reasonable inference "that any examination [the other expert] had performed was sufficiently rigorous to preclude definitively the possibility that [the petitioner] possessed subaverage intelligence." *Id.* at 316.

As in *Brumfield*, Mr. Calhoun presented evidence to the state court of a full-scale IQ score of 66 and a partial score of 58. (Doc. 18-1 at 78; doc. 18-11 at doc 18-11 at 123). But unlike in *Brumfield*, the Alabama Court of Criminal Appeals here reasonably disregarded those scores because Dr. Ronan's report stated that her graduate student felt Mr. Calhoun was not putting forth his best effort and Dr. Shealy testified that he believed Mr. Calhoun was malingering . *See Clemons v. Comm'r, Ala. Dep't of Corr.*, 967 F.3d 1231, 1248 (11th Cir. 2020) ("[I]t is abundantly clear that a state court may discount IQ scores where there is evidence of malingering."). Likewise, the Alabama Court of Criminal Appeals reasonably could have relied on evidence that Mr. Calhoun malingered during personality and psychiatric testing.

(*See* doc. 18-1 at 78–79); *Clemons*, 967 F.3d at 1248 (approving a state court's consideration of "a substantial body of additional evidence suggesting that [the petitioner] had engaged in a pattern of malingering").

However, omitting the evidence of Mr. Calhoun's low IQ scores does not make the state court's summary finding reasonable. Even reasonably disregarding the IQ scores, Dr. Ronan's report indicates that Mr. Calhoun "may have intellectual deficits," probably functioning "in the Borderline range" and that he had "some areas of below normal functioning" cognitively. (Doc. 18-1 at 78). The record does not clarify what "the Borderline range" is or means and the Alabama Court of Criminal Appeals did not address these statements from Dr. Ronan.

And Dr. Shealy's testimony that he did not believe Mr. Calhoun was intellectually disabled was not enough to permit a summary finding from an appellate court without the benefit of an evidentiary hearing. For one thing, Alabama law at the time required an evidentiary hearing on *Atkins* issues where there was "enough evidence to raise an inference that [the defendant] is [intellectually disabled]," even when "the record also contain[ed] contrary evidence indicating that" the defendant was not intellectually disabled. *Morrow v. State*, 928 S. 2d 315, 321 (Ala. Crim. App. 2004); *see Calhoun I*, 932 So. 2d 923 (decided in 2005). For another, the trial record lacks a copy of Dr. Shealy's report or any testimony from him about the

"rigorous[ness]" of his testing that could support such a finding. *See Brumfield*, 576 U.S. at 316 ("The state court therefore could not reasonably infer from this evidence that any examination [the doctor] had performed was sufficiently rigorous to preclude definitively the possibility that [the petitioner] possessed subaverage intelligence.").

As the *Brumfield* Court explained, an evidentiary hearing is even more important in cases with procedural postures like this one, where the petitioner was sentenced before *Atkins*, because "[a]t his pre-*Atkins* trial, [the petitioner] had little reason to investigate or present evidence relating to intellectual disability," and doing so actually carried a risk that a jury might find an enhanced likelihood of future dangerousness, weighing in favor of a death sentence. 576 U.S. at 321. As a result, "the state trial court should have taken into account that the evidence before it was sought and introduced at a time when [the petitioner]'s intellectual disability was not at issue." *Id.* at 322.

Even if the court were not persuaded by *Brumfield* that the Alabama Court of Criminal Appeals' finding was unreasonable, the court would be bound by the Eleventh Circuit's decision in *Burgess*. In that case, the trial record contained reports—but no testimony—from two experts. 723 F.3d at 1312–13. One expert conducted intelligence testing and concluded that the petitioner was "borderline" intellectually disabled, and the other "did not report having administered any IQ

30

testing, but rather 'estimated' that [the petitioner]'s intelligence 'was below normal probably in the borderline range, IQ somewhere between 70 and 80,'" and that he "'may even be mildly [intellectually disabled].'" *Id.* at 1313. The Alabama Court of Criminal Appeals summarily denied the claim on the merits, finding as a fact that the petitioner's IQ was between 70 and 80. *Id.* at 1314.

The Eleventh Circuit held that the finding was unreasonable because the only evidence was one expert who found the petitioner to be "borderline" intellectually disabled, and the other who merely estimated an IQ range of 70 to 80 but also opined that the petitioner might be "mildly" intellectually disabled. *Id.* at 1316 (quotation marks omitted). The Eleventh Circuit stated: "When the record provides both realistic indications that a defendant might be [intellectually disabled] and no concrete, verifiable IQ score, it is an unreasonable determination of the facts for a court to rely instead on an 'estimate' and equivocal statements to find as a fact that the defendant has an IQ of between 70 and 80." *Burgess*, 723 F.3d at 1316.

Here, as in *Burgess*, there are realistic indications that Mr. Calhoun might be intellectually disabled (Dr. Ronan's opinion that he had intellectual deficits and might function in the "borderline" range), and there is "no concrete, verifiable IQ score." *Id*. Under *Burgess*, as well as under *Brumfield*, the court must find that the

Alabama Court of Criminal Appeals' summary factual finding about Mr. Calhoun's intellectual functioning was unreasonable.

### ii. Significant Impairment in Several Areas of Adaptive Skills

One component of a finding of intellectual disability is having significant limitations in adaptive skills. *Calhoun I*, 932 So. 2d at 978. "Adaptive skills" include "communication, self-care, home living, social skills, community use, self-direction, health and safety, functional academics, leisure, and work." *Atkins*, 536 U.S. at 308 n.3, 318. The Eleventh Circuit has explained that, for purposes of Alabama law, "literature in the field" defines "significant or substantial deficits in adaptive behavior" to require "concurrent deficits or impairments in present adaptive functioning in at least two of the following skill areas: communication, self-care, home living, social/interpersonal skills, use of community resources, self-direction, functional academic skills, work, leisure, health and safety." *Holladay v. Allen*, 555 F.3d 1346, 1353 (11th Cir. 2009).

The evidence of Mr. Calhoun's adaptive skills came not only from Dr. Shealy's testimony and Dr. Ronan's report, but also from the presentence report and Ms. Garrett's testimony at the penalty phase. Ms. Garrett—who testified that she herself dropped out of school in third grade because she "could not learn"—testified

32

that Mr. Calhoun dropped out of school around sixth grade and received no further schooling. (Doc. 18-11 at 111, 114). She also testified that Mr. Calhoun had lived with her "pretty much all [his] life." (*Id.* at 113).

The presentence report indicated that Mr. Calhoun actually left school during ninth grade, that his "overall school adjustment was unsatisfactory," and that the probation and parole officer believed Mr. Calhoun was "functionally illiterate." (Doc. 18-1 at 172). He had, however, worked regularly as a concrete finisher. (*Id.*).

Dr. Ronan's report noted that Mr. Calhoun left school in ninth grade and was sent to the Childersburg Children's Development Center for drawing a picture of his penis. (Doc. 18-1 at 76). He married young and divorced three years later, abused alcohol and drugs, went to jail in his early twenties, and attempted suicide when he was twenty-six. (*Id.*). Mr. Calhoun had several sex-related criminal offenses and, during Dr. Ronan's examination of him, he "grabbed his penis with one of his hands outside of his clothing, after maneuvering his body to a point where the officers could not see him," and continued to squeeze himself for "several moments" until she told him to stop. (Doc. 18-1 at 77). Based on his interview and history, Dr. Ronan diagnosed him with an impulse control and personality disorders. (Doc. 18-1 at 77, 79).

Dr. Shealy testified that he was unable to complete one of the psychological tests he attempted to perform on Mr. Calhoun because Mr. Calhoun "was not able to read well enough to understand the items on it." (Doc. 18-11 at 123). He further testified that Mr. Calhoun's impulse disorder and/or personality disorder could impair his ability to conform his conduct to the requirements of the law. (*Id.* at 125).

Based on this evidence, the Alabama Court of Criminal Appeals rejected Mr. Calhoun's request for an evidentiary hearing and found that he did not have "significant or substantial deficits in adaptive behavior." *Calhoun I*, 932 So. 2d at 978. *Brumfield* and *Burgess* require this court to conclude that the Alabama Court of Criminal Appeals' summary finding was unreasonable.

In *Brumfield*, the trial record contained evidence that the petitioner "had been born prematurely at a very low birth weight"; had "slower responses than normal babies"; had been "taken out of school in the fifth grade and hospitalized due to his behavior"; had been "placed in special classes in school and in multiple mental health facilities, and had been prescribed antipsychotics and sedatives" that were "generally reserved for severe cases"; and had difficulty processing information. 576 U.S. at 317–19. According to the United States Supreme Court, all of this indicated deficits in "understanding and use of language" and "learning" and "at least one of the

remaining . . . areas," which, under Louisiana law, included self-care, mobility, self-direction, and capacity for independent living. *Id.* at 319; *see also id.* at 317.

On the other hand, the *Brumfield* Court acknowledged that "other evidence in the record before the state court may have cut against [the petitioner]'s claim of intellectual disability," including an expert's opinion that he "appear[ed] to be normal from a neurocognitive perspective, with a normal capacity to learn and acquire information when given the opportunity to repetition, and problem solving and reasoning skills that were adequate," as well as "underlying facts of [the] crime [that] might arguably provide reason to think that [the petitioner] possessed certain adaptive skills, as the murder for which he was convicted required a degree of advanced planning and involved the acquisition of a car and guns." *Id.* at 320 (quotation marks omitted). Given these conflicts in the evidence, the state court should have held an evidentiary hearing instead of summarily finding that the petitioner did not have impairments in adaptive skills. *Id.* at 320–21.

The evidence of Mr. Calhoun's adaptive deficits is not as fulsome as the evidence of the *Brumfield* petitioner's adaptive deficits, but it still exists. There is evidence that he did not live alone, was unable to complete school, had discipline problems and was required to attend a "Childrens Developmental Center," had some kind of fixation on sex, had a personality disorder and something like an impulse-

control disorder, and remained illiterate as an adult. (Doc. 18-11 at 111, 114, 123; doc. 18-1 at 76–77, 172). This evidence certainly indicates that Mr. Calhoun had deficits in adaptive skills such as social/interpersonal skills and functional academic skills, at a minimum. *See Holladay*, 555 F.3d at 1353 (applying Alabama law). The fact that he also had positive behaviors, such as a previous marriage, a positive relationship with his son, and the ability to work, creates a dispute of fact about his adaptive behaviors that a factfinder should have resolved after an evidentiary hearing. *See Brumfield*, 576 U.S. at 320. Just as with the intellectual functioning prong, this is especially true given the procedural posture of this case, in which Mr. Calhoun was sentenced before *Atkins* and therefore "had not yet had the opportunity to develop the record for the purpose of proving an intellectual disability claim." *Id.* at 321; *see also Morrow*, 928 So. 2d at 321.

Again, even if *Brumfield* did not require this result, the Eleventh Circuit's decision in *Burgess* would. There, the trial record contained evidence that the petitioner had intellectually disabled family members and had done poorly in school, including "his need to repeat the first grade, his eventual placement into special education classes where he continued to do extremely poorly, and leaving school after the completion of the ninth grade with all failing grades with the exception of one

D." 723 F.3d at 1312. The Alabama Court of Criminal Appeals summarily found that the petitioner could not show deficits in adaptive behavior because he

> had completed the ninth grade; had completed one year at a training school; worked as a welder while incarcerated in Mississippi; was cooperative when interviewed by a probation officer; was a "normal child who was considerate, compassionate, and caring;" had a brother who was [intellectually disabled]; and had been in a relationship with the victim.

*Id.* at 1314–15 (footnote omitted).

The Eleventh Circuit held that this was an unreasonable determination of the facts because the "good character" evidence "was presented in an entirely different context and without the benefit of any explanation of how it would or would not be consistent with [intellectual disability]," thus failing to "indicate anything substantive about [the petitioner]'s adaptive abilities as that term is used clinically." *Id.* at 1316. Moreover, a state expert had indicated that the petitioner might be "mildly" intellectually disabled, which was consistent with his "poor adaptive skills: his poor school performance and his lack of vocational success." *Id.* at 1316–17.

As in *Burgess*, some of the evidence the Alabama Court of Criminal Appeals in *Calhoun I* relied on—such as Mr. Calhoun's good relationship with his son—is irrelevant to "adaptive skills as that term is used clinically." *Burgess*, 723 F.3d at 1316. Similar to *Burgess*, a state expert indicated that Mr. Calhoun "probably"

functioned in the "Borderline" range. (Doc. 18-1 at 78); *compare with Burgess*, 723 F.3d at 1316–17. And the record before the Alabama Court of Criminal Appeals showed that Mr. Calhoun had serious academic difficulties, beginning special education in sixth grade and leaving school in ninth grade to attend a "Children's Developmental Center" based on his inappropriate sexual behavior. (Doc. 18-1 at 76, 172; doc. 18-11 at 114). Moreover, both Dr. Shealy and the probation and parole officer noted Mr. Calhoun's illiteracy as an adult. (Doc. 18-1 at 172; doc. 18-11 at 123). In short, the Alabama Court of Criminal Appeals' summary finding, made based on evidence that was presented in a completely different context before the United States Supreme Court had issued *Atkins*, was unreasonable.

### iii.    Manifestation During the Developmental Period

The Alabama Court of Criminal Appeals made no findings about whether Mr. Calhoun's deficits manifested "in the developmental period, i.e., before the age of 18." *Calhoun I*, 932 So 2d at 978. Accordingly, there is no factual finding for the court to review for reasonableness or correctness. *See* 28 U.S.C. § 22554(d)(2), (e)(1).

### iv.    Summary

Because the court concludes that the Alabama Court of Criminal Appeals' summary denial of Mr. Calhoun's *Atkins* claim was based on an unreasonable

determination of the facts, the court need not defer to the state court's decision but must, instead, review the claim *de novo*. *See* 28 U.S.C. § 2254(d); *Madison*, 761 F.3d at 1243–44. The court notes that, in addition to and separate from § 2254(d), § 2254(e)(1) requires the court to presume the state court's factual findings are correct, with the petitioner bearing the "burden of rebutting the presumption of correctness by clear and convincing evidence." *See also Pye*, 50 F.4th at 1036. Mr. Calhoun has never been permitted the opportunity to develop evidence of his *Atkins* claim despite specific factual allegations and repeated requests for an evidentiary hearing. *Cf. Williams*, 529 U.S. at 432 ("Under the opening clause of § 2254(e)(2), a failure to develop the factual basis of a claim is not established unless there is lack of diligence, or some greater fault, attributable to the prisoner or the prisoner's counsel.").

And Mr. Calhoun's § 2254 petition contains "factual allegations, which, if true, would entitle [him] to federal habeas relief." *Schriro v. Landrigan*, 550 U.S. 465, 474 (2007). Because Mr. Calhoun did "develop the factual basis of [this] claim in State court proceedings," § 2254(e)(2) does not bar the court from holding an evidentiary hearing. Accordingly, the court exercises its discretion and **WILL SET** an evidentiary hearing for this claim. *See* Rules Governing Section 2254 Cases, R. 8(a). To merit relief, Mr. Calhoun will need to present evidence at the hearing that

establishes, by clear and convincing evidence, that the Alabama Court of Criminal Appeals' finding that he is not intellectually disabled was incorrect. *See* 28 U.S.C. § 2254(e)(1).

### 2. Claim Two

Mr. Calhoun's second claim is quite similar to his first. In Claim Two, he contends that appellate counsel was ineffective for failing to adequately investigate and present Mr. Calhoun's *Atkins* claim during the direct appeal. (Doc. 1-1 at 52–64; *see also* doc. 27 at 32–35). The State responds that the state courts' denial of this claim was reasonable because he failed to plead how appellate counsel's failure prejudiced him and, in any event, he is not intellectually disabled. (Doc. 21 at 52; *see also* doc. 20 at 9–11).

To prevail on a claim of ineffective assistance of trial counsel, a petitioner must establish that his counsel's performance was deficient and that the deficient performance prejudiced his defense. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). Courts must be "highly deferential" in their "scrutiny of counsel's performance" and "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Strickland*, 466 U.S. at 689. A petitioner can establish prejudice by showing "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been

different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Reaves v. Sec'y, Fla. Dep't of Corr.*, 872 F.3d 1137, 1148 (11th Cir. 2017) (quotation marks omitted). "Claims of ineffective assistance of appellate counsel are governed by the same standards applied to trial counsel under *Strickland*." *Brooks v. Comm'r, Ala. Dep't of Corr.*, 719 F.3d 1292, 1300 (11th Cir. 2013).

Moreover, when a court reviews an ineffective assistance claim resolved by a state court on the merits, the petitioner must satisfy the *Strickland* standard and the § 2254(d)(1) reasonableness standard. *See*, *e.g.*, *Harrington v. Richter*, 562 U.S. 86, 105 (2011) ("The standards created by Strickland and § 2254(d) are both highly deferential, and when the two apply in tandem, review is doubly so.") (quotation marks and citations omitted). "When § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Id.*

As a reminder, the United States Supreme Court issued *Atkins* while Mr. Calhoun's direct appeal was pending, so the Alabama Court of Criminal Appeals ordered the parties to brief its applicability. *See Calhoun I*, 932 So. 2d at 977–78. Appellate counsel filed a supplemental brief arguing that the trial record established Mr. Calhoun's intellectual disability. (Doc. 18-17 at 98–110). Counsel's brief

41

concluded by stating that if the Alabama Court of Criminal Appeals determined it could not find Mr. Calhoun to be intellectually disabled based on the trial record, "he is entitled to further factual development of this claim, and moves this Court to remand his case to the circuit court for a determination of [intellectual disability]." (*Id.* at 110–11). In support, counsel cited two Alabama cases remanding capital cases for evidentiary hearings on intellectual disability and argued that, under *Ring v. Arizona*, 536 U.S. 584 (2002), only a jury could find that Mr. Calhoun was not intellectually disabled. (*Id.* at 111–12). As discussed above, the Alabama Court of Criminal Appeals found, based on the trial evidence, that Mr. Calhoun was not intellectually disabled. *Calhoun I*, 932 So 2d at 978. It did not explicitly address his request for an evidentiary hearing but it did reject his *Ring* argument. *Id.*

In Mr. Calhoun's Rule 32 petition, he argued that appellate counsel provided ineffective assistance because the supplemental brief focused on a substantive discussion of Mr. Calhoun's intellectual disability and failed to adequately argue why a remand for an evidentiary hearing was appropriate or what type of evidence Mr. Calhoun might present in an evidentiary hearing. (Doc. 18-23 at 133, 189–92). Mr. Calhoun then reiterated the trial evidence and additionally alleged that postconviction testing revealed he has an IQ of 61, Mr. Calhoun's sister had an IQ of 51, and one of Mr. Calhoun's teachers at the Childersburg Childhood Development

Center had taught "four of Mr. Calhoun's relatives, all of whom are severely [intellectually disabled]." (*Id.* at 193–97).

The state habeas trial court summarily dismissed this claim as insufficiently pleaded and without merit. (Doc. 18-26 at 79, 153). The Alabama Court of Criminal Appeals affirmed in a reasoned opinion. *Calhoun II*, 261 So. 3d at 465–69. The Court of Criminal Appeals held that Mr. Calhoun had not adequately pleaded that he had substantive deficits in adaptive behavior, so he had not pleaded what facts appellate counsel could have discovered that would have caused the *Calhoun I* Court to remand the case. *See generally id.* at 467–68. This ruling is an adjudication on the merits, entitled to review under § 2254(d). *See Borden v. Allen*, 646 F.3d 785, 813 (11th Cir. 2011).

Habeas relief is barred unless the state courts' adjudication of this claim resulted in a decision that was contrary to or an unreasonable application of *Strickland*, 28 U.S.C. § 2254(d)(1), or resulted in a decision that was based on an unreasonable determination of the facts, *id.* § 2254(d)(2). Mr. Calhoun contends that the state courts' decisions were unreasonable under both § 2254(d)(1) and § 2254(d)(2). (Doc. 1 at 54–62). The court will address the reasonableness of the factual determinations under § 2254(d)(2) before turning to the reasonableness of the Court's application of *Strickland* under § 2254(d)(1).

Mr. Calhoun argues that the Alabama Court of Criminal Appeals' decision was based on an unreasonable determination of the facts because his Rule 32 petition "undisputedly met the low pleading standard of [Alabama Rule of Criminal Procedure] 32.6(b)." (Doc. 27 at 32; *see also* doc. 1 at 58–62). In support, he cites the unpublished, nonbinding decision in *Smith v. Campbell*, 620 F. App'x 734 (11th Cir. 2015). (Doc. 1 at 59). But even if *Smith* were binding, it would not support Mr. Calhoun's position.

In *Smith*, the state court found that the petitioner had made only conclusory allegations that he met the *Atkins* and *Perkins* standard for intellectual disability. 620 F. App'x at 748. The Eleventh Circuit held that the state court's factual determination was unreasonable because the petitioner had actually included "at least seven factual grounds to support his *Atkins* claim." *Id.* The Eleventh Circuit explained that its holding was based on its "review of the state court's factual determination about what was alleged in [the state habeas] petition; by contrast, where a state court accurately identifies what allegations were included in a petition and concludes that those allegations failed to meet a pleading requirement, that is a legal conclusion" not subject to review for factual unreasonableness under § 2254(d)(2). *Id.* at 748 n.20.

