## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## EASTERN DIVISION

| | | |
|---|---|---|
| **JOHN RUSSELL CALHOUN,** | ] | |
| | ] | |
| **Petitioner,** | ] | |
| | ] | |
| **v.** | ] | **Case No.: 1:18-cv-0874-ACA** |
| | ] | |
| **DARREL FOX, Warden of** | ] | |
| **St. Clair Correctional Facility,** | ] | |
| | ] | |
| **Respondent.** | ] | |

## <u>MEMORANDUM OPINION AND ORDER</u>

John Russell Calhoun is an Alabama prisoner sentenced to death on four capital murder charges arising from his profoundly heinous conduct in murdering a man during a robbery, burglary, sodomy, and rape. He filed a petition for a writ of habeas corpus under 28 U.S.C. § 2254, asserting twenty claims that his convictions and sentences violate the U.S. Constitution. (Doc. 1; *see also* doc. 54 at 9–10). The court denied all but one of the claims. (Doc. 54). As to that claim, the court agreed with the State that there was a question about Mr. Calhoun's eligibility for execution under *Atkins v. Virginia*, 536 U.S. 304 (2002). (Doc. 54 at 14–40; *see* doc. 18-24 at 9 (requesting that the state habeas trial court "set an evidentiary hearing solely limited to the issue of whether Calhoun is mentally retarded"; *id.* at 99 ("While the State expressly denies the merits of [the *Atkins* claim], the State further requests that this Court set an evidentiary hearing only with respect to [that claim] to determine

whether Calhoun is mentally retarded.")). The court held a two-day evidentiary hearing on August 11 and 12, 2025 (docs. 103, 104), after which the parties submitted supplemental briefing (docs. 107, 109, 110). The case came under submission when post-hearing briefing was complete on November 10, 2025.

Because Mr. Calhoun has proved by a preponderance of the evidence that he is intellectually disabled, the court **WILL GRANT** the § 2254 petition with respect to the claim that he is ineligible for execution under *Atkins*, **WILL VACATE** his death sentences, and **WILL IMPOSE** sentences of life without the possibility of parole.

## I.    RELEVANT FRAMEWORK

The Eighth Amendment prohibits the execution of "mentally retarded"—now called intellectually disabled—defendants. *Atkins*, 536 U.S. at 311, 321. The definition of intellectual disability is left to each State. *Id.* at 317; *see Smith v. Comm'r, Alabama Dep't of Corr.*, 924 F.3d 1330, 1341 (11th Cir. 2019) ("The Supreme Court's decision in *Atkins* did not define what it means to be intellectually disabled, instead leaving that task to the states."). Alabama defines intellectual disability to require (1) "significantly subaverage intellectual functioning (an [intelligence quotient ("IQ")] of 70 or below)"; (2) "significant or substantial deficits in adaptive behavior"; and (3) manifestation of "these problems" before the defendant turned eighteen. *Ex parte Perkins*, 851 So. 2d 453, 456 (Ala. 2002).

2

At the time of Mr. Calhoun's conviction and appeal, neither the United States Supreme Court nor the Alabama Supreme Court had defined "significant or substantial deficits in adaptive behavior." *See Atkins*, 536 U.S. at 317; *Perkins*, 851 So. 2d at 456. But the United States Supreme Court had emphasized that the American Association on Mental Retardation required "limitations in two or more of the following applicable adaptive skill areas: communication, self-care, home living, social skills, community use, self-direction, health and safety, functional academics, leisure, and work" and the American Psychiatric Association ("APA") required "significant limitations in adaptive functioning in at least two of the following skill areas: communication, self-care, home living, social/interpersonal skills, use of community resources, self-direction, functional academic skills, work, leisure, health, and safety." *Atkins*, 536 U.S. at 308 n.3. The Alabama Supreme Court acknowledged these definitions in its *Perkins* decision. *See* 851 So. 2d at 456 & n.2 (citing *Atkins*, 536 U.S. at 308 n.3). And the Eleventh Circuit has explained that, for purposes of Alabama law, "literature in the field" defines "significant or substantial deficits in adaptive behavior" to require "concurrent deficits or impairments in present adaptive functioning in at least two of the following skill areas: communication, self-care, home living, social/interpersonal skills, use of community

3

resources, self-direction, functional academic skills, work, leisure, health and safety."[1] *Holladay v. Allen*, 555 F.3d 1346, 1353 (11th Cir. 2009).

Under Alabama law, the defendant bears the burden of proving intellectual disability by a preponderance of the evidence. *Smith v. State*, 213 So. 3d 239, 252 (Ala. 2007). In addition, the parties here stipulated that Mr. Calhoun must prove his intellectual disability by a preponderance of the evidence.[2] (Doc. 96 at 22–23). So the question before the court is whether Mr. Calhoun has proved, by a preponderance of the evidence, that before he turned eighteen, he had an IQ of 70 or below and significant or substantial deficits in adaptive behavior.