The Alabama Court of Criminal Appeals expressly acknowledged the facts Mr. Calhoun pleaded in his Rule 32 petition but concluded that those facts did not

44

satisfy the Rule 32 pleading standard. *See Calhoun II*, 261 So. 3d at 467–68. Accordingly, *Smith* does not establish that the Court of Criminal Appeals' decision was based on an unreasonable determination of the facts. A state court's determination about whether a state pleading satisfies a state pleading standard is not a determination of the facts subject to review under § 2254(d)(2).

Next, Mr. Calhoun argues that the Alabama Court of Criminal Appeals' decision was based on an unreasonable application of *Atkins*. (Doc. 1 at 54–58; doc. 27 at 34). But the question is not whether the Court of Criminal Appeals unreasonably applied *Atkins*; it is whether the Court of Criminal Appeals unreasonably applied *Strickland*, which governs claims of ineffective assistance of counsel. *See Calhoun II*, 261 So. 3d at 463–64 (acknowledging that the standard used in evaluating ineffective-assistance claims is the one set out in *Strickland*). The fact that Mr. Calhoun's ineffective-assistance claim involves an analysis of *Atkins* does not remove it from the strictures of *Strickland*.

Moreover, in evaluating the reasonableness of the state court's application of federal law, there is a distinction between a state court's "reasons" for denying a state habeas petition and the "justifications" it provides. *Pye v. Warden, Ga. Diagnostic Prison*, 50 F.4th 1025, 1036 (11th Cir. 2022) (en banc). The federal court reviews the state court's "reasons," not its "justifications." *Id.* If a federal court finds the

"justifications" provided by the state courts unreasonable, the federal court must "consider additional rationales that support the state court's . . . determination." *Id.*; *see also King v. Warden, Ga. Diagnostic Prison*, 69 F.4th 856, 867 (11th Cir. 2023) ("We evaluate the reasons offered by the court, but if we can justify those reasons on a basis the state court did not explicate, the state-court decision must still stand.").

The Alabama Court of Criminal Appeals' expressed "justification" was that Mr. Calhoun failed to plead sufficient facts to show that he was intellectually disabled, so presenting those facts during the direct appeal would have made no difference. *Calhoun II*, 261 So. 3d at 468. But the "reason" for the denial was that Mr. Calhoun failed to establish deficient performance by counsel. *See id.* This court can justify that reason. *See King*, 69 F.4th at 867.

The Alabama Court of Criminal Appeals could have reasonably found that Mr. Calhoun's allegations about counsel's failure to make a more fulsome request for a remand did not establish deficient performance. Appellate counsel's supplemental brief argued extensively for why the appellate court should find Mr. Calhoun ineligible for the death penalty and concluded that, if the appellate court found that argument unpersuasive, it should remand for "further factual development." (Doc. 18-17 at 98–111). Counsel cited two Alabama cases remanding capital cases for evidentiary hearings on intellectual disability. (*Id.* at 111).

46

"[T]he test for deficient performance is not whether counsel could have done more; perfection is not required. Nor is the test whether the best criminal defense attorneys might have done more. Instead, the test is whether what counsel did was within the wide range of reasonable professional assistance." *Thomas v. Att'y Gen.*, 992 F.3d 1162, 1187 (11th Cir. 2021) (alterations and quotation marks omitted). Appellate counsel's explicit request for a remand and citation to Alabama cases supporting that request was enough for the Alabama Court of Criminal Appeals to reasonably find that counsel did not perform deficiently.

Because a petitioner cannot succeed on an ineffective claim if he cannot establish deficient performance, the court declines to address prejudice. *See Boyd*, 592 F.3d 1274, 1293 (11th Cir. 2010) ("[A] court may decline to reach the performance prong of the ineffective assistance test if convinced that the prejudice prong cannot be satisfied."). The court **DENIES** Claim Two.

3.  Claim Three

Mr. Calhoun contends that trial counsel were ineffective for failing to investigate and present mitigating evidence that: (1) he grew up impoverished; (2) he experienced severe physical, psychological, and sexual abuse and incest; (3) he had a significant intellectual disability; (4) a proper mental health examination would have revealed his intellectual disability, history, and "potential psychiatric disorders";

(5) he had strong relationships with his siblings, son, and employers; and (6) he had adjusted well to life in prison. (Doc. 1 at 64–74; *see also* doc. 1-1 at 1–5). He attributes trial counsel's failure to discover this information to their failure to develop a trusting relationship with him (doc. 1 at 75–76), and their failure to hire a social worker or mitigation expert (doc. 1-1 at 5–6). He also asserts, in a single sentence at the end of this claim, that counsel were also ineffective for failing to request a jury instruction informing the jury that, under *Mills v. Maryland*, 486 U.S. 367 (1988), its findings about mitigating evidence did not need to be unanimous. (*Id.* at 6).

The State responds that parts of this claim are unexhausted and procedurally defaulted and the state courts reasonably denied the rest of the claim as insufficiently pleaded. (Doc. 21 at 24–25, 53–65). Specifically, it argues that Mr. Calhoun failed to exhaust any claim that counsel were ineffective for failing to present evidence of intellectual disability as a mitigating factor, and that the state courts relied on independent and adequate state law grounds to reject the claims with respect to his adjustment to prison life, establishment of a trusting relationship, pursuit of a mental health examination, failure to hire a social worker or mitigation expert, and failure to request a jury instruction about jury unanimity. (*Id.* at 24–25).

The court pauses here to describe the doctrine of procedural default in the AEDPA context. Procedural default comes in two forms: (1) where the petitioner

asserted the claim in state court but the state court rejected the claim based on a state procedural bar; and (2) where the petitioner failed to exhaust state remedies and a state procedural bar would now make exhaustion of the claim futile. *Bailey v. Nagle*, 172 F.3d 1299, 1302–03 (11th Cir. 1999). The State bears the burden of establishing a procedural default. *Gordon v. Nagle*, 2 F.3d 385, 388 n.4 (11th Cir. 1993).

The first type of procedural default arises from the requirement that a petitioner "must comply with all 'independent and adequate' state procedures." *Mason*, 605 F.3d at 1119 (11th Cir. 2010) (quoting *Wainwright v. Sykes*, 433 U.S. 72, 86–87 (1977)). If a state court rejects a petitioner's claim on independent and adequate state procedural grounds, the petitioner has procedurally defaulted the claim and the federal court may not consider its merits. *Ward v. Hall*, 592 F.3d 1144, 1156–57 (11th Cir. 2010). A procedural ground is independent and adequate if the state court "clearly and expressly state[d] that it [was] relying on state procedural rules to resolve the federal claim without reaching the merits of that claim," the state court's decision was not "intertwined with an interpretation of federal law," and the state procedural rule was not "applied in an arbitrary or unprecedented fashion." *Judd v. Haley*, 250 F.3d 1308, 1313 (11th Cir. 2001).

The second type of procedural default arises from the requirement that a petitioner exhaust all challenges to his conviction and sentence in state court before

seeking relief in federal court. *See* 28 U.S.C. § 2254(b)(1)(A); *Jimenez v. Fla. Dep't of Corr.*, 481 F.3d 1337, 1342 (11th Cir. 2007). To exhaust a claim, the petitioner must "give the state courts one full opportunity to resolve any constitutional issues by invoking one complete round of the State's established appellate review process" and "fairly present[ing] every issue raised in his federal petition to the [S]tate's highest court, either on direct appeal or on collateral review." *Mason v. Allen*, 605 F.3d 1114, 1119 (11th Cir. 2010) (quotation marks and citations omitted). Typically, a failure to exhaust results in the dismissal of the claim without prejudice so that the petitioner can return to state court and exhaust the claim properly. *Gore v. Crews*, 720 F.3d 811, 815 (11th Cir. 2013). However, if a petitioner failed to exhaust a claim and "it is clear from state law that any future attempts at exhaustion would be futile," then the petitioner will never be able to satisfy the exhaustion requirement and the claim is procedurally defaulted. *Bailey*, 172 F.3d at 1305.

A petitioner may overcome a procedural default only if he "can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice." *Coleman v. Thompson*, 501 U.S. 722, 750 (1991); *see also Lucas v. Sec'y, Dep't of Corr.*, 682 F.3d 1342, 1353 (11th Cir. 2012). To establish cause and prejudice, a petitioner must prove that "some objective factor external to

the defense impeded counsel's efforts" to pursue the claim properly in state court, *Murray v. Carrier*, 477 U.S. 478, 488 (1986), and that the "the errors at trial actually and substantially disadvantaged his defense so that he was denied fundamental fairness," *Ward v. Hall*, 592 F.3d 1144, 1157 (11th Cir. 2010). To establish a fundamental miscarriage of justice with respect to a defaulted claim attacking a death sentence, the petitioner must "prove that, but for the alleged constitutional error, no reasonable juror would have found him eligible for the death penalty under [Alabama] law." *Raleigh v. Sec'y, Fla. Dep't of Corr.*, 827 F.3d 938, 958 (11th Cir. 2016) (quotation marks and emphasis omitted). The petitioner bears the burden of establishing an exception to a procedural default. *Gordon*, 2 F.2d at 388 n.4.

With that framework in mind, the court turns to whether any part of Claim Three is procedurally defaulted. Mr. Calhoun raised this ineffective assistance claim in his Rule 32 petition. (Doc. 18-23 at 170–83). The state habeas trial court rejected the claim on the merits. (Doc. 18-26 at 126–36). The Alabama Court of Criminal Appeals rejected parts of it on the merits and parts of it under Alabama Rule of Appellate Procedure 28(a)(10). *Calhoun II*, 261 So. 3d at 469–73. Because the Alabama Court of Criminal Appeals was the last court to address Claim Three in a reasoned opinion, the court reviews its decision. *See Wilson*, 138 S. Ct. at 1192.

### a. Procedural Default

First, the State contends that Mr. Calhoun failed to exhaust the parts of his claim relating to intellectual disability as mitigating evidence. (Doc. 21 at 24). This court disagrees. Mr. Calhoun argued in his Rule 32 petition that, had counsel investigated Mr. Calhoun's educational difficulties, they would have learned of his "lifelong low intellectual functioning" (doc. 18-23 at 176), evidence that would have been "undoubtedly mitigating, independent of the [*Atkins*] inquiry" (*id.* at 178). Mr. Calhoun therefore presented "the substance of [the] federal habeas corpus claim" to the state courts "despite variations in the factual allegations urged in its support." *Pope v. Sec'y for Dep't of Corr.*, 680 F.3d 1271, 1286 (11th Cir. 2012) (quotation marks and alteration omitted). The court considers this part of the claim exhausted, *see id.*, and will return to the merits of the argument below.

Second, the State contends that the Alabama Court of Criminal Appeals rejected other parts of Mr. Calhoun's claim based on an independent and adequate state law ground: Rule 28(a)(10). (Doc. 21 at 25–26). The State makes this argument specifically about Mr. Calhoun's allegations that counsel failed to establish a trusting relationship, ensure a proper mental health examination was conducted, hire a social worker or mitigation expert, present evidence about his adjustment to life in prison, and request a jury instruction about jury unanimity. (*Id.*).

Rule 28(a)(10) requires an appellant's brief to set out "[a]n argument containing the contentions of the appellant[ ] with respect to the issues presented, and the reasons therefor, with citations to the cases, statutes, other authorities, and parts of the record relied on." Ala. R. App. P. 28(a)(10). The Eleventh Circuit has held that a petitioner's failure to comply with Rule 28(a)(10) results in a procedural default. *Ferguson v. Comm'r, Ala. Dep't of Corr.*, 69 F.4th 1243, 1259 (11th Cir. 2023).

The Alabama Court of Criminal Appeals clearly relied on Rule 28(a)(10) to reject Mr. Calhoun's allegations about counsel's failure to establish a trusting relationship with him and failure to ensure that he received a proper mental health examination. *Calhoun II*, 261 So. 3d at 469–70, 472–73. Its rulings were not intertwined with an interpretation of federal law or an arbitrary or unprecedented use of the rule. *See Judd*, 250 F.3d at 1313. Accordingly, the court agrees that the part of Mr. Calhoun's claim relating to these two allegations are procedurally defaulted and the court's discussion of Claim Three will not include them.

But Mr. Calhoun did not procedurally default the other parts of Claim Three (his allegations that counsel should have hired a social worker or mitigation expert, presented evidence about his adjustment to life in prison, and requested a jury instruction about jury unanimity). Mr. Calhoun's appellate brief referenced counsel's failure to hire additional experts or present evidence about his adjustment to prison,

(doc. 18-31 at 71), but the *Calhoun II* decision did not mention those parts of the claim, *see* 261 So. 3d at 469–73. Accordingly, because the Court of Criminal Appeals did not "clearly and expressly state that it [was] relying on state procedural rules to resolve the federal claim without reaching the merits of that claim," the court did not use an independent and adequate state law ground to bar the claim. *See Judd*, 250 F.3d at 1313. Instead, this court must presume that the Alabama Court of Criminal Appeals rejected those argument on the merits. *See Richter*, 562 U.S. at 98 ("Where a state court's decision is unaccompanied by an explanation, the habeas petitioner's burden still must be met by showing there was no reasonable basis for the state court to deny relief."); *see also Bishop v. Warden, GDCP*, 726 F.3d 1243, 1255 (11th Cir. 2013) (holding that § 2254(d) "does not require a state court to give reasons before its decision can be deemed to have been adjudicated on the merits," and "nothing in AEDPA requires the state court adjudication that has resulted in a decision to be accompanied by an opinion that explains the state court's rationale") (quotation marks omitted); *Loggins v. Thomas*, 654 F.3d 1204, 1217 (11th Cir. 2011) ("[U]nless the state court clearly states that its decision was based solely on a state procedural rule, we will presume that the state court has rendered an adjudication on the merits when the petitioner's claim is the same claim rejected by the state court.").

Finally, Alabama Court of Criminal Appeals clearly did not apply Rule 28(a)(10) to bar the part of the claim relating to counsel's failure to request a jury instruction about jury unanimity. *See Calhoun II*, 261 So. 3d at 477–78. Instead, the Court held that the claim was inadequately pleaded under Alabama Rule of Criminal Procedure 32.6(b). *Id.* Curiously, the State maintains that this is a procedural bar, although it does not identify how a determination that a claim was insufficiently pleaded qualifies as an independent and adequate procedural ruling. (*See* doc. 38 at 50–51). Moreover, binding Eleventh Circuit precedent provides that "[a] ruling by an Alabama court under Rule 32.6(b) is also a ruling on the merits." *Borden*, 646 F.3d at 812. Accordingly, the court will consider this part of the claim below.

### b. Merits

After the court's excision of the procedurally defaulted parts, Claim Three is that trial counsel were ineffective for failing to investigate and present mitigating evidence that: (1) Mr. Calhoun grew up impoverished; (2) he experienced severe physical, psychological, and sexual abuse and incest; (3) he had a significant intellectual disability; (4) he had strong relationships with his siblings, son, and employers; and (5) he had adjusted well to life in prison. (Doc. 1 at 64–74; *see also* doc. 1-1 at 1–5). He attributes this failure, in part, to trial counsel's failure to hire a social worker or mitigation expert. (Doc. 1-1 at 5–6). He also faults counsel for failing

to request a jury instruction informing the jury that they need not agree about the existence of mitigating circumstances. (*Id.* at 6). The court begins by revisiting the aggravating and mitigating evidence presented at the penalty phase of Mr. Calhoun's trial, as well as the evidence he now says counsel should have discovered and presented.

The penalty phase of Mr. Calhoun's trial began about twenty minutes after the jury delivered its verdicts. (*See* doc. 18-11 at 86–88). The State's evidence showed that Mr. Calhoun had two previous convictions for attempted first degree rape and a conviction for first degree sexual abuse, which the State submitted in support of its contention that the jury should find as an aggravating circumstance that Mr. Calhoun had previously been convicted of a felony involving the use or threat of violence to the person. (*Id.* at 103, 107); Ala. Code § 13A-5-49(2) (2000). The only other evidence submitted with respect to aggravating circumstances was the record of the guilt phase. (Doc. 18-11 at 108–09). As the court instructed the jury, the verdict in the guilt phase established conclusively the existence of three aggravating circumstances: that Mr. Calhoun committed the murder while engaged in rape, robbery, and burglary. (*Id.* at 158–59, 162).

The defense called two witnesses in mitigation: Ms. Garrett and Dr. Shealy. (*Id.* at 109, 115–116). Ms. Garrett testified that Mr. Calhoun had dropped out of

school in or after sixth grade and received no further schooling. (*Id.* at 111, 114). Mr. Calhoun's father had never been involved in his life and his stepfather had been in and out of jail during Mr. Calhoun's childhood. (Doc. 18-11 at 110–111). Mr. Calhoun had been married and had a child, though he and his wife had divorced. (*Id.* at 111–12). Despite the divorce, he maintained a good relationship with his son. (*Id.* at 112–13). Ms. Garrett testified that Mr. Calhoun had been a good son, a good father, and a churchgoer, and she "want[ed] him to live." (*Id.* at 112).

Dr. Shealy testified as an expert in psychology. (Doc. 18-11 at 120–21). He met with Mr. Calhoun to do a competency evaluation, to assess his mental state at the time of the offense, and to assess mitigating factors. (*Id.* at 121). Based on his intelligence testing, Dr. Shealy concluded that Mr. Calhoun was malingering and "[t]hat he really was more intelligent than he tried to lead me to believe." (*Id.* at 123). Dr. Shealy testified that he had reviewed Dr. Ronan's report and that Dr. Ronan had also found Mr. Calhoun to be malingering. (*Id.* at 124). Dr. Shealy also testified that, although he had not made any "psychiatric diagnoses," Dr. Ronan diagnosed Mr. Calhoun with mixed personality disorder, mild depression, and something close to "impulse control disorder not otherwise specified for instrumental [sic] explosive disorder." (Doc. 18-11 at 124–25). The impulse control disorder was "characterized by discrete episodes of failure to resist aggressive impulses resulting in serious

assaults with destruction of property. The degree of aggressiveness expressed during an episode is grossly out of proportion to any provocation or precipitating psychosocial stressor." (*Id.* at 125).

On cross-examination, Dr. Shealy read into the record the definition of "intermittent explosive disorder" from the Diagnostic and Statistical Manual of Mental Disorders ("DSM"). (*Id.* at 127–28). As classified under the DSM, intermittent explosive disorder is a diagnosis of exclusion after other causes such as episodes which are the result of "the direct physiological effects of a substance" have been eliminated. (*Id.*). Dr. Shealy next testified that Mr. Calhoun had reported drug and alcohol use. (*Id.*). The State also highlighted Dr. Shealy's opinion that Mr. Calhoun was malingering to "receive some benefit by trying to fake mental illness or [intellectual disability]," and his recitation of Dr. Ronan's report about Mr. Calhoun fondling himself during her examination of him. (*Id.* at 128–29).

On redirect examination, Dr. Shealy testified that "the most likely" psychological effect of an absent father "is a pattern of anti-social behavior or conduct disorder." (Doc. 18-11 at 133). He also stated that Mr. Calhoun "apparently" had some difficulties with his education, and a person with two parents and a normal education would have "more opportunities to learn moral standards and moral

behavior, and . . . more chances in a sense to not end up in this situation." (*Id.* at 133–34).

Dr. Shealy further testified that Mr. Calhoun was "likely . . . seriously impaired by alcohol and drug intoxication" at the time of the offense, but it was "difficult to determine since he has no memory for the alleged offense." (*Id.* at 130). Mr. Calhoun had told Dr. Shealy that he drank "a pint or more a day, case of beer every couple of days," and he used cocaine weekly and marijuana occasionally. (*Id.*). Dr. Shealy testified that if Mr. Calhoun had used that amount of alcohol and drugs, he would have been under the influence of an extreme mental or emotional disturbance. (Doc. 18-11 at 131). He also testified that the substance abuse, the impulse control disorder, "and what appears to be a compulsive sexual disorder . . . could lead to impairment of his ability to conform his conduct to the requirements of law," either individually or in combination. (*Id.* at 132–33). On recross examination, the State attempted to elicit testimony that Mr. Calhoun was faking his alcohol or drug abuse, but Dr. Shealy testified that he did not find any evidence of malingering in that part of the interview. (*Id.* at 135–36).

During a short break and outside the presence of the jury, trial counsel informed the court and the State that although Mr. Calhoun's childhood pastor, Reverend Threatt, had been listed as a mitigation witness, counsel was not going to

call him because "while he doesn't know anything bad about [Mr. Calhoun], he doesn't know enough about him—he hasn't seen him in fifteen years other than passing him on the street. [Reverend Threatt] left that church fifteen years ago. He left that church and has no current knowledge." (*Id.* at 138). The trial court then had a colloquy with Mr. Calhoun, ensuring that he understood his right to testify. (Doc. 18-11 at 139–40). Mr. Calhoun testified that he understood he could testify but he did not want to. (*Id.*).

In closing, trial counsel argued that "[w]hat happened in terrible," but it was not possible to bring Mr. Phillips back, so the jury should "[l]et the killing stop." (*Id.* at 150). A life sentence would prevent Mr. Calhoun from ever again doing what he did to the Phillipses and he would "die slowly" every day in prison for the rest of his life. (*Id.* at 151–52). Trial counsel also briefly reminded the jury that Dr. Shealy had given two mitigating circumstances and asked the jury to "[t]ake that back with you." (*Id.* at 151).

In rebuttal, the State argued that asking the jury to "[l]et the killing stop" was "an awfully big thing to dump on you" because Mr. Calhoun was the reason why everyone was there, the death penalty was society's self-defense mechanism to protect against those who would not conform their behavior, and Mr. Calhoun

himself believed in the death penalty because he killed Mr. Phillips without a sentence hearing. (*Id.* at 151–54).