---

[1] How psychologists group the adaptive skill areas has changed over time. In 2002, when the United States Supreme Court decided *Atkins* and the question of Mr. Calhoun's intellectual disability was before the Alabama courts, the relevant professional associations required limitations in two or more adaptive skill areas. *Atkins*, 536 U.S. at 308 n.3. Psychologists no longer look for limitations in any two of the list; now they group the ten skill areas into three "domains": "the conceptual, the social, and the practical." (Doc. 103 at 105). A diagnosis of intellectual disability requires significant deficits in at least one domain. (Doc. 103 at 105–06). This change in how the adaptive skill areas are grouped makes no difference in this case; as explained below, Mr. Calhoun has significant deficits in at least two skill areas (social skills and academic skills), and those skill areas fall into two domains. (*See* doc. 100-5 at 60–63).

[2] In its earlier opinion, the court noted that, under § 2254(e)(1), Mr. Calhoun needed to rebut the state courts' findings about his lack of intellectual disability by clear and convincing evidence, but that the court would allow him to present evidence outside the state court record as permitted by § 2254(e)(2) because he had diligently attempted to develop the factual basis of his claim in state court. (Doc. 54 at 13, 39). The State's stipulation waives any review under § 2254(e)(1). Even if it did not, the evidence adduced at the hearing clearly and convincingly rebuts the state courts' findings about Mr. Calhoun's lack of intellectual disability.

## II.   FACTUAL FINDINGS

The court's previous memorandum opinion provided a detailed description of the facts and procedural history in this case. (*See generally* doc. 54). This opinion incorporates those facts and procedural history but will repeat only the parts necessary to this discussion.

At the evidentiary hearing, Mr. Calhoun called as witnesses his aunt (Betty Calhoun), his former teacher (Julie Sims), and clinical and forensic psychologist Dr. Mariane Rosenzweig. (Doc. 103 at 14, 20, 42–43, 55). The court found these three witnesses highly credible. The State called as a witness clinical and forensic psychologist Dr. Gregory Prichard. (*Id.* at 182–83). The court found Dr. Prichard credible as well, but found his report and opinions less persuasive than Dr. Rosenzweig's because in forming her opinions, she (1) had access to and reviewed more evidence than Dr. Prichard;[3] (2) interviewed a variety of collateral sources in addition to Mr. Calhoun, while Dr. Prichard interviewed only Mr. Calhoun; (3) based on her opinion the definition of intellectual disability

---

[3] Dr. Rosenzweig based large parts of her opinion on interviews with individuals who did not testify at this hearing. Although her testimony about the content of those interviews is inadmissible hearsay evidence, her opinion based on those interviews is still admissible. *See* Fed. R. Evid. 703 ("If experts in the particular field would reasonably rely on those kinds of facts or data in forming an opinion on the subject, they need not be admissible for the opinion to be admitted."). Moreover, the content of those interviews aided the court in evaluating the helpfulness, reliability, and persuasiveness of Dr. Rosenzweig's opinion. *See id.* The court did not, however, consider the content of the interviews as substantive evidence. The court therefore does not recite the content of the interviews in this opinion.

required under Alabama law, while Dr. Prichard based his on Florida's statute defining intellectual disability; and (4) evaluated Mr. Calhoun in 2008, before he experienced catastrophic medical issues that both she and Dr. Prichard agreed changed his level of intellectual functioning, while Dr. Prichard evaluated him only after those medical issues had occurred. With that in mind, the court finds the following facts.

Mr. Calhoun was born on January 2, 1968 to Patricia Garrett. (Doc. 95-1 ¶ 2; doc. 18-11 at 109). Ms. Garrett had low intellectual functioning; she dropped out of school in third grade because she "could not learn." (Doc. 18-11 at 114). Ms. Garrett had another child, Katie Calhoun, who was intellectually disabled, with an IQ of 51. (Doc. 103 at 126–27; doc. 100-7 at 7). Ms. Garrett also had a sister, Betty Calhoun, who was two weeks younger than Mr. Calhoun. (Doc. 103 at 42–43). Mr. Calhoun lived with Betty Calhoun and her parents when he was six or seven. (*Id.* at 43). Betty Calhoun was placed in special education classes when she was in third or fourth grade based on the results of unspecified testing conducted by someone at her school. (*Id.* at 49–50). The court notes that it was clear from Betty Calhoun's demeanor while testifying that she had difficulty understanding and answering a number of the questions. The court finds that Betty Calhoun has an intellectual disability.

6

Intellectual disability is highly genetic, so Mr. Calhoun "was highly at risk to be born with an intellectual disability." (*Id.* at 128; *see* doc. 100-5 at 13 ("[S]tudies examining the incidence of intellectual disability amongst genetically related family members have consistently found a high degree of heritability, meaning that the likelihood that any individual will be intellectually disabled increases in proportion to the percentage of genes that individual shares with family members who are intellectually disabled.") (citation omitted)). As a child, Mr. Calhoun struggled to understand instructions and required help from his aunt, who was two weeks younger than him. (Doc. 103 at 44–45). He could not do chores without supervision. (*Id.* at 47). And he did not have many friends. (*Id.* at 48).

Mr. Calhoun also struggled academically. He needed help with his homework from Betty and Katie Calhoun, both of whom were intellectually disabled. (*Id.* at 51–52). The only books Betty Calhoun could report Mr. Calhoun reading were *The Cat in the Hat* and *Little Red Riding Hood*. (Doc. 103 at 52).