The jury recommended in a ten to two vote that Mr. Calhoun receive the death penalty. *Calhoun I*, 932 So. 2d at 935; (doc. 18-11 at 175). The parties did not present any additional evidence at the judicial hearing that followed (doc. 18-11 at 178), and the trial court sentenced Mr. Calhoun to death. (Doc. 18-11 at 182).

In his Rule 32 petition, Mr. Calhoun contended that trial counsel's investigation and presentation of evidence was deficient because they "appear[ed]" to have contacted only Ms. Garrett and Reverend Threatt and did not contact "numerous potential witnesses," including Mr. Calhoun, his father, his ex-wife, his son, his siblings, his aunt and uncle, a former teacher, a former boss, a family friend, and a former supervisor. (Doc. 18-23 at 172). Interviewing them would have "reveal[ed] a large amount of mitigating evidence." (*Id.* at 173). Likewise, if counsel had sought funds to hire a social workers or mitigation expert, that person would have interviewed those witnesses and obtained records that would have assisted in putting together a "coherent personal and social history." (*Id.* at 182–83).

Mr. Calhoun's Rule 32 petition alleged that Mr. Calhoun lived with his mother and sister "in abject poverty," and a childhood teacher could have testified that he "lived at a level of poverty she had never even imagined existed." (*Id.* at 174). Both

Mr. Calhoun's mother and sister both received disability because of their intellectual limitations. (Doc. 18-23 at 175). Institutional records about Mr. Calhoun's family members would have corroborated Mr. Calhoun's "unstable home life," his stepfather's alcohol abuse, the "domestic violence" inflicted on Mr. Calhoun and his mother, the "routine exposure to violence and inappropriate sexual relationships," his mother's and sister's mental health disabilities, and "the abject poverty in which Mr. Calhoun spent all of his life." (*Id.* at 182).

Mr. Calhoun was close to the sister he grew up with and protective of her. (*Id.* at 179). He also pursued and maintained strong relationships with his half-siblings and their families. (*Id.* at 180). Likewise, he and his son continued to have a close relationship even with Mr. Calhoun in jail. (Doc. 18-23 at 180).

Mr. Calhoun's father abandoned him young and had "extremely limited contact" with him. (*Id.* at 174). His stepfather was "mentally and physically abusive, including committing numerous acts of sexual abuse in the house in which Mr. Calhoun grew up" and he created "an atmosphere of almost constant exposure to violence." (*Id.* at 174–75). Mr. Calhoun stated that "[a] number of witnesses could have testified about [the stepfather]'s many violent acts." (*Id.* at 175). Another family member eventually murdered Mr. Calhoun's stepfather (doc. 18-23 at 174) over a gambling debt (*id.* at 182). In addition to the violence, Mr. Calhoun was "exposed to

incestuous sexual abuse throughout his childhood. Such behavior was rampant among Mr. Calhoun's family members." (*Id.* at 175).

The Rule 32 petition also asserted that trial counsel should have obtained "institutional records, including school records, jail and correctional records, physical and mental health records, social welfare records, employment records, and military records for Mr. Calhoun." (*Id.* at 175). Those records would have shown that he had been in special education, had been expelled from school and placed in a school for children with mental disabilities, had dropped out of that school, and had "failed a military exam which tested basic skills of prospective recruits." (Doc. 18-23 at 176). But the Talladega County School District had "destroyed the vast majority of Mr. Calhoun's educational records on or after 2003," so that records were no longer available. (*Id.* at 176).

After Mr. Calhoun left school at sixteen, he immediately began working and he continued working for fourteen years. (*Id.* at 177). He had only three employers during that time, and each would have testified that Mr. Calhoun was a good and reliable worker. (*Id.*). Finally, according to the Rule 32 petition, trial counsel should have obtained and presented evidence of "Mr. Calhoun's ability to adjust to prison life," which would have shown that he would not continue to be a danger in prison. (Doc. 18-23 at 182).

63

The Alabama Court of Criminal Appeals rejected this claim on the merits, finding that Mr. Calhoun failed to plead it with sufficient specificity and that some of the purportedly omitted evidence would have been cumulative of evidence counsel presented to the jury. *Calhoun II*, 261 So. 3d at 470–72. Mr. Calhoun contends that the Alabama Court of Criminal Appeals' decision finding that he failed to sufficiently plead prejudice was an unreasonable determination of the facts, under § 2254(d)(2) (doc. 1-1 at 9–10, 15–16), and that the Court's decision was an unreasonable application of federal law (doc. 1-1 at 10–15).

First, the Alabama Court of Criminal Appeals' rejection of Mr. Calhoun's claim on the ground that he failed to plead specific facts showing prejudice was not based on an unreasonable determination of the facts. *See* 28 U.S.C. § 2254(d)(2); *Calhoun II*, 261 So. 3d at 470–72. Mr. Calhoun makes the same argument he made in Claim Two: that the Alabama Court of Criminal Appeals' conclusion that he failed to satisfy the state pleading standard is an unreasonable determination of the facts. (*See* doc. 1-1 at 15–16; doc. 27 at 51). This argument fails here as it did there. *See supra* at 44–45; *see also Calhoun II*, 261 So. 3d at 469–72 (addressing Mr. Calhoun's specific allegations).

Next, the court turns to whether the Alabama Court of Criminal Appeals' decision involved an unreasonable application of clearly established federal law. *See*

64

28 U.S.C. § 2254(d)(1). At the outset, the court addresses a dispute about whether Claim Three is one claim or several. Mr. Calhoun contends that his claim of ineffective assistance based on the failure to investigate and present mitigating evidence is one claim and that the state courts unreasonably treated each separate allegation as a standalone claim. (Doc. 27 at 45). The State responds that the way Mr. Calhoun presented each allegation shows that each is a claim in and of itself. (Doc. 38 at 40). The court agrees with Mr. Calhoun's premise that Claim Three is a single claim that trial counsel provided ineffective assistance in investigating and presenting various forms of mitigating evidence, though the claim about counsel's failure to request a jury instruction is an outlier, which the court will discuss separately at the end of this section.

The court does not, however, agree with Mr. Calhoun's conclusion that the state courts unreasonably treated the single claim as multiple claims. Even if the state habeas trial court did so, the Alabama Court of Appeals did not: its opinion clearly indicated that this was one claim, in support of which Mr. Calhoun made various arguments. *See Calhoun II*, 261 So. 3d at 469–73; *see also id.* at 472 ("[T]his section of Calhoun's petition presented a narrative that portrayed Calhoun as a man who grew up in an impoverished and abusive household, who suffered from mental impairments

that hindered his education and his life, but who nonetheless exhibited positive character traits in his work and family life.").

Next, Mr. Calhoun contends that the Court of Criminal Appeals' decision was contrary to or an unreasonable application of *Strickland*, *Skipper v. South Carolina*, 476 U.S. 1 (1986), *Penry v. Lynaugh*, 492 U.S. 302 (1989), *abrogated on other grounds by Atkins*, 536 U.S. 304, *Williams*, 529 U.S. 362, *Wiggins v. Smith*, 539 U.S. 510 (2003), *Rompilla v. Beard*, 545 U.S. 374 (2005), *Porter v. McCollum*, 558 U.S. 30 (2009), and *Sears v. Upton*, 561 U.S. 945 (2010). (Doc. 1-1 at 1–16; *see also* doc. 1 at 68–78 at 10; doc. 27 at 51–72).

For starters, the Supreme Court's decisions in *Skipper* and *Penry* are inapposite. The Court in *Skipper* held that a state court cannot exclude evidence of a prisoner's adjustment to life in prison as a mitigating circumstance. *See* 476 U.S. at 4–5. *Skipper* did not hold that a jury faced with evidence of how a defendant had adjusted to life in prison will necessarily find that it mitigates the crime the defendant committed, merely that it *might*. *See id.* at 5 ("[E]vidence that the defendant would not pose a danger if spared (but incarcerated) must be considered *potentially* mitigating.") (emphasis added). The Court in *Penry* likewise held that a state court erroneously precluded a jury from considering certain mitigating evidence, not that presentation of the evidence would necessarily have resulted in the jury finding the

existence of a mitigating factor. 492 U.S. at 320–28. The issue in this claim is not that any state court excluded mitigating evidence, as the courts in *Skipper* and *Penry* did; the issue here is whether the Alabama Court of Criminal Appeals reasonably found that, even if counsel had presented this evidence, it was not likely to change the jury's recommendation of a death sentence.

The remaining cases Mr. Calhoun cites involved claims of ineffective assistance of counsel with respect to investigating and presenting mitigation evidence. The court will start by addressing whether *Calhoun II* was contrary to any of them before addressing whether *Calhoun II* involved an unreasonable application of any of them.

### i.    "Contrary To" Clearly Established Federal Law

"Contrary to" clearly established federal law for § 2254(d)(1) means the state court reached "a conclusion opposite to that reached by [the Supreme] Court on a question of law or . . . the state court decide[d] a case differently than [the] Court . . . on a set of materially indistinguishable facts." *Williams*, 529 U.S. at 412–13. Each of the cases Mr. Calhoun cites is distinguishable.

First, the *Strickland* decision clearly established that, for ineffective-assistance purposes, prejudice is assessed by evaluating "whether there is a reasonable probability that, absent the errors, the sentencer—including an appellate court, to the

extent it independently reweighs the evidence—would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." 466 U.S. at 695. "In making this determination, a court hearing an ineffectiveness claim must consider the totality of the evidence before the judge or jury." *Id.* Some evidence may have a "pervasive effect" and some may have "an isolated, trivial effect." *Id.* at 695–96. "[A] verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support." *Id.* at 696. "It is not enough for the [petitioner] to show that the errors had some conceivable effect on the outcome of the proceeding." *Id.* at 693.

In *Strickland*, the petitioner "planned and committed three groups of crimes, which included three brutal stabbing murders, torture, kidnapping, severe assaults, attempted murders, attempted extortion, and theft." 466 U.S. at 671–72. At the sentencing hearing, trial counsel argued that the petitioner's "remorse and acceptance of responsibility justified sparing him from the death penalty," the petitioner had no history of criminal activity, he had committed the crimes under extreme mental or emotional disturbance, and he had surrendered, confessed, and offered to testify against a codefendant. *Id.* at 673–74. The state trial court found multiple aggravating circumstances and no mitigating circumstances. *Id.* at 674–75. In his collateral proceedings, the petitioner submitted affidavits from friends, neighbors, and relatives

68

stating that they would have testified the petitioner was "basically a good person who was worried about his family's financial problems," along with a psychiatric report and a psychological report stating that he "was chronically frustrated and depressed because of his economic dilemma at the time of his crimes." *Strickland*, 466 U.S. at 675–77. The Supreme Court held that the omitted evidence "would barely have altered the sentencing profile presented to the sentencing judge." *Id.* at 699–700.

Because the *Strickland* decision held that counsel's deficiency did not prejudice the petitioner, the *Calhoun II* decision—holding that any deficiency did not prejudice Mr. Calhoun—did not reach "a conclusion opposite to that reached by [the Supreme] Court on a question of law or . . . decide[ ] a case differently than [the] Court . . . on a set of materially indistinguishable facts." *Williams*, 529 U.S. at 412–13.

In *Sears*, the state habeas trial court found no prejudice because it would have had to speculate about the effect of the omitted mitigation evidence on the jury. 561 U.S. at 952. The United States Supreme Court found the state habeas trial court's application of federal law unreasonable because a court evaluating prejudice must "consider the totality of the available mitigation evidence—both that adduced at trial, and the evidence adduced in the habeas proceeding—and reweigh it against the evidence in aggravation." *Id.* at 955–56 (quotation marks and alteration omitted). The

69

Court did not rule on whether trial counsel's deficient performance actually prejudiced the petitioner; it simply held that the state habeas trial court used the wrong standard in evaluating the prejudice prong. *Sears*, 561 U.S. at 956. The *Calhoun II* Court did not refuse to consider the totality of the mitigation evidence or use the wrong standard in evaluating prejudice. *See Calhoun II*, 261 So. 3d at 470–72. Accordingly, *Calhoun II* was also not "contrary to" *Sears*. *See Williams*, 529 U.S. at 412–13.

In *Williams*, the petitioner killed a man for three dollars. 529 U.S. at 367–68 & n.1. The State presented aggravating evidence that he had previous convictions for armed robbery, burglary, and grand larceny, he had confessed to various other violent crimes, and he had been convicted of starting a fire in the jail while detained for the murder trial. *Id.* at 368. The mitigating evidence from the petitioner's mother and two neighbors was that he was a "nice boy and not a violent person," and a psychiatrist stated that the petitioner had "removed the bullets from a gun [during one of the earlier robberies] so as not to injure anyone." *Id.* at 369 (quotation marks omitted). He also had spontaneously confessed to the murder, even though local officials had ruled the death a non-homicide. *Id.* at 367, 369.

During postconviction proceedings, the petitioner presented evidence that his parents had been convicted of criminally neglecting their children, that his father had

70

"severely and repeatedly beaten him," that he had been abused in a foster home, that he was "borderline [intellectually disabled] and did not advance beyond sixth grade in school," that he had prison commendations for helping to break up a prison drug ring and for helping to return a guard's lost wallet, and that prison officials described him as "among the inmates least likely to act in a violent, dangerous or provocative way." *Williams*, 529 U.S. at 396. The state habeas trial court found that trial counsel was ineffective but the state supreme court reversed, holding that a petitioner can establish prejudice only if the omitted evidence rendered the sentencing proceeding "fundamentally unfair." *Id.* at 371–72.

The United States Supreme Court held that the state court's rejection of the ineffective assistance claim was both contrary to and an unreasonable application of *Strickland* because *Strickland* requires only that the petitioner show a "reasonable probability" that the outcome would have been different, but the state supreme court required a showing of fundamental unfairness or unreliability. *Id.* at 394, 397. The Supreme Court also held that the state supreme court's decision was an unreasonable application of *Strickland* because it "failed to evaluate the totality of the available mitigation evidence—both that adduced at trial, and the evidence adduced in the habeas proceeding in reweighing it against the evidence in aggravation." *Id.* at 397–98. The Supreme Court held that, although the evidence of the "future dangerousness

71

aggravating circumstance" was strong, the mitigation evidence the petitioner had presented during the penalty phase (that he turned himself in for a crime the police "otherwise would never have discovered," expressed remorse, and cooperated with police) and the omitted evidence (the abusive and deprived childhood and borderline intellectual disability) together might have swayed the jury. *Williams*, 529 U.S. at 398.

Unlike the state court in *Williams*, the Court of Criminal Appeals in *Calhoun II* applied the correct legal test for prejudice under *Strickland*: "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Calhoun II*, 261 So. 3d at 464 (quoting *Strickland*, 466 U.S. at 694). Moreover, the facts presented in *Williams* are distinguishable from this case, where, at a minimum, Mr. Calhoun never turned himself in, did not express remorse, and did not cooperate with the police. Accordingly, *Calhoun II* was not "contrary to" *Williams*. *See Williams*, 529 U.S. at 412–13.

In *Wiggins*, the petitioner was involved in the drowning of a seventy-seven year old woman in her bathtub during a robbery. 539 U.S. at 514–15. During the penalty phase of the trial, counsel attempted to prove that someone else killed the victim and alluded to the petitioner's "difficult life," but presented "no evidence of [his] life history." *Id.* at 515.

During postconviction proceedings, the petitioner presented testimony from a social worker who had prepared an "elaborate social history report . . . containing evidence of the severe physical and sexual abuse petitioner suffered at the hands of his mother and while in the care of a series of foster parents." *Id.* at 516. The petitioner's mother was a "chronic alcoholic," who left the petitioner and his siblings "home alone for days, forcing them to beg for food and to eat paint chips and garbage," beat them, had "sex with men while her children slept in the same bed," and held the petitioner's hand to a hot stove burner, leading to his hospitalization. *Wiggins*, 539 U.S. at 516–17. The State placed the petitioner in foster care when he was six years old, and his first two foster mothers physically abused him, while the second foster father "repeatedly molested and raped him." *Id.* at 517. After running away and living on the streets in his teens, he "returned intermittently to additional foster homes, including one in which the foster mother's sons allegedly gang-raped him on more than one occasion." *Id.* And when he left the foster care system and entered a Job Corps program, a supervisor "allegedly sexually abused" him. *Id.*

The United States Supreme Court, evaluating prejudice *de novo* because the state courts had not reached that prong of the *Strickland* analysis, held that introduction of the omitted evidence would have had a "reasonable probability" of resulting in a different sentence. *Wiggins*, 539 U.S. at 536. The Supreme Court noted

73

that the aggravating evidence was "far weaker" than in *Williams*, the jury had heard "only one significant mitigating factor" (his lack of prior convictions), and the omitted evidence was "powerful." *Id.* at 534, 537–38.

The facts presented by this case are not "materially indistinguishable" from *Wiggins*. *See Williams*, 529 U.S. at 412–13. Unlike *Wiggins*, the aggravating factors in this case were strong and the jury heard mitigating evidence about Mr. Calhoun's childhood, his abandonment by his father, his educational problems, his mother's desire for him to live, and Dr. Shealy's testimony about Mr. Calhoun's self-reported substance abuse, mixed personality disorder, depression, and something like an impulse control disorder and a compulsive sexual disorder. (Doc. 18-11 at 109–36). These material distinctions in both aggravating factors and mitigating evidence constitute a set of facts different from those in *Wiggins*, so *Calhoun II* was not "contrary to" *Wiggins*. *See Williams*, 529 U.S. at 412–13.

In *Rompilla*, the petitioner stabbed a man repeatedly and then set his body on fire. 545 U.S. at 377. During the penalty phase, the jury found three aggravators: the murder was committed in the course of another felony, the murder was committed by torture, and the petitioner had a "significant history of felony convictions indicating the use or threat of violence." *Id.* at 378. The mitigating evidence came from five family members who "argued in effect for residual doubt, and beseeched the jury for

74

mercy, saying that they believed [the petitioner] was innocent and a good man." *Id.* The petitioner's teenage son also "testified that he loved his father and would visit him in prison." *Id.* The jury found two mitigating factors: that the son had testified on his behalf and that rehabilitation was possible. *Rompilla*, 545 U.S. at 378. But the jury found the aggravators outweighed the mitigators and sentenced the petitioner to death. *Id.*

During postconviction proceedings, the petitioner presented evidence that the petitioner's parents were severe alcoholics; his mother drank while pregnant with him and experts found that he likely had fetal alcohol syndrome; his parents frequently fought, with his father leaving his mother "bruised and black-eyed" and his mother stabbing his father on "at least one occasion"; his father beat him "with his hands, fists, leather straps, belts and sticks"; his father locked him and his brother "in a small wire mesh dog pen that was filthy and excrement filled"; the house lacked indoor plumbing and the petitioner had to sleep in an unheated attic; the parents did not give the children clothes, so they attended school in rags; and school records showed that his "IQ was in the [intellectually disabled] range." *Id.* at 391–92. Experts also found that the petitioner had "organic brain damage, an extreme mental disturbance significantly impairing several of his cognitive functions." *Id.* at 392 (quotation marks omitted).

75

The Supreme Court found that counsel's failure to present the mitigating evidence prejudiced the petitioner because the omitted evidence "adds up to a mitigation case that bears no relation to the few naked pleas for mercy actually put before the jury, and although [the Court] suppose[d] it [was] possible that a jury could have heard it all and still have decided on the death penalty, that is not the test. It goes without saying that the undiscovered mitigating evidence, taken as a whole, might well have influenced the jury's appraisal of [the petitioner]'s culpability." *Id.* at 393(cleaned up).

Again, this case is materially distinguishable from *Rompilla*. Although Ms. Garrett pleaded for mercy for her son, counsel also presented evidence of Mr. Calhoun's upbringing and his mental status. (Doc. 18-11 at 109–36). Unlike *Rompilla*, the mitigation case presented on collateral attack does resemble the mitigation case presented to the jury: that Mr. Calhoun had a loving family and intellectual and mental disabilities. Accordingly, *Calhoun II* is not "contrary to" *Rompilla*. *See Williams*, 529 U.S. at 412–13.

In *Porter*, the petitioner murdered his former girlfriend and her new boyfriend the morning after getting very drunk. 558 U.S. at 31–32. The only mitigating evidence presented "was inconsistent testimony about [the petitioner's] behavior when intoxicated and testimony that [he] had a good relationship with his son." *Id.* at

32. The trial court found four aggravating circumstances for the former girlfriend's murder and two for the new boyfriend's murder. *Id.* at 32. The trial court found no mitigating circumstances and imposed the death penalty for one of the murders. *Id.* at 32–33. The state supreme court struck one of the aggravating factors and two dissenting justices would have reversed the death penalty. *Id.* at 33.

In postconviction proceedings, the petitioner presented "extensive mitigating evidence" that trial counsel had not discovered or put before the sentencing jury. *Porter*, 558 U.S. at 33. The petitioner's father had once beat his mother so badly that "she had to go to the hospital and lost a child"; the father's "favorite target" was the petitioner, particularly when he tried to protect his mother; the father had once shot at the petitioner but, when he missed, "just beat [him] instead"; and he "attended classes for slow learners and left school when he was 12 or 13." *Id.* at 33–34. He enlisted in the Army when he was seventeen, where he fought in two days-long battles, in which he was wounded twice and his company sustained heavy losses of troops, and for which he received multiple decorations. *Id.* at 34–35. After returning from the war, he suffered "dreadful nightmares and would attempt to climb his bedroom walls with knives at night," and he "began drinking so heavily that he would get into fights and not remember them at all." *Id.* at 35–36. An expert testified that he had "brain damage that could manifest in impulsive, violent behavior" and that he

"was substantially impaired in his ability to conform his conduct to the law and suffered from an extreme mental or emotional disturbance." *Id.* at 36.