By sixth grade, when Mr. Calhoun was twelve to thirteen years old, he was in special education classes.[4] (*See* doc. 95-1 ¶ 2; doc. 100-3 at 2; doc. 103 at 97; *see* doc. 95-1 ¶¶ 2, 6–9). He received an A in reading, a C in mathematics, a C in language, an A in spelling, an A in science, and a C in conduct. (Doc. 100-3 at 2).

---

[4] The court takes judicial notice that Mr. Calhoun was a year older than most students in sixth grade. *See* Fed. R. Evid. 201(b)(1).

The following year, Mr. Calhoun entered the seventh grade at Talladega County Training School.[5] (Doc. 95-1 ¶ ). Julie Sims taught special education classes at that school for students with "mild mental retardation." (Doc. 103 at 14–16). Any student placed in her class had been tested and found to be intellectually disabled.[6] (*Id.* at 16, 21–22). Ms. Sims's students' level of ability varied: some could function only at a grade school level and some could eventually achieve a high school equivalency diploma. (*Id.* at 16–17). Mr. Calhoun, his sister Katie, his aunt Betty, and another relative of his named Leander Calhoun were all placed in Ms. Sims's "mild mental retardation" classes at different times. (*Id.* at 20, 22, 26, 49–50; *see id.* at 94; doc. 100-3 at 2).

When Mr. Calhoun was in seventh grade (aged thirteen to fourteen, the age when most students are in eighth grade), he took the Wide Range Achievement Test ("WRAT"). (Doc. 100-3 at 5; *see* doc. 100-4 at 4; doc. 95-1 ¶¶ 6–7; doc. 103 at 97). "The WRAT is a standardized achievement test that measures an individual's ability to read words, comprehend sentences, spell, and perform basic math computations." (Doc. 100-5 at 23). The score indicates the grade level at which the test taker is

---

[5] Despite the name, the Talladega County Training School was a regular grade school. (Doc. 103 at 33–34).

[6] The court credits Ms. Sims's testimony about the nature of the class she taught and how children were placed there over Dr. Prichard's speculation that she taught students with specific learning disabilities. (*See* doc. 104 at 57–58).

performing. (Doc. 103 at 92). Mr. Calhoun's results indicate that Mr. Calhoun read at a 4.1 grade level, spelled at a 3.3 grade level, and did math at a 3.0 grade level. (Doc. 100-3 at 5; doc. 103 at 97).

That year, Mr. Calhoun received a B and an A in English, a C and a B in Social Studies, a B and a C in Math, and a C+ and a B- in Science. (Doc. 95-1 ¶ 6; doc. 100-3 at 4). However, the content of Ms. Sims's classes was "typically" "simplified to correspond to the grade-level functioning that was typical among the students in [her] class" and did not include the same content as regular classes. (Doc. 103 at 18). And special education students "are often graded on a different scale that is more lenient than what is done in a regular classroom," so the grades from a special education class are not equivalent to the grades from a regular class. (*Id.* at 134, 169–70). Given Mr. Calhoun's placement in special education classes, his standardized testing scores, and the testimony about his struggles academically, the court finds that Mr. Calhoun's grades in seventh grade are not an accurate reflection of his academic ability.

The next year, when Mr. Calhoun was in eighth grade (aged fifteen, the age when most students are in ninth or tenth grade), he took several other standardized tests. One of those was the California Achievement Test ("CAT"), another test measuring academic skills. (Doc. 100-3 at 5; doc. 103 at 98). The precise scores are not reported but he performed in the first percentile in reading, the ninth percentile

in spelling, the third percentile in language, and the sixth percentile in math.[7] (Doc. 100-3 at 5).

The other test was the Short Form Test of Academic Aptitude ("SFTAA"). (Doc. 100-3 at 5; doc. 100-5 at 24). Aptitude testing describes a person's functioning on particular abilities or skills. (Doc. 103 at 92). The SFTAA is no longer used, but in the past it served as a proxy for IQ testing. (*Id.* at 99–100; *see* doc. 100-5 at 24 ("According to articles by [a number of authors], [the SFTAA] was sometimes used as a measure of intellectual functioning that generated a score that

---

[7] Dr. Prichard testified that Mr. Calhoun's scores suggest that he was not intellectually disabled because he scored above the second percentile in three subjects. (Doc. 104 at 59–61). Mr. Calhoun objected to this testimony because Dr. Prichard's expert report provided no opinion about the meaning of Mr. Calhoun's CAT scores. (*Id.* at 59). The court reserved ruling on that objection. (*Id.*).

Federal Rule of Civil Procedure 26 requires an expert's report to contain "a complete statement of all opinions the witness will express and the basis and reasons for them." Fed. R. Civ. P. 26(a)(2)(B)(i). And parties must disclose an expert's rebuttal opinion. *See* Fed. R. Civ. P. 26(a)(2)(D)(ii). "If a party fails to provide information . . . as required by Rule 26(a) . . . , the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless." Fed. R. Civ. P. 37(c)(1).