The United States Supreme Court held that the state courts' rejection of the prejudice prong was unreasonable because (1) the omitted mitigating evidence of his "heroic military service," his struggles after returning from war, his abusive childhood, and his brain abnormality and academic difficulties were "the kind of troubled history . . . relevant to assessing a defendant's moral culpability"; and (2) the aggravating evidence was "not as substantial as the sentencing judge thought" because there was, effectively, only one aggravating circumstance underlying the murder for which he received the death penalty. *Id.* at 41–42 (quotation marks omitted).

Just as with the other cases Mr. Calhoun cites, the facts in *Porter* are distinguishable from this case. Unlike *Porter*, multiple aggravating circumstances remain valid, trial counsel presented mitigating evidence of Mr. Calhoun's intellectual and mental disabilities, his self-reported intoxication and substance abuse problem, and the omitted mitigating evidence is of an entirely different caliber. *See id.* Accordingly, *Calhoun II* is not "contrary to" *Porter*. *See Williams*, 529 U.S. at 412–13.

Mr. Calhoun cannot establish that the *Calhoun II* Court reached "a conclusion opposite to that reached by [the Supreme] Court on a question of law or . . . decide[d] a case differently than [the] Court . . . on a set of materially indistinguishable facts." *Id. Calhoun II* was therefore not "contrary to" any of those cases. The next question is whether *Calhoun II* "involved an unreasonable application of[ ] clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1).

### ii. Involving an "Unreasonable Application of" Clearly Established Federal Law

An "unreasonable application of" federal law occurs when the state court correctly identifies "the governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Williams*, 529 U.S. at 413. Mr. Calhoun contends that the *Calhoun II* decision involved an unreasonable application of the same cases discussed above. *See supra* at 67–79. The court has already described each of the relevant cases in detail and determined that each has material distinctions from this case. *Id.* The question now is whether the Court of Criminal Appeals unreasonably applied those decisions in determining that there was no "reasonable probability that . . . the result of the proceeding would have been different." *Calhoun II*, 261 So. 3d at 464, 472.

79

The import of each of the cited cases is that a court evaluating prejudice in connection with this kind of claim must consider "the totality of the available mitigation evidence—both that adduced at trial, and the evidence adduced in the habeas proceeding in reweighing it against the evidence in aggravation." *Williams*, 529 U.S. at 397–98; *see also supra* at 67–79. The *Calhoun II* opinion contains no indication that the Court of Criminal Appeals failed to follow this mandate. *See* 261 So. 3d at 470–72. Moreover, this court's own review of the aggravating evidence, the mitigating evidence presented at trial, and the mitigating evidence alleged in Mr. Calhoun's Rule 32 petition supports the Court of Criminal Appeals' determination.

The aggravators in Mr. Calhoun's case were extremely strong: he had a history of three previous sex-related crimes and he committed a murder in the course of a burglary, a robbery, and a rape. (Doc. 18-11 at 103, 107; doc. 18-2 at 55, 57–58). The mitigating evidence presented at trial was weak: some evidence from Mr. Calhoun's mother that Mr. Calhoun had little education, his father had abandoned him, he had a good relationship with his son, and she wanted him to live, and evidence from Dr. Shealy that Mr. Calhoun had self-reported a serious substance abuse problem, another doctor had diagnosed him with mixed personality disorder, depression, and something like an impulse control disorder, and he had malingered during

80

intelligence testing. (Doc. 18-11 at 110–36). The allegations of omitted mitigation evidence made during Mr. Calhoun's Rule 32 petition were also weak: Mr. Calhoun grew up impoverished; he, his mother, and his sister had intellectual disabilities; his father abandoned him and his stepfather was abusive; his home life involved some sort of "inappropriate sexual relationships," including incest; he nevertheless maintained good relationships with his family; he had maintained regular work for fourteen years after dropping out of school; and he had adjusted to prison life. (Doc. 18-23 at 174–82).

As the state trial habeas court noted, Mr. Calhoun was thirty years old at the time of the murder, so "evidence concerning his childhood, poverty, abuse, and background would have been entitled to very little, if any, mitigating weight." (Doc. 18-26 at 129). Although this court's review is of the Alabama Court of Criminal Appeals' decision, the court may consider the state habeas trial court's "justifications" in evaluating the reasonableness of the Court of Criminal Appeals' decision. *See Pye*, 50 F.4th at 1036; *King*, 69 F.4th at 867. And the Eleventh Circuit has held that "[w]hen a defendant is several decades removed from the abuse being offered as mitigation evidence its value is minimal." *Callahan v. Campbell*, 427 F.3d 897, 937 (11th Cir. 2005); *see also Anderson v. Sec'y, Fla. Dep't of Corr.*, 752 F.3d 881, 908 (11th Cir. 2014) ("Although evidence of sexual abuse may constitute a

81

mitigating circumstance, when a defendant is several decades removed from the abuse being offered as mitigation evidence its value is minimal.") (alteration and quotation marks omitted). In *Callahan*, twenty-three years passed between the abuse suffered by the defendant and the murder committed by the defendant, and in *Anderson*, twenty-six years passed. *Callahan*, 427 F.3d at 923; *see Anderson*, 752 F.3d at 885–86, 896 (explaining that the abuse of the defendant began when he was five years old and the defendant committed the crime when he was thirty-one years old).

Neither Mr. Calhoun's Rule 32 petition nor his § 2254 petition make clear when in his childhood he was abused, instead referring generally to his "childhood." (*See* doc. 18-23 at 170–75; doc. 1 at 69–72). But even assuming Mr. Calhoun's abuse occurred while he was in his teens, a decade had passed since he became an adult; he was thirty years old when he murdered Mr. Phillips. (*See* doc. 18-11 at 160). The court cannot find, based on these allegations, that the Alabama Court of Criminal Appeals unreasonably applied the Supreme Court cases cited.

Similarly, Mr. Calhoun has not shown that the Court of Criminal Appeals unreasonably applied any clearly established law when it concluded that his fourteen years of work, testimony that he was a good employee, and evidence that he maintained close relationships with his siblings and son "would [not] have been so

compelling as to change the outcome of the penalty phase of his trial." *Calhoun II*, 261 So. 3d at 472. The same is true of the Court of Criminal Appeals' silent rejection of the adjustment-to-prison-life mitigating circumstance. *See generally id.* at 470–72. *Strickland* itself holds that courts evaluating prejudice in connection with an ineffective-assistance claim relating to the failure to investigate or present mitigating evidence must consider the totality of the evidence, and prejudice will be more difficult to establish where the aggravating evidence is very strong or overwhelming. *See Strickland*, 466 U.S. at 699–700 ("The evidence that respondent says his trial counsel should have offered at the sentencing hearing would barely have altered the sentencing profile . . . . Given the overwhelming aggravating factors, there is no reasonable probability that the omitted evidence would have changed the conclusion that the aggravating circumstances outweighed the mitigating circumstances . . . ."). In this case, the Alabama Court of Criminal Appeals reasonably applied *Strickland* and its progeny to reject Mr. Calhoun's claim on the merits based on the very strong aggravating circumstances and the relatively weak mitigating evidence presented at trial and during Rule 32 proceedings.

### iii. Ineffective Assistance for Failing to Request
### Instruction on Jury Unanimity

At the beginning of this section, the court referenced a part of the claim that is an outlier from the rest. In that part of the claim, Mr. Calhoun contends that trial counsel were ineffective for failing to request a jury instruction that "its findings related to mitigating circumstances need not be unanimous for individual jurors to consider them." (Doc. 1-1 at 6). In support, he cites *Mills v. Maryland*, 486 U.S. 367, 384 (1988), in which the United States Supreme Court vacated a death sentence because "the sentencer must be permitted to consider all mitigating evidence" and the jury instructions and verdict form created "a substantial probability that reasonable jurors . . . well may have thought they were precluded from considering any mitigating evidence unless all 12 jurors agreed on the existence of a particular such circumstance." The Alabama Court of Criminal Appeals rejected this claim on the merits because Mr. Calhoun had not identified "what mitigating factors the jury would have found but for the absence of this instruction." *Calhoun II*, 261 So. 3d at 477–78.

Mr. Calhoun has provided no argument about how the Court of Criminal Appeals' decision was contrary to or involved an unreasonable application of *Strickland*. (*See* doc. 1-1 at 6; doc. 27 at 49–50; doc. 44 at 31–32). Instead, he relies

on *Mills* itself, which was decided during a direct appeal and did not involve any allegation of ineffective assistance. *See generally* 486 U.S. 367. In any event, the Alabama Court of Criminal Appeals reasonably concluded that Mr. Calhoun had not shown how trial counsel's failure to request an instruction on jury unanimity affected the outcome of his sentencing, which is a requirement for any claim of ineffective assistance. *See Calhoun II*, 261 So. 3d at 477–78; *see also Strickland*, 466 U.S. at 687. As a result, Mr. Calhoun has not shown that the Court of Criminal Appeals' rejection of this claim was contrary to or involved an unreasonable application of *Strickland*. The court **DENIES** Claim Three.

   4.  <u>Claims Four, Sixteen, and Eighteen</u>

   In Claim Sixteen, Mr. Calhoun contends that the State violated *Batson* by striking two thirds of the black venire members. (Doc. 1-1 at 65–66). In Claim Eighteen, Mr. Calhoun contends that the state trial court erred by failing to examine the jury pool selection process because the jury pool was only twenty-four percent black even though Talladega County was thirty-one percent black. (*Id.* at 70–72). And in Claim Four, Mr. Calhoun contends that trial counsel were ineffective for declining the state trial court's invitation to make a *Batson* challenge to the prosecutor's use of peremptory strikes, especially in light of Talladega County's history of race discrimination in jury selection and the under-representation of black

venire members in the jury pool. (*Id.* at 17–22). Because these claims are factually related, the court addresses them together.

After voir dire and for-cause strikes, the venire in Mr. Calhoun's trial consisted of fifty people, twelve of whom were black. (Doc. 18-6 at 40). The State used eight of its nineteen peremptory strikes on black venire members, leaving four, three of whom were seated on the jury and one of whom was an alternate. (*Id.*; *see also id.* at 41 (the State agreeing that trial counsel's figures were correct)). When the trial court asked if the defense wanted to make a *Batson* challenge, trial counsel responded that they did not, because they had "examined the percentages of the venire, and based on the percentages that we have looked into and the reasons for strikes by the State, at this point we have no Batson Motion." (*Id.* at 39–40). Trial counsel explained that twenty-four percent of the entire venire had been black, which was less than the thirty-three percent of the jury who were black. (*Id.* at 40).

On direct appeal, Mr. Calhoun argued that the State violated *Batson* by striking two-thirds of the black venire members, especially when considered in light of the county's history of race discrimination in jury selection. (Doc. 18-15 at 119–21). The Alabama Court of Criminal Appeals rejected this claim on the grounds that trial counsel waived any objection and, in any event, "the record fails to establish a prima facie case of racial discrimination." *Calhoun I*, 932 So. 2d at 943.

86

Separately, Mr. Calhoun argued that Talladega County's method of jury selection was racially discriminatory because the number of black venire members in the jury pool was lower than the number of black residents of Talladega County. (Doc. 18-15 at 152–53). The Alabama Court of Criminal Appeals held that the record contained no information about Talladega County's method of selecting jurors or the racial makeup of Talladega County, so Mr. Calhoun could not carry his burden of showing racial discrimination in the jury selection process. *Calhoun I*, 932 So. 2d at 939.

In his Rule 32 petition, Mr. Calhoun combined the two claims. (*See* doc. 18-23 at 144–47). He contended that trial counsel were ineffective for waiving the *Batson* challenge because the State struck sixty-six percent of the black venire members, trial counsel erred by relying on the proportion of black members of the venire compared to the jury, and counsel should have argued that "Talladega County prosecutors have struck disproportionately high numbers of black prospective jurors from venires as a pattern and practice for years," "not a single black juror served on a petit jury from 1950 to 1965," and only twenty-four percent of Mr. Calhoun's jury pool was black, compared to the thirty-one percent of Talladega County that was black. (*Id.*).

The state habeas trial court denied the ineffective assistance claim as insufficiently pleaded. (Doc. 18-26 at 91–94). The Alabama Court of Criminal Appeals affirmed, explaining that (1) striking sixty-six percent of the black venire members alone would not be sufficient to establish a prima facie *Batson* violation; (2) the history of racially discriminatory jury strikes was too attenuated to establish a prima facie *Batson* violation; (3) Mr. Calhoun failed to identify any black venire members who were stricken because of their race; (4) in light of the lack of a prima facie case of discrimination, counsel's reason for waiving a *Batson* challenge was irrelevant; and (5) Mr. Calhoun's allegation about the relative percentages of the black population in his venire versus Talladega County as a whole was insufficient to properly plead racial discrimination in the jury selection process. *Calhoun II*, 261 So. 3d at 473–75.

Racial discrimination in jury selection violates the Equal Protection Clause of the Constitution. *Batson v. Kentucky*, 476 U.S. 79, 85 (1986). This rule exists both with respect to the "procedures used to select the venire from which individual jurors are drawn," *id.*, and the selection of a defendant's own petit jury, *id.* at 89. When a defendant challenges the jury selection procedure as a whole, he must show (1) the excluded group is a "'distinctive' group in the community"; (2) "the representation of this group in venires from which juries are selected is not fair and reasonable in

relation to the number of such persons in the community"; and (3) the "underrepresentation is due to systematic exclusion of the group in the jury-selection process." *Duren v. Missouri*, 439 U.S. 357, 369 (1979). When a defendant challenges the selection of his petit jury based on the State's use of peremptory strikes, he must "produc[e] evidence sufficient to support the inference that the prosecutor exercised peremptory challenges on the basis of race." *King*, 69 F.4th at 868 (quotation marks omitted). If he can do so, the State must "come forward with a neutral explanation for its strikes," after which the trial court must determine "whether the defendant has established purposeful discrimination." *Id.* (quotation marks omitted).

In Claim Sixteen, Mr. Calhoun contends that the State violated *Batson* because it struck two thirds of the black venire members and Talladega County has a history of racial discrimination in which a black juror did not serve on a petit jury until 1965. (Doc. 1-1 at 65–66). Mr. Calhoun asserts that the Alabama Court of Criminal Appeals' rejection of his substantive *Batson* claim was based on an unreasonable determination of facts and was contrary to clearly established federal law, but he does not explain why. (*Id.* at 66). Accordingly, he has forfeited this claim. *See King*, 69 F.4th at 877 ("[O]rdinary forfeiture rules, under which a party forfeits an argument by failing to adequately brief it, apply to habeas proceedings in the district court. So

[the petitioner] had to make more than the skeletal argument in his petition to preserve these issues.") (citation omitted). The court **DENIES** Claim Sixteen.

In Claim Eighteen, Mr. Calhoun contends that the state trial court erred by failing to "examine the jury selection process to determine if there existed a prima facie case for race discrimination in the Talladega County jury pool selection process." (Doc. 1-1 at 70). Mr. Calhoun contends in a conclusory manner that the Alabama Court of Criminal Appeals' rejection of this claim was based on an unreasonable determination of the facts, but he does not explain why. (*See id*. at 70, 72). That argument is therefore forfeited. *See King*, 69 F.4th at 877.

Mr. Calhoun also argues that the decision was contrary to or involved an unreasonable application of *Vasquez v. Hillery*, 474 U.S. 254 (1986), *Duren*, *Rose v. Mitchell*, 443 U.S. 545 (1979), and *In re Murchison*, 349 U.S. 133 (1955), because the state trial court "was faced with the appearance of unfairness in the jury pool selection process, and it should have further examined the process to determine if a prima facie case for race discrimination existed pursuant to the fair cross section requirement." (Doc. 1-1 at 71–72). But none of those cases hold that a trial court must *sua sponte* examine the jury pool selection process to determine if the jury pool represents a fair cross section of the community. *See Vasquez*, 474 at 263 (holding that racial discrimination in the selection of a grand jury warrants automatic reversal

Case 1:18-cv-00874-ACA    Document 54    Filed 09/20/24    Page 91 of 160

of a conviction); *Rose*, 443 U.S. at 569–73 (holding that at the petitioners had not

shown a disparity sufficient to make out a prima face case of racial discrimination);

*Duren*, 439 U.S. at 368 (requiring the defendant to make a "prima facie showing of

an infringement of his constitutional right to a jury drawn from a fair cross section of

the community"); *Murchison*, 349 U.S. at 133–34, 139 (holding that it violates due

process for a judge to serve as both a "one-man grand jury" and the presiding judge

in a contempt case arising out of a witness's testimony before the grand jury).

Accordingly, the Alabama Court of Criminal Appeals' decision rejecting this claim

was not contrary to or based on an unreasonable application of clearly established

federal law. The court **DENIES** Claim Eighteen.

In Claim Four, Mr. Calhoun contends that trial counsel provided ineffective

assistance by declining to make a *Batson* challenge based on their misunderstanding

of the applicable law. (Doc. 1-1 at 17–22; *see also* doc. 27 at 87–94). He argues that

the Alabama Court of Criminal Appeals' determination that he failed to adequately

plead the claim was an unreasonable determination of the facts under § 2254(d)(2)

and that the decision was based on an unreasonable application of *Batson*. (Doc. 27

at 91–94).

First, the Alabama Court of Criminal Appeals' determination that Mr. Calhoun

failed to satisfy Alabama's pleading standard for Rule 32 petitions was not based on

an unreasonable determination of the facts. *See* 28 U.S.C. § 2254(d)(2). Rule 32.6(b) requires that "[e]ach claim in the petition must contain a clear and specific statement of the grounds upon which relief is sought, including full disclosure of the factual basis of those grounds." Mr. Calhoun alleged in his Rule 32 petition that trial counsel's failure to make a *Batson* challenge was ineffective because the State struck sixty-six percent of the black venire members, trial counsel's decision not to object was based on a misunderstanding of the law, Talladega County has historically used discriminatory jury selection procedures, and the percentage of black venire members did not precisely mirror the percentage of black residents of Talladega County. (Doc. 18-23 at 144–46). The Alabama Court of Criminal Appeals acknowledged each of those allegations. *Calhoun II*, 261 So. 3d at 473–74. It therefore did not base its decision that Mr. Calhoun's Rule 32 petition failed to satisfy the pleading standard on an unreasonable determination of the facts, but instead on its legal conclusion that the facts pleaded were insufficient to merit relief.

Mr. Calhoun's reliance on *Daniel v. Commissioner, Alabama Department of Corrections*, 822 F.3d 1248 (11th Cir. 2016) is unavailing. (*See* doc. 27 at 91–92). In that decision, the Eleventh Circuit held that the Alabama state court's decision rejecting a habeas petitioner's claim as insufficiently pleaded under Rule 32.6 was based on an unreasonable application of federal law because the allegations in the

Rule 32 petition were adequate to show both deficient performance and prejudice under *Strickland*. *Daniel*, 822 F.3d at 1272–73, 1277. The *Daniel* Court did not attempt to hold that the Alabama court made an unreasonable factual determination. *See id.* at 1272–74, 1277–80 (explaining how the state court's decision misapplied *Strickland*). It therefore cannot support Mr. Calhoun's argument that the state court's decision about whether a petitioner's allegations satisfy the state pleading standard is a factual determination.

Second, the Alabama Court of Criminal Appeals' decision was not based on an unreasonable application of federal law, as determined by the United States Supreme Court. *See* 28 U.S.C. § 2254(d)(1). The Alabama Court of Criminal Appeals concluded that Mr. Calhoun's pleaded facts, if true, would still not have shown a *Batson* or *Duren* violation. *Calhoun II*, 261 So. 3d at 473–75. This court, likewise, focuses on the prejudice prong.

Mr. Calhoun's argument about prejudice has two parts. (Doc. 27 at 89–90, 92–94). First, relying exclusively on Alabama law, Mr. Calhoun argues that "[c]ounsel's deficient performance prejudiced Mr. Calhoun because it deprived him of the protections afforded by *Batson*'s three-step burden-shifting procedure." (Doc. 27 at 89). But cases decided by the Alabama Supreme Court cannot "clearly establish[ ]

Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1).

Second, Mr. Calhoun argues that because the trial court invited a *Batson* challenge, "it stands to reason that had Mr. Calhoun's trial counsel raised a *Batson* challenge, the trial court would likely have found a *prima facie* case of discrimination and required the prosecution to provide race-neutral justifications for its strikes." (Doc. 27 at 92). This selective reading of the record omits the fact that trial counsel, in explaining the decision not to make a *Batson* challenge, also pointed to "the reasons for strikes by the State." (Doc. 18-6 at 39–40).

Putting that aside, the only authority Mr. Calhoun cites in support of his prejudice argument is *Johnson v. California*, 545 U.S. 162 (2005), in which the United States Supreme Court held that that the state courts erred by requiring a defendant to make out the prima facie case by a preponderance of the evidence and that the defendant had carried his burden by pointing out that the State struck every black venire member. The *Johnson* decision holds that the appropriate standard for determining whether a defendant has created a prima facie case of discrimination is whether "the totality of the relevant facts gives rise to an inference of discriminatory purpose." *Id.* at 168 (quoting *Batson*, 476 U.S. at 93–94). It does not clearly establish that a defendant satisfies that burden when the State strikes sixty-six percent of the

94

black venire members, even when the county has a history of racially discriminatory strikes and the proportion of black venire members does not match the proportion of black county residents.