Dr. Prichard's expert report mentions the CAT scores but draws no conclusion and offers no opinion based on those scores. (*See* doc. 100-8 at 9). Indeed, Dr. Prichard's report does not address adaptive functioning at all, instead focusing on intellectual functioning. (*See generally id.*; doc. 104 at 40). And the State did not disclose a rebuttal expert. (Doc. 103 at 187–95). At the hearing, the State asked Dr. Prichard's opinion about the impact of the CAT score to rebut Dr. Rosenzweig's opinion that the CAT scores showed adaptive deficiencies. (*See* doc. 100-5 at 60). The only justification offered by the State was that it was not required to disclose its expert's rebuttal opinions because this was an *Atkins* hearing and Mr. Calhoun bears the burden of proof. (*See* doc. 103 at 187–95). The court does not find that to be a substantial justification for the failure to comply with the rules. The court also does not find the disclosure of the rebuttal opinion during the last moments of the hearing to be harmless. Accordingly, the court **STRIKES** Dr. Prichard's testimony about the import of Mr. Calhoun's CAT scores.

was comparable to that of an IQ score from the administration of a comprehensive test of intellectual functioning, such as the Wechsler Intelligence Scale for Children.")). Mr. Calhoun scored in the first percentile on that test. (Doc. 100-3 at 5; doc. 103 at 99).

Mr. Calhoun received mostly Bs and Cs in eighth grade. (Doc. 100-3 at 4). However, the court again finds that those grades do not accurately reflect Mr. Calhoun's academic abilities, given his scoring in standardized tests and the other evidence about his academic difficulties.

In addition to his academic struggles, Mr. Calhoun had behavioral difficulties. Ms. Sims recalled that on one occasion, Mr. Calhoun grabbed her by the arm and dragged her down a bank. (Doc. 103 at 27). On another occasion, he drew a picture of a penis, signed it, and left it on her desk. (*Id.* at 27). That incident resulted in him being removed from the school and sent to Childersburg Children's Development Center, where he soon dropped out. (*Id.* at 27; doc. 18-1 at 76).

Mr. Calhoun turned eighteen in 1986. (Doc. 95-1 ¶ 13). Although a finding of intellectual disability requires the onset of the disability to have occurred before Mr. Calhoun turned eighteen, *see Perkins*, 851 So. 2d 456, the court will recite evidence about Mr. Calhoun's functioning after that age solely for the sake of evaluating whether it corroborates the evidence from when he was under eighteen.

11

Mr. Calhoun continued to exhibit inappropriate behavior, particularly sexually inappropriate behavior, toward others. For example, after he was expelled from Ms. Sims's class, he spotted her around town and menaced her on several occasions. (Doc. 103 at 38–40). He was convicted of several offenses involving attempted rape and sexual abuse. (*See* doc. 18-11 at 103, 107). And of course, he committed the murder, rape, and burglary underlying his capital convictions. (*See* doc. 54 at 2–4).

Mr. Calhoun lived with his mother his entire adult life unless he was in jail. (Doc. 18-11 at 113). He was unable to complete a job application on his own and relied on the help of others, including his stepfather, to do so. (Doc. 103 at 47). He worked unskilled labor jobs, including as a concrete finisher. (Doc. 18-1 at 172).

Mr. Calhoun's first IQ test was in 1998, when he was thirty years old. (*See* doc. 95-1 ¶ 2; doc. 100-2 at 2). During pretrial proceedings in the capital cases against Mr. Calhoun, Dr. Kathy Ronan, a Ph.D. and certified forensic examiner, evaluated his competence to stand trial and mental state at the time of the offenses. (Doc. 100-2 at 2–9). Although she was not evaluating Mr. Calhoun for intellectual disability, she had a graduate student administer an IQ test because of his history of special education. (*Id.* at 6). By that time, the Weschler Adult Intelligent Scale–Third Edition ("WAIS-III") had been published and would have been the test offering the most accurate IQ score. (Doc. 103 at 77; *see* doc. 100-5 at 34–35).

Dr. Ronan's student administered the previous version of the test, the Weschler Adult Intelligence Scale–Revised ("WAIS-R"), which had been published in 1981. (Doc. 100-2 at 6; *see* doc. 54 at 26 n.3). Mr. Calhoun received a verbal IQ score of 67, a prorated performance IQ score of 68, and a prorated full scale IQ score of 66.[8] (Doc. 100-2 at 6). Dr. Ronan did not analyze Mr. Calhoun's adaptive behavior. (*See generally* doc. 100-2). She noted some attention and memory problems and concluded, based on her student's report and Mr. Calhoun's "inter- and intra- test patterns, as well as his questionable motivation and general presentation, . . . that although he may have intellectual deficits, he likely functions higher than this, probably in the Borderline range." (*Id.* at 6).

In 2000, when Mr. Calhoun was thirty-two years old, Dr. Alvin Shealy performed a psychological evaluation to determine Mr. Calhoun's competency to stand trial, his mental state at the time of the offense, and any potential mitigating factors. (Doc. 100-1 at 2, 5–6; doc. 95-1 ¶ 2). Dr. Shealy noted that Mr. Calhoun could not read well enough to take a written personality and psychopathology test that used a fourth grade reading level. (Doc. 100-1 at 5; doc. 103 at 81).