Mr. Calhoun has not carried his burden of showing that the Alabama Court of Criminal Appeals' rejection of this claim was based on an unreasonable application of clearly established federal law or an unreasonable determination of the facts. *See* 28 U.S.C. § 2254(d). Habeas relief is therefore not available based on Claim Four.

5. Claim Five

Mr. Calhoun contends that trial counsel were ineffective for failing to object to the state trial court allowing the State to call his mother (Ms. Garrett) as a hostile witness. (Doc. 1-1 at 23).

Under Alabama Rule of Criminal Procedure 19.2(b), "[t]he court may, on its own motion or at the suggestion of a party, call witnesses, and all parties are entitled to cross-examine witnesses thus called." *See also* Ala. R. Evid. 614 (same). The Alabama Court of Criminal Appeals has held that trial courts have broad discretion to call witnesses, even when the witness is not a hostile witness. *See Snyder v. State*, 893 So. 2d 488, 520–22 (Ala. Cr. Crim. App. 2003). During Mr. Calhoun's trial, the prosecutor asked the court for permission to call Ms. Garrett "as a court's witness" on the grounds that she was Mr. Calhoun's mother and she had given a taped

95

statement about Mr. Calhoun's actions that she later disputed. (Doc. 18-9 at 10). The state trial court granted that request. (*Id.*).

Because Ms. Garrett was a court witness, the State cross-examined her, often using leading questions. (*See id.* at 11–17). They had the following exchange:

> Q:    In fact you told him, "Cody, I done heard they said you done killed a man."
>
> A:    Yeah.
>
> Q:    And what was his response when you said Cody they said you done killed a man?
>
> A:    He said, "I don't know. I might have did."
>
> . . . .
>
> Q:    And then you went on further to ask him, in fact said, "Cody, they said you done shot a man." And what was his response?
>
> A:    "I don't know, Pip. I might have did."

(Doc. 18-9 at 14).

On direct appeal, Mr. Calhoun argued that the state trial court erred by calling Ms. Garrett as a "hostile witness." (Doc. 18-15 at 104–06). The Alabama Court of Criminal Appeals held that a trial court can call a court witness under Rule 19.2 even if the witness is not hostile, and Ms. Garrett's "close relationship to Calhoun, the fact that she contradicted a prior statement given to police, and the fact that Calhoun had given her items to destroy that connected him to the murder were sufficient" to call her as a court witness. *Calhoun I*, 932 So. 2d at 956.

96

In his Rule 32 petition, Mr. Calhoun asserted that trial counsel were ineffective for failing to object to the trial court's decision to call Ms. Garrett as a court witness. (Doc. 18-23 at 154). The state habeas trial court rejected this claim as insufficiently pleaded. (Doc. 18-26 at 106–07). The Alabama Court of Criminal Appeals affirmed, holding that although the State was allowed to use leading questions, Ms. Garrett's testimony about Mr. Calhoun's admission was not in response to a leading question. *Calhoun II*, 261 So. 3d at 475. In addition, the Court held that Mr. Calhoun had not adequately alleged that Ms. Garrett would have testified differently if she were not called as a court witness. *Id.*

Mr. Calhoun contends that the Alabama Court of Criminal Appeals' decision was based on an unreasonable determination of the facts, under § 2254(d)(2), and based on an unreasonable application of clearly established federal law, under § 2254(d)(1). (Doc. 1-1 at 23; doc. 27 at 96). Neither contention has any merit. The record confirms the Alabama Court of Criminal Appeals' determination that Ms. Garrett's testimony about Mr. Calhoun's admission was in response to non-leading questions. *See Smith v. S.H. Kress & Co.*, 98 So. 378, 379 (1923) ("Any question so framed as to expressly or impliedly assume the existence of a material fact not theretofore testified to, so that the answer may affirm the fact so suggested, is leading."). Likewise, even if the testimony had been in response to leading

questions, the record confirms that Mr. Calhoun never alleged how Ms. Garrett's response to non-leading questions might have been different. (*See* doc. 18-23 at 154). Nor does Mr. Calhoun's § 2254 remedy that deficiency. (*See* doc. 1-1 at 23). The court therefore **DENIES** Claim Five.

6.  Claim Six

Mr. Calhoun contends that trial counsel were ineffective for failing to object to the State's statement that it did not matter when Mr. Calhoun formed the intent to rob, because capital murder under Alabama law requires that the defendant have formed the intent to commit the accompanying felony before committing the murder. (Doc. 1-1 at 25–27).

At the end of Mr. Calhoun's trial, the state trial court instructed the jury that, to qualify as capital murder, the jury had to find "that the murder took place during the robbery." (Doc. 18-11 at 44). The court further instructed the jury that "[d]uring means in the course or the commission of or in connection with or immediate flight from the commission of a robbery." (*Id.* at 45).

During the State's closing argument in the guilt phase of Mr. Calhoun's, the prosecutor stated that for the charge of capital murder during a robbery, the murder must be committed

during, and I believe during is going to be defined for you as the term that means in the course of or in connection with the commission or the immediate flight therefrom the commission of the underlying felony. So in the course of, during, or in the running away from, he committed intentional murder. Before, during or after, in the flight therefrom, a robbery in the first degree is capital murder.

(Doc. 18-10 at 183–84). He then stated:

> [R]emember, intent to commit this robbery can be formed once [Mr. Calhoun]'s already in. After he's done what he wanted to do to [Mrs. Phillips] and Tracy's dead, if at that point in time, you remember during is during, before and after the immediate flight therefrom. So if you think well, I think he went there to kill him, I think it was intentional murder, but I think he went there to rape, not to rob, well, remember that the intent to commit the robbery to take the property can be formed during the event. So the robbery, his intent when it was formed is not material here.

(*Id.* at 185). Counsel did not object. (*See id.*).

On direct appeal, Mr. Calhoun argued that the State erred by telling the jury that it could find him guilty of capital murder even if he formed the intent to rob after committing the murder. (Doc. 18-15 at 31–33). The Alabama Court of Criminal Appeals held that "a taking of property committed after a murder and as a mere afterthought and unrelated to the murder will not sustain a conviction" for capital murder during a robbery, but "the fact that the victim was dead at the time the property was taken would not absolve a defendant of a charge of robbery" if the evidence permitted "the jury to find that the murder and the taking were links in a

99

continuous chain of events." *Calhoun I*, 932 So. 2d at 967 (quotation marks omitted). The Court held that sufficient evidence existed "for a jury to conclude that Calhoun intended to commit a robbery when he killed Tracy Phillips." *Id.* It also held that the prosecutor's misstatement about the timing of Mr. Calhoun's intent did not "so infect[ ] the proceedings with unfairness that Calhoun was denied a fair trial" because the prosecutor's closing argument, taken as a whole, showed that he was arguing that the evidence showed Mr. Calhoun intended to commit robbery before the murder and, in any event, the Alabama Court of Criminal Appeals presumed the jury had followed the trial court's correct instruction about the meaning of "during." *Id.* at 968.

In his Rule 32 petition, Mr. Calhoun asserted that trial counsel were ineffective for failing to object to the prosecutor's statement during closing argument because the State had presented evidence that Mr. Calhoun turned down offers of money and jewelry before he murdered Mr. Phillips, showing that the robbery was nothing but an afterthought. (Doc. 18-23 at 150–51, 159). The state trial habeas court denied this claim as insufficiently pleaded and foreclosed by the Alabama Court of Criminal Appeals' decision on direct appeal. (Doc. 18-26 at 98–100).

In his appeal of the denial of his Rule 32 petition, Mr. Calhoun challenged the state habeas trial court's rejection of this claim, but his citation to the record directed the court to a part of the State's rebuttal closing argument, which did not address the

100

timing issue. (Doc. 18-31 at 84–86; *see* doc. 18-11 at 28–29). His reply brief, however, correctly cited the record. (*See* doc. 18-32 at 137). The Alabama Court of Criminal Appeals affirmed the state trial court's rejection of the claim under Rule 28(a)(10) on the ground that Mr. Calhoun's brief on appeal cited to a part of the record that "contain[ed] no assertions by the prosecutor regarding when Calhoun formed the intent to rob." *Calhoun II*, 261 So. 3d at 476. The Court then went on to address a different but related claim (that trial counsel should have challenged the sufficiency of the evidence of intent to rob) and rejected that claim on the merits. *Id.*

The State contends that this claim is procedurally defaulted based on the procedural bar raised by the appellate court's reliance on Rule 28(a)(1), an independent and adequate state law Rule 28(a)(10). (Doc. 21 at 25). The court agrees. As discussed above, dismissal of a claim based on Rule 28(a)(10) results in a procedural default. *See Ferguson*, 69 F.4th at 1259. Mr. Calhoun has provided no support for his assertion that the Alabama Court of Criminal Appeals' application of this rule should not bar his claim in this context, where he initially provided an incorrect citation that he later corrected in a reply brief.

Even if the court were to find that the claim was not procedurally defaulted, however, the claim would fail. The Alabama Court of Criminal Appeals clearly held during Mr. Calhoun's direct appeal that sufficient evidence showed Mr. Calhoun

101

formed the intent to rob before he murdered Mr. Phillips. *Calhoun I*, 932 So. 2d at 967. The same court reiterated that holding during Mr. Calhoun's appeal of his Rule 32 petition. *Calhoun II*, 261 So. 3d at 476. Mr. Calhoun's argument to the contrary amounts to an argument that the jury (or the court on appeal) incorrectly weighed the evidence. (*See, e.g.*, doc. 44 at 38–39). But this court is required to defer to the factual findings made during the state court proceedings. *See* 28 U.S.C. § 2254(d)(2), (e)(1). Moreover, the Alabama Court of Criminal Appeals found as a matter of state law that the state trial court instructed the jury about the meaning of "during," and courts presume that juries follow the court's instructions. *See Calhoun I*, 932 So. 2d at 968. In light of the fact that sufficient evidence supported a finding that Mr. Calhoun formed the intent to rob before he committed the murder, Mr. Calhoun cannot overcome that presumption. As a result, he cannot show any reasonable probability that he was prejudiced by trial counsel's failure to object to the prosecutor's statement. *See Reaves*, 872 F.3d at 1148.

7. Claim Seven

Mr. Calhoun contends that trial counsel were ineffective for failing to request a jury charge on the lesser included offense of felony murder and for failing to object to the verdict forms. (Doc. 1-1 at 27–29). Under Alabama law, felony murder occurs when a person commits or attempts to commit certain felonies "and, in the course of

102

and in furtherance of the crime that he or she is committing or attempting to commit, or in immediate flight therefrom, he or she, or another participant if there be any, causes the death of any person." Ala. Code § 13A-6-2(a)(3).

During the defense's closing argument in the guilt phase of Mr. Calhoun's trial, counsel stated that "there are different degrees to each charge. I'll submit to you that on each charge that the charge the judge gives you as to intentional murder or felony murder would be a possible correct verdict in this case or else the judge wouldn't give you that charge." (Doc. 18-11 at 12). The state trial court instructed the jury about some lesser included offenses, but felony murder was not one of them. (*See id.* at 50–51, 58–59, 62–63, 65). With respect to each charge of capital murder, the trial court explained to the jury that the lesser included offenses were intentional murder and the underlying felony. (*Id.*). The court instructed the jury that if it did not find Mr. Calhoun guilty of committing the murder during the relevant felony, then the jury would have "to decide if the defendant is guilty of either of these lesser included charges . . . , or find that the defendant is not guilty of any of these lesser included charges." (*Id.* at 51, 59, 62–63, 65).

Each capital murder charge had its own verdict form. (Doc. 18-1 at 141–42; doc. 18-2 at 44–45, 158; doc. 18-3 at 63). Each verdict form offered four options: (1) find Mr. Calhoun guilty of capital murder during the relevant underlying felony,

"OR" (2) find Mr. Calhoun not guilty of capital murder but guilty of the lesser included charge of murder, "OR" (3) find Mr. Calhoun not guilty of capital murder but guilty of the lesser included underlying felony, "OR" (4) find Mr. Calhoun not guilty. (*Id.*).

In his direct appeal, Mr. Calhoun contended that the state trial court's instructions and verdict forms incorrectly informed the jury that the two lesser included offenses for each charge were mutually exclusive, so that the jury could not find that he committed both the underlying felony and the murder, but not the felony "during" the murder. (Doc. 18-15 at 33–37). The Alabama Court of Criminal Appeals construed this claim to mean that Mr. Calhoun was challenging the lack of an instruction on felony murder and rejected that claim because "[t]he crime of felony murder is reserved for those situations where an unintended death occurs as a result of a defendant's dangerous conduct. Here, the manner of the killing—shooting Phillips in the back of the head at point-blank range—showed that the murder was intentional." *Calhoun I*, 932 So. 2d at 969.

In his Rule 32 petition, Mr. Calhoun contended that trial counsel were ineffective for failing to request a jury instruction on felony murder after referring to felony murder during closing arguments and that trial counsel were ineffective for failing to challenge the fact that the verdict forms precluded the jury from finding

him guilty of both lesser included offenses. (Doc. 18-23 at 160–62). The state habeas trial court denied this claim as insufficiently pleaded and foreclosed by the Alabama Court of Criminal Appeals' decision on direct appeal. (Doc. 18-26 at 113–14). The Alabama Court of Criminal Appeals affirmed, explaining that Mr. Calhoun did not adequately plead his claim because he did not explain "how the evidence presented at trial would have supported" either a jury instruction or verdict form on felony murder, and his reliance on counsel's argument during closing did not suffice because "the assertions of counsel are not evidence." *Calhoun II*, 261 So. 3d at 477.

Mr. Calhoun contends that the Alabama Court of Criminal Appeals' decision was based on both an unreasonable determination of the facts, under § 2254(d)(2), and an unreasonable application of clearly established federal law, under § 2254(d)(1). (Doc. 1-1 at 29; doc. 27 at 101–05). The court disagrees.

The Alabama Court of Criminal Appeals did not unreasonably find that Mr. Calhoun's only allegation in support of his claim was his trial counsel's statement during closing argument. That was, in fact, Mr. Calhoun's only factual allegation in support of his entitlement to the jury instruction for a different verdict form. (*See* doc. 18-23 at 160–62).

The Alabama Court of Criminal Appeals also did not unreasonably apply clearly established federal law in making its decision. The substantive issue

105

underlying the ineffective assistance claim is whether Mr. Calhoun was entitled to the felony murder jury instruction or an altered verdict form. The Alabama Court of Criminal Appeals held, as a matter of state law, that he was not. *Calhoun II*, 261 So. 3d at 477; *see also Calhoun I*, 932 So. 2d at 969. "[A] state court's interpretation of state law, . . . , binds a federal court sitting in habeas corpus." *Bradshaw v. Richey*, 546 U.S. 74, 76 (2005). And given that binding determination of the underlying issue, the Alabama Court of Criminal Appeals' determination that counsel did not perform deficiently or prejudice Mr. Calhoun's defense is not unreasonable. *See Strickland*, 466 U.S. at 687.

8.  Claim Eight

Mr. Calhoun contends that trial counsel were ineffective for failing to object to the admission of victim impact testimony from Mr. Phillips's son and daughter and then by failing to request a limiting instruction about that testimony. (Doc. 1-1 at 29–33).

Mr. Phillips's children both testified during the guilt phase of Mr. Calhoun's trial. (Doc. 18-7 at 138–161; doc. 18-10 at 123–48). Gabriel Phillips testified about seeing Mr. Calhoun at the family's house when Mrs. Phillips came home from putting out yard signs. (Doc. 18-7 at 138–55). In the course of that testimony, he described leaving the house to stay the night at a friend's house, and the prosecutor

said, "And told your dad bye, and that was the last time you saw your dad," to which Gabriel responded, "Uh-huh." (*Id.* at 155). Trial counsel did not object. (*See id.*).

Tabitha Phillips testified about interacting with Mr. Calhoun while putting out signs for the yard sale with her mother as well as the parts of the murder that she witnessed. (Doc. 18-10 at 123–47). At one point, the prosecutor asked her if she came out of the room before her mother came back upstairs and she responded that she had. (*Id.* at 140). When he asked her what she saw, she testified: "I walked straight back to my mother's room, and I bent down and kissed my dad on the cheek, and I was hoping that he would wake up, or he would get up or move or tell me something, and he didn't." (*Id.*). Again, trial counsel did not object. (*See id.*). In rebuttal closing argument, the prosecutor highlighted Tabita Phillips's testimony, stating:

> I just want to leave you with something, leave you with this thought. I want to leave you with the words of a child who took this witness stand, and I asked her, "Did you leave that room?" And she said yes. What did you do? "I kissed my daddy on the cheek and hoped he would wake up." You go back there, and you remember those words, and you remember why she had to say that.

(Doc. 18-11 at 33–34).

On direct appeal, Mr. Calhoun argued that the admission of "improper victim impact testimony" from the Phillips children warranted reversal of his conviction. (Doc. 18-15 at 131–35). The Alabama Court of Criminal Appeals held that, "[w]hile

portions of the children's testimony served no purpose at the guilt phase of the proceedings, we are more than confident that this testimony had no prejudicial impact on Calhoun's trial." *Calhoun I*, 932 So. 2d at 968.

In his Rule 32 petition, Mr. Calhoun asserted that trial counsel were ineffective for failing to object to the admission of the victim impact testimony and for failing to request a limiting instruction about how the jury could consider the testimony at both the guilt and penalty phases. (Doc. 18-23 at 154–56). The state habeas trial court denied this claim on the ground that the Alabama Court of Criminal Appeals' decision foreclosed it. (Doc. 18-26 at 107–08). The Alabama Court of Criminal Appeals affirmed, holding that "the testimony was not improper and trial counsel were not ineffective for failing to raise a baseless objection or to request an unnecessary limiting instruction." *Calhoun II*, 261 So. 3d at 478.

In his § 2254 petition, Mr. Calhoun contends that the Alabama Court of Criminal Appeals incorrectly held that the testimony was proper. (Doc. 1-1 at 32; doc. 27 at 106–07). But this is a question of state evidentiary law, and "federal courts are not empowered to correct erroneous evidence rulings of state trial courts" unless the error "rise[s] to the level of a denial of fundamental fairness." *Snowden v. Singletary*, 135 F.3d 732, 737 (11th Cir. 1998) (quotation marks omitted). "A denial of fundamental fairness occurs whenever the improper evidence is material in the

sense of a crucial, critical, highly significant factor." *Id.* As the *Calhoun I* decision stated, the challenged testimony from the Phillips children "served no purpose at the guilt phase of the proceedings." 932 So. 2d at 968. But the *Calhoun I* decision also found that the testimony "had no prejudicial impact on Calhoun's trial." *Id.* This court agrees: the evidence of Mr. Calhoun's guilt was overwhelming. The Phillips children's testimony did not touch on any "crucial, critical, highly significant factor" and therefore its admission did not result in a denial of fundamental fairness. *Snowden*, 135 F.3d at 737. This court remains bound by the Alabama state courts' evidentiary ruling.

And in light of that ruling, any objection by counsel would have been meritless. *See Calhoun II*, 261 So. 3d at 478. As a result, the state court's finding that counsel neither performed deficiently not prejudiced Mr. Calhoun's defense by failing to object or request a limiting instruction is entitled to deference. *See Strickland*, 466 U.S. at 687. The court **DENIES** Claim Eight.

9.  Claim Nine

Mr. Calhoun contends that trial counsel were ineffective for failing to object to and request a limiting instruction about testimony from a state police officer (Wren Cooley) and a state police detective (Charles Hedrick) that they knew Mr. Calhoun before his arrest and testimony from another witness (Dale Morris) that Mr. Calhoun

had pulled a gun on him earlier in the day. (Doc. 1-1 at 33–34). He argues that the prosecutor's closing argument shows this evidence was intended to prove his bad character. (*Id.* at 34–35).

During the guilt phase of Mr. Calhoun's trial, Charles Hedrick, an investigator with the Talladega County Sheriff's Department, testified that he was working the traffic detail the night of Mr. Phillips's murder. (Doc. 18-8 at 164–65). He heard a radio dispatch mentioning Mr. Calhoun, whom he knew "prior to this occasion." (*Id.* at 166). Because he knew where Mr. Calhoun lived, he went there to try to find him. (*Id.* at 167). He testified at length about his search, which did not reveal Mr. Calhoun but did locate Mr. Calhoun's car. (*Id.* at 167–74).

Wren Cooley, a warrant officer with the Talladega Police Department, testified that he participated in the search for Mr. Calhoun the morning after the murder. (Doc. 18-8 at 182). At one point early in the morning, he saw Mr. Calhoun, who fled. (*Id.* at 184–85). Officer Cooley chased him on foot but eventually lost him. (*Id.* at 185–86).

Dale Morris testified that he and Mr. Calhoun were friends. (Doc. 18-7 at 96–97, 101). During a conversation the afternoon before the murder, Mr. Calhoun pulled a small black gun out of a small black bag and pointed it at Mr. Morris. (*Id.* at 99–104). After Mr. Morris's uncle jumped between them and told Mr. Morris to stop

teasing Mr. Calhoun, Mr. Calhoun said that he was "just playing" and handed the gun, which was not loaded, to Mr. Morris. (*Id.* at 103, 111; *see also id.* at 107). Mr. Morris gave the gun back to Mr. Calhoun. (*Id.* at 103).