Dr. Shealy administered only one part of the WAIS-III and therefore did not obtain a full scale IQ score. (Doc. 100-1 at 4; doc. 103 at 79). Dr. Shealy obtained a

---

[8] A prorated score results when the tester does not administer all of the subtests. (Doc. 103 at 76).

verbal IQ score of 58 on the verbal subtest but concluded that Mr. Calhoun might be malingering and "would have scored somewhat higher on the test" because of variability within subtests and discrepancies between his word knowledge during an interview and his responses to vocabulary items on the test. (Doc. 100-1 at 4–5). Dr. Shealy also thought that Mr. Calhoun appeared to malinger on a psychological test. (*Id.* at 5). He ultimately opined that Mr. Calhoun "really was more intelligent than he tried to lead [Dr. Shealy] to believe. . . . [B]ecause of his attempting to present himself as mentally retarded, [Dr. Shealy] concluded that he actually was brighter than that and that he wasn't mentally retarded." (Doc. 18-11 at 123). Dr. Shealy, however, did not evaluate Mr. Calhoun's adaptive behavior. (*See generally* doc. 100-1 at 2–6).

Also in 2000, a probation and parole officer prepared a presentence report about Mr. Calhoun. (Doc. 18-1 at 160, 176). The officer noted his impression that Mr. Calhoun was "functionally illiterate." (Doc. 18-1 at 172).

In 2008, when Mr. Calhoun was forty years old, Dr. Rosenzweig was retained to review Dr. Shealy's mitigation evaluation and to do a new mitigation evaluation. (Doc. 103 at 61–62; doc. 95-1 ¶ 2). She interviewed Mr. Calhoun for over ten hours and spent thirty-two hours interviewing twenty-three people who had known him at different stages of his life. (Doc. 103 at 63). She also administered the Wechsler Adult Intelligence Scale–IV ("WAIS-IV") examination and reported

a full scale IQ score of 61. (Doc. 95-1 ¶ 18). She determined that Mr. Calhoun was not malingering during that test. (Doc. 103 at 91). However, she was not retained to opine about Mr. Calhoun's intellectual functioning and therefore did not evaluate it. (*Id.* at 62).

In 2009, when Mr. Calhoun was forty-one years old, Dr. John Goff, a neuropsychologist, administered the WAIS-IV examination and reported a full scale IQ score of 58. (Doc. 100-4 at 2, 4; doc. 95-1 ¶¶ 2, 19; doc. 103 at 82). He also did two tests for malingering and concluded that "there was no indication of malingering or dissimulation or exaggeration of any sort of cognitive symptomatology." (Doc. 100-4 at 3–4). Mr. Calhoun's scaled scores in every subtest except visual puzzles and arithmetic were in the second percentile or lower. (*Id.* at 4). He scored in the ninth percentile on the visual puzzles subtest and in the fifth percentile on the arithmetic subtest. (*Id.* at 4). Dr. Goff noted that Mr. Calhoun "misidentified a triangle as a 'rectangle'[,] . . . was able to read a sentence at the second-grade level[,] . . . had a little difficulty at the fourth-grade level," and "was not able to perform simple mathematical calculations either mentally or on paper." (*Id.* at 4).

Dr. Goff also administered two subtests from the WRAT, on which Mr. Calhoun scored below the first percentile. (Doc. 100-4 at 4). The approximate grade equivalencies for those scores are 3.2 grade level for word reading and 3.5

grade level for mathematics. (*Id.* at 4–5). "The reading score reflects marginal illiteracy, and in combination his reading and mathematics scores would represent a substantial deficit in regard to functional academics." (*Id.* at 5). Dr. Goff found that Mr. Calhoun was "functioning within the mildly retarded range of psychometric intelligence and towards the middle of that range." (*Id.* at 5).

In 2015, Mr. Calhoun suffered an acute hemorrhagic stroke that required an emergency craniectomy. (Doc. 95-1 ¶ 20). Dr. Rosenzweig and Dr. Prichard agreed that this stroke and other medical issues Mr. Calhoun experienced in the 2010s have affected both his physical and intellectual abilities. (Doc. 100-5 at 19–20; doc. 100-8 at 3, 5–7; doc. 103 at 73, 85–86).

In 2024, Dr. Rosenzweig conducted an intellectual disability evaluation and concluded that Mr. Calhoun had an IQ below 70 and deficiencies in adaptive behavior, both of which manifested before he turned eighteen. (Doc. 103 at 62–63, 66, 125). She based her opinion on the criteria set out in the APA's Diagnostic and Statistical Manual, Fifth Edition ("DSM-V"), and the American Association on Intellectual and Developmental Disabilities ("AAIDD") manual. (*Id.* at 66–67).

With respect to Mr. Calhoun's IQ, Dr. Rosenzweig testified that tests resulting in full scale IQ scores are the best way to assess intellectual functioning. (*Id.* at 149). Additionally, testers should use the current version of the WAIS test because WAIS tests are "normed" when they are first published. (*Id.* at 72). Studies

have shown that, in a phenomenon called the "Flynn effect," scores tend to increase by about .3 points per year after the norming of a test. (Doc. 103 at 72; doc. 100-5 at 35). Both the APA and the AAIDD recognize the Flynn effect.[9] (Doc. 103 at 72). Finally, Dr. Rosenzweig testified that psychologists can test for malingering by doing "tests of effort" or comparing the person's test results against past results. (*Id.* at 88).