In his Rule 32 petition, Mr. Calhoun asserted that trial counsel were ineffective for failing to object to or request limiting instructions about the testimony from Investigator Hedrick and Officer Cooley that they knew Mr. Calhoun before this incident and the testimony from Mr. Morris that Mr. Calhoun had pulled a gun on him earlier in the day. (Doc. 18-23 at 153–54). He argued that this testimony was offered only to show his bad character. (*Id.* at 153). The state habeas trial court denied this claim as insufficiently pleaded and refuted by the record. (Doc. 18-26 at 102–04). The Alabama Court of Criminal Appeals affirmed on the ground that the record refuted the allegation that Investigator Hedrick knew Mr. Calhoun because of previous criminal behavior and that Officer Cooley knew Mr. Calhoun beforehand at all. *Calhoun II*, 261 So. 3d at 478. With respect to Mr. Morris's testimony, the Alabama Court of Criminal Appeals explained that the testimony clearly established that Mr. Morris believed Mr. Calhoun was joking, so any objection would have been baseless. *Id.* at 478–79.

Mr. Calhoun contends that the state court's decision was based on an unreasonable determination of the facts and an unreasonable application of clearly

111

established federal law. (*See* doc. 1-1 at 36; doc. 27 at 107–08). However, the record confirms the Alabama Court of Criminal Appeals' determinations. Investigator Hedrick did not explain how he knew Mr. Calhoun and nothing about his testimony implied that Mr. Calhoun had engaged in previous criminal conduct. (*See* doc. 18-8 at 164–74). Officer Cooley never testified that he knew Mr. Calhoun before he saw him the morning after the murder. (*See id.* at 182–86). And Mr. Morris clearly testified that Mr. Calhoun explained that pointing the gun at him was a joke and gave him the unloaded gun as proof. (Doc. 18-7 at 99–103). In any event, the purpose of Mr. Morris's testimony was to establish that Mr. Calhoun had a small black gun the day he committed the murder. (*See id.*). The Alabama Court of Criminal Appeals' decision was not based on either an unreasonable determination of the facts or an unreasonable application of *Strickland*.

　　10. Claims Ten and Thirteen

　　In Claim Ten, Mr. Calhoun contends that trial counsel were ineffective for failing to object to prosecutorial misconduct in the form of leading questions, bolstering of witness testimony, arguing facts not in evidence, misrepresenting evidence, comparing lesser included offenses to a plea for sympathy, comparing the rights of the victims to Mr. Calhoun's rights, mischaracterizing Ms. Garrett's testimony as nothing more than a plea for her son's life, misstating the law about how

the jury should weigh aggravating and mitigating circumstances, and encouraging the jury to convict and impose the death sentence based on passion and prejudice instead of findings about the elements of the crimes and the aggravating and mitigating circumstances. (Doc. 1-1 at 36–44). In Claim Thirteen, Mr. Calhoun contends that the State denied him a fair trial because the prosecutor engaged in the same forms of misconduct. (*Id.* at 50–58).

The State contends that Mr. Calhoun procedurally defaulted the parts of Claim Ten relating to encouraging a guilty verdict based on passion and prejudice, arguing facts not in evidence, comparing the rights of the victims to Mr. Calhoun's rights, and mischaracterizing Ms. Garrett's testimony. (Doc. 21 at 25–32). However, the State does not argue that any part of Claim Thirteen—which asserts the underlying claims of prosecutorial misconduct—is procedurally defaulted. (*See id.* at 87–93). Because the court's resolution of Claim Thirteen on the merits will necessarily resolve Claim Ten, the court will skip the analysis of procedural default and proceed straight to the merits of both claims. *See* 28 U.S.C. § 2254(b)(2) ("An application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State."); *Carruth v. Comm'r, Ala. Dep't of Corr.*, 93 F.4th 1338, 1357–58 (11th Cir. 2024) ("Regarding mixed questions of procedural default and merits claims in the habeas context, we

113

may sidestep addressing procedural bar issues when the substantive issue is easily decided against the petitioner . . . .").

In his direct appeal, Mr. Calhoun argued that prosecutorial misconduct denied him a fair trial, pointing to the prosecutor's use of leading questions, arguing facts not in evidence, denigration of Mr. Calhoun's right to consideration of lesser included offenses, comparison of the rights of the victims and Mr. Calhoun, and misstating the law about how the jury should weigh the aggravating and mitigating circumstances. (Doc. 18-15 at 60–81). The Alabama Court of Criminal Appeals rejected each of these assertions, holding that no "illegal evidence was admitted as a result of the prosecutor's leading questions," one misstatement in the prosecutor's opening statement did not "so infect[ ] Calhoun's trial with unfairness that he was denied a fair and impartial trial," the prosecutor's other statements in opening and closing were permissible arguments supported by the evidence, and that a complete review of "all of the challenged instances, as well as the prosecutor's entire argument" revealed no basis for a new trial. *Calhoun I*, 932 So. 2d at 963–66.

Mr. Calhoun's Rule 32 petition raised the claim of ineffective assistance for failing to object to the alleged prosecutorial misconduct, most of which was the same prosecutorial misconduct he had alleged in his direct appeal. (Doc. 18-23 at 164–69). The state habeas trial court denied the claim on the merits. (Doc. 18-26 at 116–23).

114

On appeal, the Alabama Court of Criminal Appeals affirmed, primarily on the ground that the alleged underlying prosecutorial misconduct was not misconduct. *Calhoun II*, 261 So. 3d at 479–80. Specifically, the Court of Criminal Appeals held that the allegation about leading questions was not sufficiently specific to establish any misconduct; Mr. Calhoun failed to explain how repeating a witness's testimony constituted "bolstering" of that testimony; Mr. Calhoun failed to plead any facts indicating that the jury failed to consider lesser included offenses in its deliberations; and the record refuted Mr. Calhoun's allegation that the prosecutor misstated the law about how to weigh aggravating and mitigating circumstances. *Id.* The Court of Criminal Appeals did not explicitly address Mr. Calhoun's arguments about the prosecutor arguing facts that were not in evidence or the prosecutor comparing the victim's rights to Mr. Calhoun's rights. *See id.*

In summary, the *Calhoun I* decision addressed Mr. Calhoun's underlying claims of prosecutorial misconduct, while the *Calhoun II* decision addressed his claim of ineffective assistance of counsel for failing to object to the alleged prosecutorial misconduct. In this § 2254 proceeding, Mr. Calhoun contends that the *Calhoun II* decision was based on an unreasonable determination of the facts, under § 2254(d)(2), and an unreasonable application of clearly established federal law, under § 2254(d)(1). (Doc. 1-1 at 41–43; doc. 21 at 79–87). He also challenges the

115

*Calhoun I* decision's adjudication of the underlying prosecutorial misconduct claims "for the same reasons." (Doc. 27 at 80 n.21). The court splits its discussion into each instance of alleged prosecutorial misconduct, bearing in mind that Mr. Calhoun asserts both the substantive claim of misconduct and an ineffective assistance claim based on counsel's failure to object to the alleged misconduct.

### i.    Leading Questions

First, Mr. Calhoun alleges that the prosecutor improperly used leading questions to "prejudice[ him] in a number of ways." (Doc. 1-1 at 36, 51–52). The examples he listed in his direct appeal are almost identical to those he listed in his Rule 32 petition and appeal. (*Compare* doc. 18-15 at 62–63 n.8, *with* doc. 18-23 at 164 n.6, *and* doc. 18-31 at 95). The *Calhoun I* Court reviewed those citations and held that the prosecutor's use of leading questions did not lead to the admission of any "illegal evidence." 932 So. 3d at 963. The *Calhoun II* Court held that Mr. Calhoun's allegations in his Rule 32 petition were not sufficiently specific to demonstrate any prosecutorial misconduct. 261 So. 3d at 479.

Mr. Calhoun contends that *Calhoun II* was based on an unreasonable determination of the facts because he provided a list of over 300 citations to pages

116

where the prosecutor led a witness.[4] (Doc. 27 at 80–82). Although Mr. Calhoun purports to apply the same argument to the *Calhoun I* decision (*see id.* at 80 n.21), it is inapplicable, as the *Calhoun I* decision reviewed each of the citations and found no misconduct, 932 So. 2d at 963. Mr. Calhoun has therefore forfeited any argument that this court should not defer to the *Calhoun I* decision and its holding that the prosecutor's use of leading questions did not constitute misconduct. *See King*, 69 F.4th at 877 ("[O]rdinary forfeiture rules, under which a party forfeits an argument by failing to adequately brief it, apply to habeas proceedings in the district court. So [the petitioner] had to make more than the skeletal argument in his petition to preserve these issues.") (citation omitted). In light of that holding, the court cannot find that trial counsel performed deficiently by failing to object, or that objecting would have had a reasonable likelihood of changing the outcome of the trial. *See Strickland*, 466 U.S. at 687.

---

[4] The court notes that the Alabama Court of Criminal Appeals acknowledged Mr. Calhoun's citation of these authorities but found that he failed to provide sufficient *argument* about the citations to satisfy Alabama's pleading standard for Rule 32 petitions. *See Calhoun II*, 261 So. 3d at 479. The court is not persuaded that a state court's determination that correctly identified allegations in a pleading fail to satisfy a state pleading standard qualifies as a factual determination. *See*, *e.g.*, *supra* at 44–45.

### ii.     Bolstering of Witness Testimony

Next, Mr. Calhoun alleges that the prosecutor "bolstered" witness testimony "by restating each witness' answer," which "add[ed] the State's own authority to the words and repeatedly emphasiz[ed] this damaging testimony to the jury." (Doc. 1-1 at 37). Again, the examples Mr. Calhoun listed in his direct appeal match those he listed in his Rule 32 petition and appeal. (*Compare* doc. 18-15 at 62–63 n.8, *with* doc. 18-23 at 165 n.7*, and* doc. 18-31 at 95). The *Calhoun I* Court rejected this claim together with the claim that the prosecutor improperly led the witnesses. *See Calhoun I*, 932 So. 2d at 962–63. The *Calhoun II* Court held that the record refuted this claim because "[i]n reviewing the record, it appears that the prosecutor was merely clarifying the witness's answer." 261 So. 3d at 479.

Mr. Calhoun contends that the *Calhoun II* decision was based on an unreasonable determination of the facts because "the Court of Criminal Appeals erred by offering substantive determinations about the *import* of the evidence to be adduced rather than the sufficiency of Mr. Calhoun's allegations." (Doc. 1-1 at 42). He makes no argument about the reasonableness of either the factual determinations or application of federal law in the *Calhoun II*'s decisions' rejection of this claim. (*See* doc. 27 at 80–87; doc. 44 at 47–56).

118

Contrary to Mr. Calhoun's contention, the *Calhoun II* decision did not reject this part of his claim as insufficiently pleaded but instead on the ground that the record refuted the claim. *Calhoun II*, 261 So. 3d at 479. He therefore has not shown that the *Calhoun II* decision was based on an unreasonable determination of the facts. And in light of the holding that the prosecutor did not bolster witness testimony, trial counsel's failure to object was not ineffective assistance. *See Strickland*, 466 U.S. at 687.

### iii. Arguing Facts not in Evidence

Third, Mr. Calhoun contends that the prosecutor argued facts that were not in evidence in five ways: (1) after a witness testified that he heard two shots, the prosecutor asked if he heard anything else after hearing "what appeared to be one shot" (doc. 18-7 at 174); (2) the prosecutor asked a police officer who found a red shirt if he had "known earlier in the day the defendant had been seen in a red shirt" (doc. 18-10 at 74); (3) the prosecutor stated in closing argument that Mr. Calhoun "cased the house out" when he went there in the afternoon (*id.* at 182); (4) in the opening statement, the prosecutor misrepresented that a vaginal swab of Mrs. Phillips would match Mr. Calhoun's DNA (doc. 18-6 at 87); (5) the prosecutor misrepresented that Mr. Calhoun penetrated Mrs. Phillips's anus with his penis (doc. 18-10 at 188); and (6) the prosecutor improperly argued to the jury that Mr. Calhoun

left the Phillips's house with Mrs. Phillips's rings (*id.* at 185). (Doc. 1-1 at 37, 52). Mr. Calhoun also provides a list of forty-nine citations with no explanation beyond a statement that the prosecutor "'testified' to facts not in evidence" at these pages. (*Id.* at 52).

Mr. Calhoun made these same underlying claims of prosecutorial misconduct in his direct appeal. (Doc. 18-15 at 68–70). The *Calhoun I* decision rejected the claims of prosecutorial misconduct. 932 So. 2d at 963–65. The Alabama Court of Criminal Appeals explicitly held that the prosecutor's question about the red shirt was proper and the prosecutor's arguments that Mr. Calhoun "cased the house out," penetrated Mrs. Phillips's anus with his penis, and left with Mrs. Phillips's jewelry were reasonable inferences drawn from the evidence. *Id.* at 964–65. The Court agreed with Mr. Calhoun that the prosecutor's statement, made in opening, that a vaginal swab matched Mr. Calhoun, was wrong, because the DNA expert had actually testified that he was not able to do extensive testing on the vaginal swabbing. *Id.* at 963–64. However, the expert had testified that the testing he was able to complete did not exclude Mr. Calhoun, and the prosecutor's statement did not "so infect[ ] Calhoun's trial with unfairness that he was denied a fair and impartial trial." *Calhoun I*, 932 So. 2d at 964.

The only one of Mr. Calhoun's facts-not-in-evidence arguments that the *Calhoun I* decision did not expressly address was his argument that the prosecutor attempted to "fix" a witness's testimony that he heard two shots by asking him if he heard anything after hearing "one shot." *See Calhoun I*, 932 So. 2d at 963–65; (doc. 18-15 at 68). Nevertheless, the court must presume that the Alabama Court of Criminal Appeals rejected that argument on the merits as well. *Richter*, 562 U.S. at 98; *see also Loggins*, 654 F.3d at 1217.

Mr. Calhoun's Rule 32 petition asserted an ineffective-assistance claim based on the same underlying conduct. (Doc. 18-23 at 165). The state habeas trial court denied this part of the claim on the merits. (Doc. 18-26 at 118–19). The Alabama Court of Criminal Appeals did not address this part of the claim. *Calhoun II*, 261 So. 3d at 479–80.

In this § 2254 proceeding, Mr. Calhoun does not address the *Calhoun I* decision's adjudication of the underlying claim. (*See generally* doc. 1-1 at 37, 52; doc. 27 at 77; doc. 44 at 49–51). He provides almost no explanation for why the actions he challenges in this section constituted argument or testimony about facts not in evidence. (*See* doc. 1-1 at 37, 52; doc. 27 at 77; doc. 44 at 50). Moreover, this court's review of the record citations confirms the Alabama Court of Criminal Appeals' holding. *Calhoun I*, 932 So. 2d at 963–65; *see United States v. Eckhardt*,

466 F.3d 938, 947 (11th Cir. 2006) ("To establish prosecutorial misconduct, (1) the remarks must be improper, and (2) the remarks must prejudicially affect the substantial rights of the defendant.") (quotation marks omitted). As a result, the *Calhoun I* decision's rejection of Claim Thirteen was based on an unreasonable determination of the facts or an unreasonable application of clearly established federal law. And because the underlying claim of prosecutorial misconduct for arguing or "testifying" about facts not in evidence fails, so does the claim of ineffective assistance of counsel for failing to object to that alleged misconduct. *See Strickland*, 466 U.S. at 687.

### iv. Comparing Lesser Included Offenses to a Plea for Sympathy

Fourth, Mr. Calhoun contends that the prosecutor mischaracterized the purpose of lesser included offenses by the telling the jury that they are a plea for sympathy. (Doc. 1-1 at 37, 52–53).

During closing arguments in Mr. Calhoun's guilt phase, trial counsel argued that the jury could convict Mr. Calhoun of lesser included offenses of intentional murder or felony murder because (1) the evidence did not show Mr. Calhoun had the "intent to kill somebody and rape somebody" when he went to the Phillipses' house

that night and (2) the evidence of a robbery was not credible. (Doc. 18-11 at 12–14).

In rebuttal, the prosecutor stated:

> I'm going to tell you exactly what lesser included offenses are. Lesser included offenses are a plea for sympathy. Let's think about one more plea for sympathy we had in this case. Tracy Phillips: "Tell me what you want. We'll give you anything you want. We've got money, we've got jewelry. Please, tell me what you want." A plea for sympathy. What did his plea for sympathy get him? A bullet in the head. That's a plea for sympathy. Think about the response to him and you give him the same response that he gave. Lesser included offenses.

(*Id.* at 20–21). The prosecutor then argued that the only way the jury could convict Mr. Calhoun of any lesser included offenses was to find that either the murder or the underlying felony did not occur, and the evidence showed both an intentional killing and the underlying felonies. (*Id.* at 22–25). He concluded: "So lesser included offenses are an attempt for sympathy which just simply don't apply. It's capital murder, and that's all there is to it." (*Id.* at 25).

Mr. Calhoun made this substantive claim in his direct appeal and the Alabama Court of Criminal Appeals rejected it on the ground that the prosecutor's argument was "legitimate" because he "was arguing that the evidence did not support conviction on any lesser offenses and to convict Calhoun of an offense lesser than capital murder would amount to an act of sympathy," which was a permissible argument under Alabama law. *Calhoun I*, 932 So. 2d at 965. Mr. Calhoun then made

an ineffective assistance claim based on the same alleged prosecutorial misconduct (doc. 165–66), and the state habeas trial court rejected that claim on the merits (doc. 18-26 at 119–20). The Alabama Court of Criminal Appeals held that Mr. Calhoun's claim was insufficiently pleaded because he did not "plead any facts indicating that the jury did not consider lesser-included offenses in its deliberations." *Calhoun II*, 261 So. 3d at 479–80.

Mr. Calhoun contends that the *Calhoun II* decision was based on an unreasonable determination of the facts because his Rule 32 petition described exactly "how the prosecutor inappropriately encouraged the jury to not consider lesser-included offenses." (Doc. 27 at 82). But *Calhoun II* was not based on a finding that Mr. Calhoun failed to describe the prosecutor's inappropriate conduct; it held that even if the prosecutor's argument was improper, Mr. Calhoun failed to articulate any facts indicating that the jury heeded that argument. *See Calhoun II*, 261 So. 3d at 479–80. *Calhoun II* was not based on an unreasonable determination of the facts. *See* 28 U.S.C. § 2254(d)(1).

Mr. Calhoun also argues that *Calhoun II* was contrary to or an unreasonable application of clearly established federal law because the underlying prosecutorial misconduct was clear under *Beck v. Alabama*, 447 U.S. 625 (1980) and two Alabama Court of Criminal Appeals decisions. (Doc. 27 at 83). The Alabama decisions do not

constitute clearly established federal law. *See* 28 U.S.C. § 2254(d)(2) (defining clearly established federal law to be "determined by the Supreme Court of the United States). So the court limits its discussion to *Beck* and a Supreme Court case that Mr. Calhoun indicates the Alabama decisions cited: *Spaziano v. Florida*, 468 U.S. 447 (1984), *overruled in other part by Hurst v. Florida*, 557 U.S. 92 (2016).

Neither *Calhoun I* nor *Calhoun II* is contrary to or an unreasonable application of *Beck* or *Spaziano*. In *Beck*, the Supreme Court held that a State may not prohibit a judge presiding over a capital case from instructing the jury about the possibility of convicting the defendant of a lesser included offense. 447 U.S. at 627–28. In *Spaziano*, the state court told the defendant that it would instruct the jury on various lesser included offenses for which the statute of limitations had run only if the defendant would waive the limitations defense. 468 U.S. at 450. The Supreme Court held that conditioning the availability of the lesser included offenses on a waiver of the statute of limitations did not violate *Beck*. *Id.* at 455–57.

*Beck* and *Spaziono* do not clearly establish that a prosecutor's argument to the jury that it should not consider lesser included offenses because they were a plea for sympathy constitutes misconduct. As such, *Calhoun I* was not contrary to or an unreasonable application of those decisions. This part of Claim Thirteen therefore fails.

125

Likewise, *Beck* and *Spaziano* do not clearly establish that such an argument precludes a jury from considering those lesser included offenses. As a result, *Calhoun II* was not contrary to or an unreasonable application of those decisions. And in light of the holdings in *Calhoun I* and *Calhoun II* that the prosecutor's argument was permissible under Alabama law and that Mr. Calhoun failed to show that the jury declined to consider lesser included offenses as a result of that argument, Mr. Calhoun cannot establish that trial counsel were deficient for failing to object or that any failure to object prejudiced his defense. *See Strickland*, 466 U.S. at 687. This part of Claim Ten also fails.

### v.   Comparing the Rights of Victims to Mr. Calhoun's Rights

Fifth, Mr. Calhoun contends that the prosecutor engaged in misconduct by comparing the rights of the victims to Mr. Calhoun's rights. (Doc. 1-1 at 38, 53).

During opening statements in the penalty phase of Mr. Calhoun's trial, the prosecutor asked the jury "to listen to the testimony and remember one thing. Remember what consideration the Defendant gave Tracy Phillips and the Phillips[ ] family, and I ask you to give him the same consideration." (Doc. 18-11 at 97–998). During closing argument, the prosecutor acknowledged that Ms. Garrett had testified that she wanted her son to live and stated, "I have no problem with that. I fully

expected his mother would come up here and ask for that. But I suspect that Tracy Phillips' mother would like to have had a sentencing hearing on May 8, 1998, and offer evidence not to kill her son. She didn't get that chance." (*Id.* at 149). After Mr. Calhoun asked for the jury to "[l]et the killing stop" and impose a life sentence (*id.* at 152), the prosecutor argued in rebuttal that "if there is one person here today amongst this courtroom that believes in the death penalty, it's [Mr. Calhoun]. Because on May 8, 1998, he acted as judge, jury and executioner of Tracy Phillips; and Tracy Phillips didn't get a sentence hearing" (*id.* at 154).