Dr. Rosenzweig did not do a new IQ test on Mr. Calhoun in 2025 because Mr. Calhoun's medical problems had caused brain damage such that a new IQ test would not reflect his IQ as it was before he turned eighteen. (*Id.* at 73). However, she testified that psychologists generally expect a person's IQ score to stay within a 95% "confidence interval." (*Id.* at 86–87). So with that principle in mind, she reviewed the complete and partial IQ tests done by Drs. Ronan, Shealy, Goff, and

---

[9] Dr. Prichard testified that he does not believe the Flynn effect should be applied to IQ scores because 0.3 is simply the average of the change in score experienced by people within the studies, making it difficult to apply that number to individuals, and some research shows a "reverse Flynn" effect by which IQ testing conducted on more recent populations shows a lower IQ score than the IQ testing conducted on past populations. (Doc. 104 at 7–10). The court found Dr. Rosenzweig's explanation for why psychologists should apply the Flynn effect more persuasive than Dr. Prichard's explanation for why they should not. (*See* doc. 103 at 72; doc. 100-5 at 35). In particular, the court found unpersuasive the argument that because the Flynn effect is an average of the results of everyone in each of these studies, it cannot be applied to individuals outside the studies. In any event, disregarding the Flynn effect would not change the court's findings in this case. The only IQ scores substantially affected by application of the Flynn effect were Dr. Ronan's student's test (reducing the score from 66 to 61) and Dr. Prichard's test (reducing the score from 58 to 53). (Doc. 103 at 76–77, 84–85). But Dr. Ronan's student's score falls within the confidence interval whether it is adjusted or not (doc. 100-5 at 38), and both Dr. Prichard and Dr. Rosenzweig agreed that Dr. Prichard's test is not useful because Dr. Prichard administered it after Mr. Calhoun had suffered serious medical problems that impacted his intellectual functioning (doc. 100-6 at 2; doc. 100-8 at 6–7).

herself between 1998 (when Mr. Calhoun was thirty) and 2009 (when he was forty-one). (Doc. 100-5 at 25–33; doc. 95-1 ¶¶ 2, 18–19; doc. 100-1 at 2; doc. 100-2 at 2; doc. 100-4 at 4; doc. 103 at 82).

Using the score she obtained when she tested Mr. Calhoun in 2008 as the baseline, Dr. Rosenzweig determined that the confidence interval was 58 to 66 for the full scale IQ score. (Doc. 100-5 at 38; doc. 103 at 87). The full scale IQ score obtained by Dr. Ronan's student in 1998 was 66 or, if adjusted for the Flynn effect, 61, both of which fell within the confidence interval. (Doc. 100-2 at 6; doc. 100-5 at 34–35; doc. 103 at 77). Dr. Shealy did not obtain a full scale IQ score because he administered only one subtest. (*See* doc. 100-1 at 4). The full scale IQ score obtained by Dr. Goff in 2009 was 58, also within the confidence interval. (Doc. 100-4 at 4). The court notes that Dr. Prichard agreed that the tests conducted in the 2000s by Dr. Rosenzweig and Dr. Goff were "credible IQ tests that suggest intellectual disability." (Doc. 104 at 24).

Dr. Rosenzweig acknowledged that Drs. Ronan and Shealy suspected that Mr. Calhoun was malingering but noted that neither performed a test for malingering. (Doc. 103 at 89). By contrast, she, Dr. Goff, and Dr. Prichard all tested for malingering and concluded that Mr. Calhoun did not appear to be malingering. (Doc. 100-4 at 3–4; doc. 100-8 at 11; doc. 100-5 at 38; doc. 103 at 91). Dr. Rosenzweig did not opine that Drs. Ronan or Shealy were incorrect about

18

Mr. Calhoun's malingering, but after reviewing all of the evidence, she concluded that "even if Mr. Calhoun was not putting forth his best effort or deliberately giving wrong answers to some items when tested by Drs. Ronan and Shealy, it appears that the impact would have been no more than to slightly lower some scores," which would not have changed the level of intellectual functioning their testing indicated. (Doc. 100-5 at 39). The court finds this explanation highly persuasive, particularly given Dr. Shealy's administration of only a part of the IQ test, Dr. Ronan's and Dr. Shealy's lack of testing for malingering, their generalized statements about the level at which they suspected Mr. Calhoun could function, and their failure to consider his adaptive functioning. The court also finds persuasive Dr. Rosenzweig's conclusion that Mr. Calhoun had significantly subaverage intellectual functioning. (Doc. 103 at 103; doc. 100-5 at 39).

With respect to adaptive deficits, Dr. Rosenzweig interviewed Mr. Calhoun and twenty-three people who had known Mr. Calhoun. (Doc. 103 at 110–11). Based on these interviews and the school records from Mr. Calhoun's sixth, seventh, and eighth grade years she opined that Mr. Calhoun had difficulty with reading, writing, and arithmetic and difficulty understanding multi-step instructions. (*Id.* at 113–16). Mr. Calhoun also struggled with age-appropriate behavior, perceiving peers' social cues, and social judgment, demonstrated by his lack of friends and the inappropriate drawing that he left for Ms. Sims. (*Id.* at 117–20). Mr. Calhoun needed support to

19

find employment, and when he was employed, he continued to demonstrate difficulty following instructions. (*Id.* at 121–22). In Dr. Rosenzweig's opinion, these deficits showed that Mr. Calhoun had significant deficits in his adaptive behavior. (Doc. 103 at 124). And given the school records and Ms. Sims's testimony about Mr. Calhoun's behavior while in special education classes, Dr. Rosenzweig opined that Mr. Calhoun's adaptive deficits manifested before he turned eighteen. (Doc. 100-5 at 65).