On direct appeal, Mr. Calhoun challenged these comments. (Doc. 18-15 at 72–73). The Alabama Court of Criminal Appeals agreed that the prosecutor's comments were "improper" but concluded that there was no plain error because "these references were valued by the jury at their true worth, as having been uttered in the heat of debate and . . . not expected to become factors in the formation of the verdict." *Calhoun I*, 932 So. 2d at 970. Mr. Calhoun then asserted in his Rule 32 petition that trial counsel were ineffective for failing to object to those comments. (Doc. 18-23 at 166). The state habeas trial court denied the ineffective assistance claim on the merits. (Doc. 18-26 at 120–21). The Alabama Court of Appeals did not address this part of the claim on the merits. *See Calhoun II*, 261 So. 3d at 479–80.

The court begins with *Calhoun I*, which rejected the underlying prosecutorial misconduct claim on the ground that the jury did not consider the argument in arriving at its verdict. 932 So. 2d at 970. Relying on *Beck*, an Eleventh Circuit decision, and two Alabama Court of Criminal Appeals decisions, Mr. Calhoun contends that "[i]t is beyond question that the prosecutor's actions in . . . comparing the victims' rights to Mr. Calhoun's rights reflect specific instances of prosecutorial misconduct." (Doc. 1-1 at 54; doc. 27 at 83). The court construes this as an argument that *Calhoun I* was contrary to or an unreasonable application of clearly established federal law.

But *Beck* does not speak to a prosecutor's comparison of the rights of the victim to the rights of a defendant; it addresses a State's prohibition of the jury's considering any lesser included offenses in a capital case. 447 U.S. at 627–28. And the Eleventh Circuit and Alabama state court decisions cannot clearly establish federal law. *See* 28 U.S.C. § 2254(d)(2). Accordingly, Mr. Calhoun has not carried his burden under § 2254(d). This part of Claim Thirteen fails. And because the underlying claim of misconduct fails, so too does the claim of ineffective assistance for failing to object to the alleged misconduct. *See Strickland*, 466 U.S. at 687.

> **vi.    Mischaracterizing Ms. Garrett's testimony and Misstating the Law about Aggravating and Mitigating Circumstances**

Sixth, Mr. Calhoun contends that the prosecutor engaged in misconduct by telling the jury that Ms. Garrett's testimony was just a plea for sympathy, that mitigating circumstances amount to a plea for sympathy, and that Mr. Calhoun's presentation of one mitigating circumstance did not outweigh the State's four aggravating circumstances. (Doc. 1-1 at 38–39, 54–55).

During the opening statements in the penalty phase, the prosecutor told the jury that "any mitigating [circumstances] considered by you must be based on evidence. Again, just like in the guilt stage, it's not based on speculation or sympathy or anything of that nature." (Doc. 18-11 at 96). The prosecutor also explained that once the jury determined what aggravating and mitigating circumstances existed,

> then it is not that you do an adding. It's not that you say well, we'll add—we've got four aggravating, and there is only one mitigating, so four is more than one, and that's it or vice versa. It's not that way. It's actually the weighing of the two. Once you have the aggravating—one aggravating can outweigh many mitigating and vice versa. So, that is the process of weighing.

(*Id.*).

Among other evidence presented in the penalty phase, Ms. Garrett testified about Mr. Calhoun's childhood, upbringing, and family circumstances, and stated that she "want[ed] him to live." (*Id.* at 109–116).

During closing arguments, the prosecutor again explained to the jury that "it's not we prove four, and they prove none, or we prove four, and they prove one, and ours out numbers. It is the weight. And what weight do you give that." (*Id.* at 145). He then stated: "A mitigating circumstance again is just another way of asking for sympathy, and we already know the Defendant's history when it comes to sympathy, so I don't feel it is necessary to continue to go over that." (Doc. 18-11 at 145). He argued that the State had proved four aggravating circumstances and Mr. Calhoun had not proved any statutory mitigating circumstances, so "[t]he only thing left is the non-statutory mitigation, and that's his mother coming up here and asking you to spare his life, and she wants her son to live." (*Id.* at 149). He went on: "Let's say for some stretch that you believe that. That's one, and we've proven four; and I believe without question ours outweigh what, if any, they have proved—if they've proved any of the non-statutory, his mother asking you to spare his life, and that's all." (*Id.*).

On direct appeal, Mr. Calhoun contended that these arguments were prosecutorial misconduct because the prosecutor led the jury to believe that (1) the jury's role was to "count[ ] up . . . the mitigating and aggravating factors rather than

130

weighing them against one another as required by law"; (2) it could consider only Ms. Garrett's testimony about wanting her son to live and it could not consider her testimony about other mitigating circumstances, such as Mr. Calhoun's upbringing and family; and (3) the jury could not consider any mitigating evidence because mitigation could not be based on sympathy for the defendant. (Doc. 18-15 at 73–77).

The *Calhoun I* Court held that the prosecutor's argument did not imply to the jury that "the process of weighing the aggravating and the mitigating circumstances was strictly a numerical test." *Calhoun I*, 932 So. 2d at 971. Moreover, while the Court "did not condone the prosecutor's comment" that mitigation was just another way of asking for sympathy, the Court was "confident that it did not so infect the trial with unfairness that Calhoun was denied a fair trial." *Id.* The decision did not address Mr. Calhoun's argument that the prosecutor mischaracterized Ms. Garrett's testimony. *See id.* Nevertheless, the court must presume that the Alabama Court of Criminal Appeals rejected it on the merits. *See Richter*, 562 U.S. at 98; *Loggins*, 654 F.3d at 1217.

In the Rule 32 petition, Mr. Calhoun asserted that trial counsel's failure to object to the prosecutor's argument was ineffective assistance. (Doc. 18-23 at 166–67). The state habeas trial court denied that claim on the merits. (Doc. 18-26 at 121). The Alabama Court of Criminal Appeals affirmed on the ground that the prosecutor

properly argued that the aggravating circumstances outweighed, not outnumbered, the mitigating circumstances. *Calhoun II*, 261 So. 3d at 480. The Court declined to address Mr. Calhoun's argument about the prosecutor mischaracterizing Ms. Garrett's testimony and arguing that the jury could not base its sentence on sympathy because Mr. Calhoun had shifted his argument enough to make it a different argument that he had forfeited by failing to raise in the Rule 32 court. *Id.*

To begin, the court disposes of Mr. Calhoun's argument that the prosecutor engaged in misconduct by arguing that the jury should sentence Mr. Calhoun to death because the aggravating circumstances outnumbered the mitigating circumstances. As both the *Calhoun I* and *Calhoun II* decisions held, the record shows the opposite: the prosecutor clearly explained, both in opening statement and closing argument, that the jury had to weigh the circumstances in deciding whether to impose a death sentence. (Doc. 18-11 at 96, 145). The prosecutor explicitly stated that the number of aggravating or mitigating circumstances did not matter; what mattered was how the circumstances weighed against each other. (*Id.*).

Mr. Calhoun contends that the court should review his other two arguments (about mischaracterizing Ms. Garrett's testimony and arguing that mitigating circumstances are just a plea for sympathy) *de novo* because the *Calhoun II* decision did not address those arguments. (Doc. 44 at 52–56). Again, he does not address the

132

*Calhoun I* decision. (*See generally* doc. 1-1 at 39, 55–57; doc. 27 at 84–87; doc. 44 at 52–56). Even if the court agreed that *de novo* review of the ineffective assistance claim adjudicated in *Calhoun II* were appropriate, the court would be required to use § 2254(d) deference in reviewing the underlying holding about the substantive prosecutorial misconduct claim adjudicated in *Calhoun I*. So the court begins with the underlying claim.

Mr. Calhoun's only argument about the substantive prosecutorial misconduct claim is a passing reference to the prosecutor's statements being a violation of *Eddings v. Oklahoma*, 455 U.S. 104 (1982) and *Woodson v. North Carolina*, 428 U.S. 280 (1976). (Doc. 1-1 at 39, 55–56). But neither *Eddings* nor *Woodson* addresses prosecutorial misconduct.

In *Eddings*, the Supreme Court held that a sentencer may not "refuse to consider, *as a matter of law*, any relevant mitigating evidence. . . . The sentencer, and the [appellate court] on review, may determine the weight to be given to relevant mitigating evidence. But they may not give it no weight by excluding such evidence from their consideration." *Id.* at 114–15. Similarly, the Supreme Court in *Woodson* held unconstitutional a State's statute making the death penalty mandatory for any first degree murder conviction. 428 U.S. at 305–06. Neither *Eddings* nor *Woodson* addresses whether a prosecutor's argument can preclude a jury from considering

133

relevant mitigating factors. Accordingly, those cases do not establish that the prosecutor's purported mischaracterization of Ms. Garrett's testimony or argument about mitigating circumstances being a plea for sympathy constitute prosecutorial misconduct.

Absent a persuasive argument that *Calhoun I*'s rejection of this prosecutorial misconduct claim on the merits was contrary to or an unreasonable application of clearly established federal law, the court cannot grant relief to Mr. Calhoun. *See* 28 U.S.C. § 2254(d)(2). As such, this part of Claim Thirteen fails. And because the underlying prosecutorial misconduct claim fails, so does the claim of ineffective assistance for failing to object to the alleged misconduct. *See Strickland*, 466 U.S. at 687.

### vii.    Inciting the Jury's Passion and Prejudice

Mr. Calhoun contends that the prosecutor's closing argument during the guilt phase encouraged the jury to convict him and impose a death sentence based on "passion and prejudice." (Doc. 1-1 at 39–40, 57–58).

During closing argument in Mr. Calhoun's guilt phase, the prosecutor described what happened to the Phillips family as "the great American nightmare" and urged the jury to tell Mr. Calhoun that "what you did on this occasion is the most horrible act that you could have ever committed." (Doc. 18-11 at 4–5). During

rebuttal, the prosecutor said that in a world where "life means nothing" and people take what they want, the jury could "do something about one person. You can do something about one. You can send a message to that one and people like him that want to do that is [sic] we're not going to have this anymore, that you cannot do that." (*Id.* at 32). In penalty phase rebuttal, the prosecutor argued that everyone believed in self defense and "society has a right to defend itself just like individuals, and that's our self-defense mechanism is the death penalty." (*Id.* at 153).

On direct appeal, Mr. Calhoun argued that the prosecutor encouraged a verdict based on passion, prejudice, and the juror's fears. (Doc. 18-15 at 77–81). The Alabama Court of Criminal Appeals held that "given the events that occurred on May 8 the prosecutor's comments were not inappropriate; given the circumstances surrounding Calhoun's horrific actions in the Phillipses' house, they were more than appropriate." *Calhoun I*, 932 So. 2d at 966. The Court then "carefully reviewed all of the challenged instances, as well as the prosecutor's entire argument under a plain-error review," and held that "nothing the prosecutor said during Calhoun's trial so infected his trial with unfairness that he is entitled to a new trial." *Id.*

In his Rule 32 petition, Mr. Calhoun contended that trial counsel were ineffective for failing to object to the prosecutor's argument. (Doc. 18-23 at 168). The state habeas trial court denied this claim on the merits. (Doc. 18-26 at 122–23).

135

The Alabama Court of Criminal Appeals affirmed on a procedural ground. *Calhoun II*, 261 So. 3d at 480.

Mr. Calhoun now argues that the rejection of his prosecutorial misconduct claim was incorrect in the light of the Supreme Court's decisions in *Viereck v. United States*, 318 U.S. 236 (1943), *Berger v. United States*, 295 U.S. 78 (1935), and *United States v. Young*, 470 U.S. 1 (1985), (Doc. 1-1 at 57; doc. 44 at 40–45). The court will not address the Eleventh Circuit or Alabama decisions cited because those cannot clearly establish federal law for habeas purposes. *See* 28 U.S.C. § 2254(d)(2).

*Calhoun I* was not contrary to or an unreasonable application of any of the cited Supreme Court cases. In *Viereck*, the defendant was charged with omitting a material fact from a supplemental registration statement required of certain agents of foreign principals. 318 U.S. at 237. He had acted as the agent of German principals and was tried during World War II. *See id.* at 239. During closing argument, the prosecutor argued that the United States was at war with "those who, right at this very moment, are plotting your death and my death; plotting our death and the death of our families because we have committed no other crime than that we do not agree with their ideas of persecution and concentration camps." *Id.* at 247 n.3. Comparing the jury to members of the military fighting abroad, the prosecutor implored them to protect the American people and to "do your duty." *Id.* The Supreme Court, after

136

determining that reversal was warranted for a different reason, stated that the prosecutor's statements "might well have placed the judgment of conviction in jeopardy" because they were "wholly irrelevant to any facts or issues in the case" and "the purpose and effect . . . could only have been to arouse passion and prejudice." *Id.* at 247.

First, it is not clear that the Supreme Court's discussion of the prosecutor's problematic closing statement is a holding that can clearly establish federal law, given the Court's statement that the reversal was because of a different error and the prosecutor's statement "might" have denied the defendant a fair trial. *See id.* at 247; *Bates v. Sec'y, Fla. Dep't of Corr.*, 768 F.3d 1278, 1288 (11th Cir. 2014) ("The phrase 'clearly established federal law' refers only to the holdings, as opposed to the dicta, of the Supreme Court's decisions as of the time of the relevant state-court decision.") (quotation marks and alteration omitted).

Even if *Viereck* set out a holding that a prosecutor's argument designed "only . . . to arouse passion and prejudice" violated a defendant's right to a fair trial, the facts presented by *Viereck* are distinguishable from those presented by this case. There, the prosecutor aligned the defendant with a country at war with the United States, compared the jury to members of the military fighting in the war, and urged the jury to do its "duty" for the protection of the American people. *See Viereck*, 318

137

U.S. at 247 n.3. Here, the prosecutor argued that Mr. Calhoun's own acts were horrible and warranted the punishment of death because he would not conform to society's standards. (Doc. 18-11 at 4–5, 32, 153). In the light of these distinctions, this court cannot hold that *Calhoun I* was contrary to or an unreasonable application of *Viereck*. *See* 28 U.S.C. § 2254(d)(2).

In *Berger*, the prosecutor misstated facts, "put[ ] into the mouths of such witnesses things which they had not said," suggested "by his questions that statements had been made to him personally out of court, in respect of which no proof was offered," pretended "to understand that a witness had said something which he had not said," assumed "prejudicial facts not in evidence," bullied and argued with witnesses, "and, in general, . . . conduct[ed] himself in a thoroughly indecorous and improper manner." 295 U.S. at 84. The Supreme Court, finding that the case against the defendant was "weak" and that the prosecutor's misconduct was "pronounced and persistent," held that "prejudice to the cause of the accused is so highly probable that we are not justified in assuming its nonexistence." *Id.* at 89. The Court noted, however, that "a different conclusion might be reached" where the case against the defendant is strong. *Id.*

Again, this case is distinguishable from *Berger*. The prosecutor in Mr. Calhoun's trial made some improper comments, but they were sporadic and the

evidence of Mr. Calhoun's guilt was overwhelming. This court cannot hold that *Calhoun I* was contrary to or an unreasonable application of *Berger*.

The final case is *Young*, in which defense counsel improperly argued to the jury that the prosecution was unfair and insinuated that the prosecutor did not believe in the defendant's guilt. 470 U.S. at 4–5. In response, the prosecutor improperly and repeatedly vouched for his personal belief in the defendant's guilt. *Id.* at 5–6. The Supreme Court held that "[t]he kind of advocacy shown by this record has no place in the administration of justice," *id.* at 9, but "a criminal conviction is not to be lightly overturned on the basis of a prosecutor's comments standing alone, for the statements or conduct must be viewed in context; only by so doing can it be determined whether the prosecutor's conduct affected the fairness of the trial," *id.* at 11. The Supreme Court concluded that the prosecutor's arguments, although improper, "were not such as to undermine the fundamental fairness of the trial and contribute to a miscarriage of justice" when considered in context with the defense attorney's conduct. *Id.* at 16.

The *Calhoun I* Court did exactly what the Supreme Court directed in *Young*: it reviewed the entire trial record to determine whether the prosecutor's comments, questions, and argument affected the fairness of the trial. *Calhoun I*, 932 So. 2d at 960. Mr. Calhoun's conclusory citation to *Young* without developing any argument

about how *Calhoun I* actually contravened or unreasonably applied it cannot suffice to overcome the deference due under § 2254(d)(2). (*See* doc. 44 at 43).

Mr. Calhoun has not established that *Calhoun I*'s rejection of his prosecutorial misconduct claim was contrary to or an unreasonable application of any clearly established federal law. *See* 28 U.S.C. § 2254(d)(2). And because Mr. Calhoun's underlying prosecutorial misconduct claims fail, so does his claim of ineffective assistance for failure to object to prosecutorial misconduct. *See Strickland*, 466 U.S. at 687.

### viii.   Cumulative Effect

Mr. Calhoun contends that the cumulative effect of the prosecutor's misconduct denied him a fair trial, so counsel were ineffective for failing to object. (Doc. 1-1 at 40, 44; doc. 44 at 43, 79, 86–87). Mr. Calhoun provides no further argument in support of that contention. (*See* doc. 1-1 at 40; doc. 44 at 43, 79, 86–87). He therefore has forfeited that argument. *See King*, 69 F.4th at 877.

The court **DENIES** Claim Ten and Claim Thirteen.

### 11. Claim Eleven

Mr. Calhoun contends that trial counsel were ineffective for failing to object to the admission of a rape test kit as unreliable and testimony from the State's DNA witness as misleading. (Doc. 1-1 at 45–47).

In his Rule 32 petition, Mr. Calhoun contended that trial counsel were ineffective for failing to challenge the admission of the unauthenticated rape kit by arguing that the testing procedures were not adequately developed, the population frequency statistics lacked an adequate foundation, the testing procedures did not comport with required guidelines, and the State's expert misled the jury by referring to a DNA "match" and overstating statistics. (Doc. 18-23 at 141–42). The state habeas trial court denied this claim on the merits. (Doc. 18-26 at 85–86).

In his brief on appeal from the denial of his Rule 32 petition, Mr. Calhoun repeated his argument about the testing procedures, the foundation for the population frequency statistics, and the expert's testimony misleading the jury. (Doc. 18-31 at 98–101). In support, he cited only a law review article. (*See id.*). The Alabama Court of Criminal Appeals found that Mr. Calhoun waived his claim because he failed to comply with Rule 28(a)(10). *Calhoun II*, 261 So. 3d at 480.

The State contends that Mr. Calhoun procedurally defaulted this claim because the Alabama Court of Criminal Appeals rejected it based on an independent and adequate state law ground. (Doc. 21 at 25). Mr. Calhoun responds that the state law ground was applied in an arbitrary or unprecedented manner because of its manifest unfairness. (Doc. 27 at 75–76; *see also id.* at 47–50 (incorporated by reference)); *see Card v. Dugger*, 911 F.2d 1494, 1517 (11th Cir. 1990) (holding that to be applied in

141

a non-arbitrary or unprecedented fashion, the rule "must be faithfully and regularly applied and must not be manifestly unfair in its treatment of a petitioner's federal constitutional claim") (citations omitted). Specifically, he argues that although he requested a sixty-page extension of the page limit, the Court gave him only a twenty-page extension, precluding him from citing any legal authority. (Doc. 27 at 76).

The court finds that this claim is procedurally defaulted. The Alabama Court of Criminal Appeals clearly relied on Rule 28(a)(10) and the ruling was not intertwined with federal law. *See Judd*, 250 F.3d at 1313. Moreover, the Court did not apply the rule in an arbitrary or unprecedented manner. Rule 28(a)(10) requires a petitioner to provide "citations to the cases, statutes, other authorities, and parts of the record relied on." Ala. R. App. P. 28(a)(10). Alabama law has long held that the courts need not "do a party's legal research or to make and address legal arguments for a party based on undelineated general propositions not supported by sufficient authority or argument." *Ex parte Borden*, 60 So. 3d 940, 943 (Ala. 2007) (quotation marks omitted). Mr. Calhoun's appellate brief was 100 pages long (doc. 18-31 at 2–115) and this claim took up three pages (*id.* at 98–101). But Mr. Calhoun provided only one citation, which was not to any legal authority but to a law review article. (*See id.*). Moreover, although he quarrels with the Court's order granting him a twenty-page extension instead of the sixty pages he requested, he does not state what

142

authority he would have cited if he had received all the pages he requested. (Doc. 27 at 76). Nothing about the Alabama Court of Criminal Appeals' ruling is unfair, much less manifestly so. The court **DENIES** Claim Eleven as procedurally defaulted.

12. Claim Twelve

Mr. Calhoun contends that trial counsel were ineffective for failing "to explain why Mr. Calhoun was not guilty of capital murder," including by failing to investigate other suspects, failing to put on a case-in-chief in defense, failing to present evidence of Mr. Calhoun's intellectual disability to show he lacked the "requisite culpability for capital murder," and failing to argue in closing that Mr. Calhoun was not guilty of capital murder or that he had a viable defense. (Doc. 1-1 at 47–49).