In 2025, when Mr. Calhoun was fifty-seven years old, Dr. Prichard administered the WAIS-IV examination and reported a full scale IQ score of 58. (Doc. 95-1 ¶¶ 2, 21; doc. 103 at 130). The court will not discuss that IQ score any further because Dr. Prichard and Dr. Rosenzweig agree that it is not helpful in evaluating Mr. Calhoun's intellectual functioning before the serious medical issues he experienced in the 2010s. (Doc. 100-5 at 19–20; doc. 100-8 at 3, 5–7; doc. 103 at 73, 85–86). Dr. Prichard did not evaluate Mr. Calhoun's adaptive functioning. (Doc. 104 at 40–41, 55–57). Dr. Prichard was unable to offer an opinion about whether Mr. Calhoun was intellectually disabled, instead opining only that "intellectual disability cannot be substantiated as a valid diagnosis at this time." (Doc. 100-8 at 13) (emphasis omitted).

## III.   DISCUSSION

The question before the court is whether Mr. Calhoun has proved, by a preponderance of the evidence, that he has (1) "significantly subaverage intellectual functioning (an IQ of 70 or below)"; (2) "significant or substantial deficits in adaptive behavior"; and (3) "these problems" manifested before he turned eighteen. *Perkins*, 851 So. 2d at 456. The court finds that he has done so.

### 1.  IQ of 70 or Below

A preponderance of the evidence establishes that Mr. Calhoun's IQ was below 70 both before he turned eighteen and when he committed the capital murder. According to Dr. Rosenzweig, IQ should be evaluated by reference to full scale IQ scores. (Doc. 103 at 149). Each full scale IQ score Mr. Calhoun received before his medical problems in the 2010s resulted in a score below 70. (Doc. 100-2 at 6; doc. 95-1 ¶¶ 18–19). And although Dr. Ronan reported that her graduate student thought Mr. Calhoun might have malingered on the test, she did not conduct any test for malingering, while the other two test administrators did and found no malingering. (*See* doc. 100-2 at 6; doc. 100-4 at 3–4; doc. 103 at 91). Moreover, the court accepts Dr. Rosenzweig's opinion that even if Mr. Calhoun malingered on the test conducted by Dr. Ronan's student, any effect on the score would have been slight because the score still fell within the 95% confidence interval. (Doc. 100-5 at 39). The court also accepts Ms. Sims's testimony that students placed in her special

education class were tested and found to be intellectually disabled (doc. 103 at 16, 21–22), even though the testing itself is not in the record.[10]

The only other IQ testing done before Mr. Calhoun's stroke was Dr. Shealy's partial test from 2000. (Doc. 100-1 at 2, 4). Because Dr. Shealy administered only one subtest, the court does not find that score particularly helpful and gives it little weight. Nevertheless, the court notes that Mr. Calhoun's score on the subtest was 58, well within the level required for a finding of mild intellectual disability. (Doc. 100-1 at 4; doc. 103 at 80). And although Dr. Shealy suspected Mr. Calhoun of malingering, he did not conduct any test of malingering. (*See* doc. 100-1 at 4–5).

The IQ testing conducted between 1998 and 2009 establishes by at least a preponderance of the evidence that Mr. Calhoun had an IQ below 70. The State does not seriously dispute that, but instead argues that this court cannot find that

---

[10] The State argues that in the 1990s, state courts found that Talladega County's school system was underfunded, affecting the education of children with disabilities. (Doc. 109 at 29–31). It also points to a federal case from 1981 involving the Talladega County Board of Education's failure to offer an appropriate individualized education program to a severely intellectually disabled student and two federal cases from 1990 involving the Montgomery County Board of Education's failures to evaluate two emotionally disabled children and eventual placement of those students in inappropriate classes. (*Id.* at 31–32). The State argues that these cases establish that Ms. Sims's testimony that she taught classes for intellectually disabled students is not credible. (*Id.* at 28–29). The court disagrees. The court found Ms. Sims highly credible. She testified that her classroom was adequately staffed, that she taught a class for "mild mental retardation," that students placed in her class underwent testing before that placement, and that Mr. Calhoun and a number of his intellectually disabled relatives were students in her class. (Doc. 103 at 14–16, 20–22, 26, 36). The court will not discredit her testimony based on the existence of a case generally involving the County Board of Education for the county in which she worked, a case involving a completely different student, or two cases involving a completely different county. (*See* doc. 109 at 29–32).

Mr. Calhoun's IQ was below 70 before he turned eighteen because he has no IQ scores from before the age of eighteen. (Doc. 109 at 37). The court disagrees.

As an initial matter, the State offers no authority holding that a defendant or petitioner can prove manifestation of a low IQ before the age of eighteen only with evidence of IQ testing performed before that age. (*See id.* at 37). To the contrary, the evidence indicates that IQ scores generally remain stable absent brain damage of some sort. (*See* doc. 103 at 86–87). There is no evidence that Mr. Calhoun suffered any brain damage until his stroke in the 2010s. (*See* doc. 95-1 ¶ 20). And every full scale IQ score obtained from Mr. Calhoun before that stroke was below 70. (Doc. 100-5 at 38).