Mr. Calhoun made this same claim in his Rule 32 petition. (Doc. 18-23 at 148–52). The state habeas trial court denied this claim on the merits. (Doc. 18-26 at 95–101). Mr. Calhoun repeated his claim in his brief on appeal, citing in one sentence to *Herring v. New York*, 422 U.S. 853, 862 (1975), for the proposition that "no aspect of such advocacy could be more important than the opportunity finally to marshal the evidence for each side before submission of the case to judgment." (Doc. 18-31 at 101–03). The Alabama Court of Criminal Appeals, finding that the general citation to *Herring* failed to comply with Rule 28(a)(10), rejected this claim because

143

"authority supporting only general propositions of law does not constitute a sufficient argument for reversal." *Calhoun II*, 261 So. 3d at 481.

The State contends that this claim is procedurally defaulted by the Alabama Court of Criminal Appeals' application of an independent and adequate procedural bar. (Doc. 20 at 61). Mr. Calhoun does not respond to that assertion. (*See generally* docs. 27, 44). The court finds that this claim is procedurally defaulted. The Alabama Court of Criminal Appeals clearly relied on Rule 28(a)(10), the ruling was not intertwined with federal law, and the rule was not applied in an arbitrary or unprecedented manner. *See Judd*, 250 F.3d at 1313; *see also Beachcroft Properties, LLP v. City of Alabaster*, 901 So. 2d 703, 708 (Ala. 2004) (explaining, in the context of finding that an appellate failed to comply with Rule 28(a)(10), that "[a]uthority supporting only general propositions of law does not constitute a sufficient argument for reversal") (quotation marks omitted). The court **DENIES** Claim Twelve as procedurally defaulted.

13. Claim Fourteen

Mr. Calhoun contends that the state trial court and Alabama Court of Criminal Appeals unreasonably applied clearly established federal law by failing to consider the evidence of nonstatutory mitigating circumstances. (Doc. 1-1 at 59–62). He also argues that their "refusal to consider the evidence" was based on an unreasonable

144

determination of the facts because Alabama law puts the burden on the State to rebut any mitigating circumstance the defendant "interject[s]." (*Id.* at 62–63).

In the sentencing order, the state trial court stated that after making "a diligent search" of the evidence offered by the defendant and the "favorable" aspects of the presentence report "to determine if there is any aspect of the defendant's character or record or any circumstances of the offense for which he has been convicted that would constitute a mitigating circumstance," it found "no mitigating circumstance." (Doc. 18-2 at 60).

On direct appeal, Mr. Calhoun argued that the state trial court improperly failed to consider and find mitigating circumstances because he presented Ms. Garrett's testimony and evidence from the presentence report and the State failed to rebut any of that evidence. (Doc. 18-15 at 45–49). The Alabama Court of Criminal Appeals held that the state trial court did not err because it "must consider evidence offered in mitigation, but it is not obliged to find that the evidence constitutes a mitigating circumstance," and the sentencing order indicated that the court had considered the evidence. *Calhoun I*, 932 So. 2d at 975.

First, the Alabama Court of Criminal Appeals' decision was not based on an unreasonable determination of the facts, under § 2254(d)(2). Mr. Calhoun's argument about the reasonableness of the facts is actually an argument that the state courts

failed to comply with Alabama law by rejecting unrebutted mitigating evidence. (Doc. 1-1 at 62). But a state court's interpretation of state law binds a federal court. *See Bradshaw v. Richey*, 546 U.S. 74, 76 (2005). This court cannot second-guess the state courts' reading of Alabama law. To the extent Mr. Calhoun challenges a factual finding that the state court did consider the evidence, he has not carried his burden of showing that such a finding was unreasonable. The state trial court's order states that it "diligent[ly] search[ed]" the evidence but was unconvinced that any of the evidence amounted to a mitigating circumstance. (Doc. 18-2 at 60). Mr. Calhoun has not pointed to any evidence or made any allegations that, accepted as true, would cast doubt on the trial court's statement. (*See* doc. 1-1 at 62–63).

Nor is the Alabama Court of Criminal Appeals' decision based on an unreasonable interpretation of clearly established federal law. The Court of Criminal Appeals held that federal law required "consideration of all evidence submitted as mitigation" but "whether the evidence is actually found to be mitigating is in the discretion of the sentencing authority." *Calhoun I*, 932 So. 2d at 975 (quotation marks omitted). Mr. Calhoun contends that this is an unreasonable application of *Lockett v. Ohio*, 438 U.S. 586 (1978), *Woodson v. North Carolina*, 428 U.S. 280 (1976), and *Hitchcock v. Dugger*, 481 U.S. 393 (1987). (Doc. 1-1 at 60–61).

146

*Lockett* stated, in a plurality opinion, that the Constitution requires "that the sentencer . . . not be precluded from considering, as a mitigating factor, any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death." 438 U.S. at 604. *Woodson* stated, in a plurality opinion, that "in capital cases the fundamental respect for humanity underlying the Eighth Amendment requires consideration of the character and record of the individual offender and the circumstances of the particular offense as a constitutionally indispensable part of the process of inflicting the penalty of death." 428 U.S. at 304 (citation omitted). And *Hitchcock* held that a petitioner was entitled to habeas relief where the record clearly showed that the state trial court instructed the jury not to consider, and itself refused to consider, "evidence of nonstatutory mitigating circumstances." 481 U.S. at 398–99. None of those cases clearly establish that once a state court has considered the evidence presented, it must find the existence of mitigating circumstances.

The Alabama Court of Criminal Appeals' rejection of this claim was not based on an unreasonable determination of the facts or an unreasonable application of clearly established federal law. *See* 28 U.S.C. § 2254(d). The court **DENIES** Claim Fourteen.

14. Claim Fifteen

Mr. Calhoun contends that the state trial court impermissibly considered the races of the victim and Mr. Calhoun when it sentenced Mr. Calhoun. (Doc. 1-1 at 63–64).

In an order setting out the findings of fact relating to the penalty phase, the state trial court stated that the State had offered evidence of four mitigating circumstances, Mr. Calhoun had offered mitigating evidence from Dr. Shealy and his mother, the jury had recommended a death sentence by a vote of ten to two, the aggravating circumstances outweighed the mitigating circumstances, and the jury did not act "under the influence of passion, prejudice or any arbitrary factor." (Doc. 18-2 at 55–56). It concluded with the following paragraph:

> The Court finds that the defendant is a black male and the victim, Tracy Phillips, was a white male. The Court further taking judicial knowledge of the proceedings conducted before it, finds that the composition of the jury trying the defendant in this case was as follows: Seven (7) white males, one (1) black male, three (3) black females and one (1) white female. One (1) white female and one (1) black male were the alternate jurors. The Court further taking judicial knowledge finds that the foreperson both at the guilt stage and sentencing hearing was a black female.

(*Id.* at 56). In a separate order titled "Consideration, Findings and Determination of Sentence as Required by Section 13A-5-47(b)," the state trial court set out its findings

148

about the aggravating and mitigating circumstances and the appropriate weight to be assigned to them. (*Id.* at 57–60).

On appeal, Mr. Calhoun contended that the state trial court improperly considered the race of Mr. Phillips and Mr. Calhoun. (Doc. 18-15 at 50–51). The Alabama Court of Criminal Appeals rejected this claim on the ground that Mr. Calhoun took the sentence out of context and the record contained no indication that the trial court considered Mr. Calhoun's race in sentencing him to death. *Calhoun I*, 932 So. 2d at 976.

Mr. Calhoun contends that the Court of Criminal Appeals' rejection of this claim was based on an unreasonable determination of the facts and an unreasonable application of clearly established federal law prohibiting a sentencing court from considering a defendant's race. (Doc. 1-1 at 63–64). But the Court's factual determination that the record refutes Mr. Calhoun's argument is reasonable. It is clear that the state trial court wrote the sentence identifying the races of Mr. Phillips and Mr. Calhoun in the context of describing the racial composition of the jury, not in connection with its decision to sentence Mr. Calhoun to death. (*See* doc. 18-2 at 56; *see also id.* at 57–60). And because the state trial court did not base its sentence on the race of either Mr. Phillips or Mr. Calhoun, the Alabama Court of Criminal Appeals' decision was not contrary to or an unreasonable application of any clearly

149

established federal law prohibiting consideration of race in sentencing. The court **DENIES** Claim Fifteen.

15. Claim Seventeen

Mr. Calhoun contends that the state trial court erred by refusing to strike a prospective juror for cause after the potential juror disclosed that Mr. Phillips's counsel had spoken with him before voir dire. (Doc. 1-1 at 67–68).

During voir dire, potential juror Gene Ballard informed the parties and the court that he knew something about the facts of the case. (Doc. 18-5 at 96–97). On questioning, he stated that while he was out in the courthouse hallway, he said hello to a "previous acquaintance" named Jones. (*Id.* at 117). Mr. Ballard knew Mr. Jones because they had a mutual friend who knew Mr. Jones "when they was kids 20 something years ago." (*Id.*). Mr. Ballard had last talked with Mr. Jones three or four months earlier, when Mr. Ballard was working on a house and Mr. Jones was working on a neighbor's house. (*Id.*). On the day of voir dire, Mr. Ballard saw Mr. Jones in the hallway and said hello, and Mr. Jones told him "he was a cousin of the guy that got murdered" and showed Mr. Ballard a picture of Mr. Phillips. (Doc. 18-5 at 117).

Mr. Ballard stated that he had not formed any opinions based on the interaction with Mr. Jones and that he did not "even really—if you had put two pictures down

150

there, I wouldn't know them apart." (*Id.* at 118–19). He further stated that he would be able to put aside what Mr. Jones said and render a verdict based on the law and the evidence. (*Id.* at 119).

Mr. Calhoun moved to strike Mr. Ballard for cause based on the interaction with Mr. Jones. (Doc. 18-6 at 28–29). The state trial trial court denied that motion. (*Id.* at 29). Mr. Calhoun therefore used a peremptory strike to remove Mr. Ballard. *Calhoun I*, 932 So. 2d at 944.

On direct appeal, Mr. Calhoun contended that the state trial court erred in failing to strike Mr. Ballard for cause, forcing him to use a peremptory strike. (Doc. 18-15 at 142–44). The Alabama Court of Criminal Appeals held that any error in refusing Mr. Calhoun's strike for cause was harmless because he did not show "that the jury ultimately impaneled was biased." *Calhoun I*, 932 So. 2d at 943–45. Alternatively, the Court held that the state trial court did not err in failing to remove Mr. Ballard for cause because "the record clearly shows that this juror was not biased against Calhoun." *Id.*

Mr. Calhoun contends that this decision was based on an unreasonable determination of the facts and an unreasonable application of federal law governing his right to use peremptory challenges, under *Swain v. Alabama*, 380 U.S. 202 (1965), *overruled in part by Batson*, 476 U.S. 79, and his right to an impartial jury, under

151

*Turner v. Louisiana*, 379 U.S. 466 (1965), *Irvin v. Dowd*, 366 U.S. 717 (1961), and

*Zant v. Stephens*, 462 U.S. 862 (1983). (Doc. 1-1 at 68–69).

First, Mr. Calhoun has offered no explanation for why he believes the Alabama

Court of Criminal Appeals' decision was based on an unreasonable determination of

the facts. (*See* doc. 1-1 at 69). Accordingly, that argument is forfeited. *See King*, 69

F.4th at 877.

Second, Mr. Calhoun has not pointed to any Supreme Court cases establishing

that that a defendant's need to use a peremptory strike after a trial court denies a

motion to strike for cause violates the defendant's rights. He cites a sentence from

*Swain*, which stated that "denial or impairment of the right [to use peremptory strikes]

is reversible error without a showing of prejudice." 380 U.S. at 219. But as the United

States has explained, the Court has "disavowed this statement," opining that "the oft-

quoted language in *Swain* was not only unnecessary to the decision in that case but

was founded on a series of our early cases decided long before the adoption of

harmless-error review." *Rivera v. Illinois*, 556 U.S. 148, 160 (2009) (quotation marks

and alteration omitted).

Third, Mr. Calhoun has not pointed to any Supreme Court cases clearly

establishing that a defendant's need to use a peremptory strike deprives him of an

impartial jury. In *Turner*, two of the witnesses for the prosecution were deputy

152

sheriffs who fraternized with the sequestered jury throughout the trial. 379 U.S. at 468–69. The Supreme Court held that this association prejudiced the defendant's rights. *Id.* at 474. *Irvin* involved the denial of a defendant's right to change venue based on his inability to obtain an impartial jury in the county, which had been exposed to extensive media coverage of the crimes. 366 U.S. at 719–20, 725–28. And *Zant* held that, once a jury has found that the defendant is eligible for the death penalty based on the existence of a statutorily defined aggravating circumstance, the jury could consider "other possible aggravating factors" as long as it made an "*individualized* determination on the basis of the character of the individual and the circumstances of the crime." 462 U.S. at 877–79. Accordingly, all three cases Mr. Calhoun cites are inapposite and cannot operate to lift § 2254(d) deference from the *Calhoun I* decision. The court **DENIES** Claim Seventeen.

    16. Claim Nineteen

    Mr. Calhoun contends that his sentence is unconstitutional because a judge, instead of the jury, found that the aggravating circumstances outweighed the mitigating the circumstances, there is no indication that a jury unanimously found the aggravating circumstances, the court and the State repeatedly told the jury that it would make only a recommendation about the appropriate sentence, and the state trial

court impermissibly found as a fact that Mr. Calhoun had previously been convicted of a violent felony. (Doc. 1-1 at 72–74).

Alabama law in effect at the time of Mr. Calhoun's trial provided that, after the jury has found a defendant guilty of a capital crime, the trial court must hold a separate sentence hearing. Ala Code § 13A-5-45(a)(2000). "[A]ny aggravating circumstance which the verdict convicting the defendant establishes was proven beyond a reasonable doubt at trial shall be considered as proven beyond a reasonable doubt for purposes of the sentence hearing." *Id.* § 13A-5-45(e). And if at least one aggravating circumstance was present, the defendant was eligible for the death penalty. *See id.* § 13A-5-45(f). Aggravating circumstances included the defendant having been "previously convicted of . . . a felony involving the use or threat of violence to the person," or a capital offense committed "while the defendant was engaged [in] rape, robbery, [or] burglary." Ala. Code § 13A-5-49(2), (4).

Mr. Calhoun was convicted of murder during a first degree robbery, murder during a first degree burglary, murder during a first degree sodomy, and murder during a first degree rape. (Doc. 18-1 at 15–16, 184–85; doc. 18-2 at 86–87, 197–98). At the time, Alabama law provided that a sentence hearing in a capital case must be "conducted before a jury which shall return an advisory verdict." Ala. Code § 13A-5-46(a) (2000). A recommendation of a death sentence had to be "based on a vote of

at least 10 jurors." *Id.* § 13A-5-46(f). But the responsibility to determine the sentence rested with the trial court; the advisory verdict was "not binding upon the court," which was required only to "give[ ] consideration" to that recommendation. *Id.* § 13A-5-47(e) (2000).

Before opening statements in the penalty phase, the state trial court told the jury that "at the end of this proceeding you will after considering the aggravating circumstances and mitigating circumstances, and after properly weighing those, you will make a recommendation to this Court as to whether or not this Defendant should be sentenced to death or to life without parole." (Doc. 18-11 at 89). The State presented evidence that Mr. Calhoun had previous convictions for attempted first degree rape and a conviction for first degree sexual abuse. (Doc. 18-11 at 103, 107). The state trial court instructed the jury that the guilt phase verdict established three aggravating circumstances beyond a reasonable doubt: murder committed while the defendant was engaged in rape, robbery, and burglary. (Doc. 18-11 at 159–61). In closing instructions, the court repeatedly referred to the jury's verdict as a "recommendation." (*Id.* at 157, 167–68, 173).

The jury's verdict for each offense recommended death by a vote of ten to two, without specifying the aggravating and mitigating circumstances. (Doc. 18-1 at 143; doc. 18-2 at 46, 159; doc. 18-3 at 64). The state trial court then entered orders stating

that the aggravating circumstances were that Mr. Calhoun had previously been convicted of felonies involving the use or threat of violence and the offense was committed while Mr. Calhoun was committing rape, robbery, and burglary. (Doc. 18-2 at 57–58). The state trial court found no mitigating circumstances and concluded that the aggravating circumstances outweighed the mitigating circumstances, warranting imposition of the death penalty. (*Id.* at 59–60).

In his direct appeal, Mr. Calhoun contended that his sentence was unconstitutional under *Caldwell v. Mississippi*, 472 U.S. 320 (1985), and *Ring*, which the United States Supreme Court had issued during the pendency of his appeal. (Doc. 18-15 at 158–59; doc. 18-17 at 11–26). The Alabama Court of Criminal Appeals did not address *Caldwell* but held that the sentence did not violate *Ring* because the jury found beyond a reasonable doubt that Mr. Calhoun committed "[t]he felonies which elevated the murder to a crime punishable by death." *Calhoun I*, 932 So. 2d at 978.

Mr. Calhoun contends that the Alabama Court of Criminal Appeals decision was "an unreasonable application of law and an unreasonable determination of fact." (Doc. 1-1 at 74). Because he provides no argument about how the decision was based on an unreasonable determination of fact, he has forfeited that argument. *See King*, 69 F.4th at 877. But he does cite *Ring* and *Caldwell* in support of his argument that

the decision was based on an unreasonable application of the law. (*See* doc. 1-1 at 72–74).

Mr. Calhoun has not established that the Alabama Court of Criminal Appeals unreasonably applied *Ring* or *Caldwell*. In *Ring*, the United States Supreme Court held that Arizona's capital sentencing scheme was unconstitutional because it permitted imposition of the death penalty based on a judge, sitting without a jury, finding that at least one aggravating circumstance existed. 536 U.S. at 609. But *Ring* did not hold that a judge could not find additional aggravating circumstances and could not conduct an independent weighing of the aggravating and mitigating circumstances. *See id.*; *see also Lee v. Comm'r, Ala. Dep't of Corr.*, 726 F.3d 1172, 1198 (11th Cir. 2013) ("Nothing in *Ring*—or any other Supreme Court decision—forbids the use of an aggravating circumstance implicit in a jury's verdict. Indeed, *Ring* itself specifically left open and did not decide the question of whether the aggravator used to impose a death sentence could be implicit in the jury's verdict. Furthermore, *Ring* does not foreclose the ability of the trial judge to find the aggravating circumstances outweigh the mitigating circumstances") (citation omitted). Accordingly, the Alabama Court of Criminal Appeals' decision was not based on an unreasonable application of *Ring*.

Mr. Calhoun also contends that this sentence violates *Caldwell*. (Doc. 1-1 at 74). In that case, the jury was the sentencer but any death sentence was automatically reviewable by the state supreme court. *Id.* at 325–26. Defense counsel argued in closing that its responsibility was "awesome" and it had the option to "give him life or you can give him death." *Id.* at 324. The prosecutor, in rebuttal, argued that the jury's decision was not final because "the decision you render is automatically reviewable by the [Mississippi] Supreme Court." *Id.* at 325. The United States Supreme Court held that "it is constitutionally impermissible to rest a death sentence on a determination made by a sentencer who has been led to believe that the responsibility for determining the appropriateness of the defendant's death rests elsewhere." 472 U.S. at 328–29. The Alabama Court of Criminal Appeals did not expressly discuss this argument, but the court must presume that it rejected the argument on the merits. *See Richter*, 562 U.S. at 98; *Loggins*, 654 F.3d at 1217.

Mr. Calhoun has not established that the rejection of his *Caldwell* argument was based on an unreasonable application of clearly established law. Unlike in *Caldwell*, where the jury was the sentencer, the jury in this case found the aggravating factor that made the defendant eligible for the death penalty and gave a recommendation about an appropriate sentence. The trial court then weighed the circumstances and imposed the sentence it deemed appropriate. *See* Ala. Code § 13A-

158

5-47(e) (2000). Nothing about the state trial court's references to the jury's verdict as a recommendation was misleading or minimized the jury's role; it accurately described the jury's role. *See, e.g.*, *Romano v. Oklahoma*, 512 U.S. 1, 9 (1994) ("[T]o establish a *Caldwell* violation, a defendant necessarily must show that the remarks to the jury improperly described the role assigned to the jury by local law.") (quotation marks omitted). Accordingly, the Alabama Court of Criminal Appeals' rejection of this claim is entitled to deference and the court **DENIES** Claim Nineteen.

          17. <u>Claim Twenty</u>

          Mr. Calhoun's final claim is that the cumulative effect of all of his claims denied him a fair trial and a reliable sentencing. (Doc. 1-1 at 75). He provides no argument and only one citation to a Supreme Court case holding that "the state's obligation under *Brady v. Maryland*, 373 U.S. 83 (1963), to disclose evidence favorable to the defense, turns on the cumulative effect of all such evidence suppressed by the government." (*See id.*); *Kyles v. Whitley*, 514 U.S. 419, 421 (1995). Because this argument is entirely deficient, it is forfeited. *See King*, 69 F.4th at 877. The court **DENIES** Claim Twenty.

**IV.   CONCLUSION**

          The court **DENIES** all of Mr. Calhoun's claims except Claim One. The court **WILL SET** an evidentiary hearing on that claim. To facilitate that hearing, the court

will hold a status conference in chambers on **November 6, 2024, 2:00 PM,** Hugo L

Black US Courthouse, Birmingham, AL, before Judge Annemarie Carney Axon.  The

attorneys should confer before the conference and be prepared to discuss the

anticipated length of the hearing, dates for the hearing, deadlines for identifying and

disclosing witnesses and other evidence, and whether any stipulations of fact are

possible.

       **DONE** and **ORDERED** this September 20, 2024.

_____
**ANNEMARIE CARNEY AXON**
UNITED STATES DISTRICT JUDGE