In addition, Dr. Rosenzweig testified that achievement testing has a correlation with IQ testing, and Mr. Calhoun performed within the first to ninth percentiles on achievement testing conducted when he was in his early teens. (Doc. 103 at 92; doc. 100-3 at 5). She also testified that a now-defunct standardized test on which Mr. Calhoun scored in the first percentile during his teens was previously used as a proxy for IQ testing. (Doc. 103 at 99–100; doc. 100-5 at 24). The court finds that testimony credible and therefore finds that Mr. Calhoun has established that the IQ testing conducted on him as an adult also establishes that he had an IQ of below 70 before he turned eighteen.

2. Significant or Substantial Deficits in Adaptive Behavior

A preponderance of the evidence establishes that Mr. Calhoun has significant or substantial deficits in at least two adaptive skill areas (functional academics and social/interpersonal skills). *See Perkins*, 851 So. 2d at 456 & n.2 (citing *Atkins*, 536 U.S. at 308 n.3); *Holladay*, 555 F.3d at 1353. As set out above, the evidence establishes that Mr. Calhoun performed extremely poorly on standardized achievement testing conducted in his teens, receiving scores indicating that Mr. Calhoun read at a fourth grade level, spelled at a third grade level, and did math at a third grade level. (Doc. 100-3 at 5; doc. 103 at 98). On other standardized tests, Mr. Calhoun performed in the first to ninth percentiles in reading, spelling, language, and math. (Doc. 100-3 at 5). When tested at the age of forty-one, Mr. Calhoun still read and did math at a third grade level. (Doc. 100-4 at 5). And as the court has found, Mr. Calhoun's grades in his special education classes do not accurately reflect his ability level, given the leniency afforded to special education students. (Doc. 103 at 134, 169–70; *see also id.* at 18). This evidence establishes that Mr. Calhoun had a significant or substantial deficit in functional academics.

Mr. Calhoun also had significant or substantial deficits in social/interpersonal skills. As Betty Calhoun testified, Mr. Calhoun lacked friends as a child. (Doc. 103 at 48). As Ms. Sims testified, Mr. Calhoun behaved inappropriately toward her by grabbing her and by leaving a signed drawing of a penis on her desk. (*Id.* at 27). He

24

continued behaving inappropriately toward her, menacing her on several occasions even after he had left school. (*Id.* at 38–40). And Dr. Rosenzweig credibly testified that, based on her interviews with numerous people who knew Mr. Calhoun when he was a child, his behavior toward others amounted to a significant or substantial deficit with respect to social/interpersonal skills. (*Id.* at 117–20). The court notes as well the evidence from Mr. Calhoun's trial that even as an adult, he lacked social judgment, pulling a gun on a friend as a "joke." (Doc. 18-7 at 99–103). Moreover, as the State points out, Mr. Calhoun behaved inappropriately toward Dr. Ronan during her evaluation of him by grabbing his penis in her sight. (Doc. 100-2 at 5). But the court does not agree with the State that Mr. Calhoun's history of sex-based criminal activity disproves the existence of deficits in his adaptive skills. (*See* doc. 109 at 39–40). The court is satisfied based on the evidence presented that Mr. Calhoun had at least two significant or substantial deficits in his adaptive skills and that those deficits manifested before he turned eighteen.

Because Mr. Calhoun also satisfied the court that he had an IQ below 70 before he turned eighteen and when he committed this crime, the court **FINDS** that Mr. Calhoun is intellectually disabled as that term is defined by Alabama law. He is therefore ineligible for execution. The court **WILL GRANT** his § 2254 petition with respect to the *Atkins* claim and **WILL VACATE** the death sentences.

25

## IV. CERTIFICATE OF APPEALABILITY

When the court enters a final order adverse to the petitioner, the court must also either grant or deny a certificate of appealability. Rules Governing Section 2254 Cases, R. 11(a). This court may issue a certificate of appealability "only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). To make such a showing, a petitioner "must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong," *Slack v. McDaniel*, 529 U.S. 473, 484 (2000), or that "the issues presented were adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell*, 537 U.S. at 336 (quotation marks omitted).

The court will grant relief on Claim One, and so a certificate of appealability is unnecessary as to that claim. However, because the court has denied relief on the remaining claims, the court must decide whether a certificate of appealability is appropriate with respect to any of them. The court concludes that it is not. Accordingly, the court **WILL DENY** a certificate of appealability to Mr. Calhoun with respect to Claims Two through Twenty.

## V.    CONCLUSION

The court **WILL GRANT** the § 2254 petition with respect to the claim that Mr. Calhoun is intellectually disabled and therefore ineligible for the death penalty under *Atkins*. The court **WILL VACATE** the death sentences. The court previously

26

denied all other claims asserted in the § 2254 and **WILL DENY** a certificate of appealability as to those claims.

The court will enter a separate final order.

**DONE** and **ORDERED** this March 25, 2026.

_____

**ANNEMARIE CARNEY AXON**
UNITED STATES DISTRICT JUDGE

27